UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| Blue Willow Inn Restaurant, Inc., et al. | ) | |
| | ) | Case Nos. 10-31267, |
| | ) | 10-31269, 10-31270 and |
| Debtors. | ) | 10-31266 |
| | ) | |
| | ) | Jointly Administered Under |
| | ) | Case No. <u>10-31267</u> |

---

# DISCLOSURE STATEMENT
# FOR DEBTORS' CHAPTER 11 JOINT PLAN

Martha A. Miller, Esq.
Martha A. Miller, P.C.
229 Peachtree Street, N.E.
2415 International Tower
Atlanta, Georgia 30303

Counsel for Debtors


Dated: July 29, 2011

# I. INTRODUCTION

This Disclosure Statement (the "Disclosure Statement") has been prepared pursuant to Section 1125 of the United States Bankruptcy Code on behalf of **Blue Willow Inn Restaurant, Inc., Blue Willow Inn Gift Shop, Inc., Blue Willow Village, Inc. and Billie R. Van Dyke** (hereinafter referred to as "Debtors") in connection with Debtors' solicitation of votes for their Chapter 11 Joint Plan dated July 29, 2011 (the "Plan"). It contains important information about Debtors and the Plan.

In providing this Disclosure Statement to parties in interest, Debtors expressly seek to enable such parties to make an informed judgment on whether to approve or reject the Plan.

This Disclosure Statement contains a summary of the Plan, general information about Debtors and their Chapter 11 cases and important information concerning Debtors' current and future financial condition.

The information contained herein has been prepared by Debtors in good faith, based upon information available to Debtors. Debtors have never caused any of the financial information contained herein to be verified by an audit. However, all financial information was compiled from the records of Debtors.

The description of the Plan contained in this Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself, which has been filed contemporaneously herewith. **Each creditor is encouraged to read, consider and carefully analyze the terms and provisions of the Plan which accompanies this Disclosure Statement**.

The statements contained in this Disclosure Statement are made as of the date hereof, unless another time is specified herein, and delivery of this Disclosure Statement shall not create an implication that there has been no change in the facts set forth herein since the date of this Disclosure Statement and the date the materials relied upon in preparation of this Disclosure Statement were compiled.

Each of the documents attached hereto as attachments, including those exhibits to the Private Placement Memorandum, are incorporated into and are a part of the Disclosure Statement as if set forth in full herein.

This Disclosure Statement may not be relied on for any purpose other than to determine how to vote on the Plan, and nothing contained herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving Debtors or any other party, or be deemed conclusive advice on the tax or other legal effects of the reorganization on holders of claims or interests.

**THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER GOVERNMENTAL AGENCY, NOR HAS THE COMMISSION OR ANY SUCH OTHER GOVERNMENTAL AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN, WHICH IS ANNEXED HERETO AS ATTACHMENT 1, SHOULD BE READ IN ITS ENTIRETY. ADDITIONALLY, IT MAY BE ADVISABLE FOR CREDITORS TO CONSULT THEIR OWN COUNSEL OR OTHER ADVISORS WITH RESPECT TO THE MATTERS CONTAINED HEREIN.**

**NO REPRESENTATIONS CONCERNING THE DEBTORS, THEIR FUTURE BUSINESS OPERATIONS, FINANCIAL CONDITION OR THE VALUE OF THEIR PROPERTY ARE AUTHORIZED BY DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO CREDITORS TO SECURE AN ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION.**

## II. BRIEF DISCUSSION OF CHAPTER 11 OF THE BANKRUPTCY CODE

Under Chapter 11 of the Bankruptcy Code a Debtor is afforded an opportunity to rehabilitate its business and to restructure its financial obligations to its creditors. In some instances, a Debtor may also change the structure of its equity securities ("interests") by canceling one or more classes of equity securities or issuing new securities.

In general, a Debtor files a "Chapter 11 Plan" which sets forth a proposal for settlement of the Debtor's debts. A Debtor's debts are classified as either being unsecured or secured, depending on whether the Debtor has pledged any of its property to the creditor as collateral for the debt.

The Bankruptcy Code (the "Code") requires that certain unsecured debts receive priority in payment over other debts. Examples of unsecured debts entitled to priority are expenses and fees incurred during the Chapter 11, wages and certain employee benefits, certain consumer obligations, and taxes.

The Code requires that a Plan propose full cash payment to all priority unsecured creditors except taxing authorities. Taxes under the Code may be paid over time in installments. Unsecured creditors may receive all or a portion of their claims under a Plan.

A Debtor under Chapter 11 may restructure its secured debt by paying its secured creditors in cash in full or in installment payments. A Debtor may also arrange for a secured creditor's collateral to be sold or surrendered.

In any event, unless the creditors agree differently, a Plan must provide creditors with at least the same consideration which creditors would receive in a liquidation of Debtor under Chapter 7 of the Code.

The Debtor or other proponent of a Plan files the Plan with the Clerk of the Bankruptcy Court. The Code requires that a Plan be accompanied by a Disclosure Statement. The Disclosure Statement must contain a summary of the Plan and sufficient information about the Debtor and its financial affairs to enable a creditor or other party in interest to intelligently determine whether to vote for or against the Plan.

After the Plan and Disclosure Statement are filed, the Court holds a hearing on the adequacy of the Disclosure Statement. If the Court determines that the Disclosure Statement makes proper disclosure, then it is approved and the Plan and Disclosure Statement, along with a ballot are mailed to creditors and equity security holders for vote.

Typically, a date is set by the Court as the last day votes may be counted. The Court also schedules a Confirmation Hearing at which time the votes are counted and the Court hears evidence as to whether the Plan complies with various standards for confirmation under the Code. In order for the Plan to be approved by creditors and interest holders, a vote of two-thirds in amount and a majority in number of creditors of each class of "impaired" creditors who vote must affirmatively vote for the Plan.

If a class of impaired creditors does not accept the Plan, then the Plan may still be confirmed if it is "fair and equitable" respecting such class. The Code defines "fair and equitable" regarding unsecured creditors as generally meaning payment of the entire amount of each creditor's claim or that no class of creditors or interest holders with a lesser priority will receive any consideration under the Plan. Regarding secured creditors, "fair and equitable" generally means that the creditor receives the "indubitable equivalent" of its secured claim or cash or deferred payments with a present value equal to the amount of the secured claim.

When a Plan is confirmed notwithstanding the lack of acceptance of all impaired classes, it is said that the Debtor has effected a "cramdown" of the Plan. "Impaired" means that the creditor or interest holder is not receiving precisely the same rights it was entitled to under its contract with the Debtor. Generally, unless an unsecured creditor receives one hundred percent of its claim in cash, it is said to be impaired.

When a Debtor's Plan is confirmed, the Debtor receives a discharge or release of all indebtedness which it does not pay under the provisions of the Plan. The discharge applies whether or not a creditor received notice of the Chapter 11 proceeding.

## III.  GENERAL INFORMATION AND BACKGROUND CONCERNING DEBTOR

### A.     General Background

There are four related Chapter 11 cases pending in this Court which have been procedurally consolidated: Blue Willow Inn Restaurant, Inc. ("Restaurant") (Case No. 10-31267); Blue Willow Inn Gift Shop, Inc. ("Gift Shop") (Case No. 10-31270); Blue Willow Village, Inc. ("Village") (Case No. 10-31269); and Billie R. Van Dyke (Case No. 10-31266). Mrs. Van Dyke is the sole owner of the corporate debtors and holds legal title to all real property on which the corporate debtors conduct business. The lead business of these affiliated businesses is the Restaurant. The Restaurant, Village and Gift Shop operate on 7.112 acres ("7.112 Acres") in Social Circle, Georgia. The legal descriptions of the three tracts that comprise the 7.112 Acres with a plat map showing the tracts is attached as Attachment 2.

Debtor Blue Willow Inn Restaurant, Inc. was formed in 1992 to renovate a Greek Revival mansion to operate as a restaurant of fine southern cuisine. Through the hard work and talent of its owners, Louis Van Dyke and Billie R. Van Dyke, husband and wife, the Restaurant has earned a national reputation as a citadel of excellent southern food and cookbooks. It has received awards and been profiled in state and national media as has its owners. The Restaurant employs 62 people. Attached hereto as Attachment 3 is an editorial column from the *Covington News*, published April 23, 2011, which highlights the uniqueness of the Restaurant, its wide renown and substantial significance to the community.

The Restaurant's impact on the regional economy is significant. Regional experts report that a destination restaurant like the Blue Willow brings in eight dollars into the region for every dollar spent at the Restaurant. The Restaurant's sales for 2011 year-to-date of $1,092,093.00[1] translate into money to the community of $8,736,744.00, just for the last six months. Between its position as one of the largest employers in Walton County and its economic impact on the region, the Restaurant is of substantial importance to the area.

---

[1] Sales figures are found in Exhibit A to Attachment 5.

The Blue Willow Inn Gift Shop, Inc. ("Gift Shop") was created in 1993 to retail the Van Dyke's cookbooks and Restaurant-related memorabilia and gifts. It adjoins the Restaurant on Tract 2, Attachment 2.

These four affiliated Chapter 11 cases were filed on July 20, 2010 to stop the foreclosure of the real property on which the Debtors operate their businesses. Since the filing, the Debtors have acted as procedurally consolidated debtors-in-possession under 11 U.S.C. §§ 1107(a) and 1108.

The Debtors suffered a staggering loss when Co-Debtor and CEO of the entity-debtors, E. Louis Van Dyke, died unexpectedly on Thanksgiving Eve, 2010. Since the Debtor's inception, Mr. Van Dyke had been the inspiration and operations manager of the entity Debtors' operations. Upon his death, Mr. Van Dyke's widow, Billie R. Van Dyke, assumed operational control of the businesses. Mr. Van Dyke's death made it impossible to propose a plan of reorganization until now.

In June 2007, Debtors Louis Van Dyke and Billie R. Van Dyke, became indebted to Wells Fargo's predecessor, Wachovia Bank, for $490,000.00 secured by Magnolia Hall, a circa 1910 Greek Revival mansion located on 1.2822 acres at 147 N. Cherokee Road, Social Circle, Georgia 30025 ("Magnolia Hall Property"). Magnolia Hall was used as an events and catering facility. On October 9, 2008, the Van Dykes borrowed an additional $100,000.00 from Wells Fargo also secured by the Magnolia Hall Property. The Magnolia Hall debt is guarantied by the Restaurant, Gift Shop, Village and Mrs. Van Dyke. The legal description of Magnolia Hall is in Attachment 4 hereto.

Pursuant to a pending order, Debtors are surrendering Magnolia Hall to the first secured lender on the property, Wells Fargo Bank, N.A. ("Wells Fargo") as being unnecessary to the Restaurant's continued reorganization and burdensome to the reorganization efforts.

On December 4, 2007, all Debtors executed promissory notes or guaranties for a construction loan to build the Village. Security for the construction loan is comprised of the 7.112 Acres upon which is located the Restaurant, Gift Shop, Village and Office Building. All Debtors guarantied the construction loan.

Debtors executed an interest rate swap agreement with Wells Fargo whereby the bank was obligated to make monthly payments to the Restaurant based upon a variable rate on a specified sum and the Debtors were obligated to the bank to make payments based on a fixed rate on the same specified sum. This was a gamble that the Debtors lost resulting in more than $200,000.00 in additional debt secured by the Restaurant, Gift Shop, Village and Magnolia Hall Properties. All obligations of Wells Fargo are cross-collateralized and guarantied by all Debtors.

On June 1, 2009, Debtors E. Louis Van Dyke and Billie R. Van Dyke quit-claimed the 7.112 Acres to the Downtown Development Authority of Social Circle (the "DDA"). As part of conduit loan transactions, the DDA, in turn, assigned its interest to the Georgia Department of Community Affairs ("GDCA"). The GDCA loaned the Debtors $250,000.00 secured by a deed to secure debt filed June 1, 2009. Also, on June 1, 2009, the DDA executed a deed to secure debt to the Georgia Cities Foundation, Inc., which loaned Debtors $250,000.00. On July 23, 2009, the DDA executed a deed to secure debt and assigned title to One Georgia Authority which also invested $250,000.00 in the Debtors. Most of the funds from these governmental creditors were used to pay down the Wells Fargo loan.

The Debtors experienced financial difficulty when, in 2008, construction of the Village was complete. Pre-construction, all seven units of the Village were leased. Due to the unprecedented recession commencing in 2007, by 2008 all of the pre-construction tenants had defaulted on their agreements. As the recession continues, it has been very difficult to lease the Village retail units.

Press reports about an impending foreclosure of the Restaurant Property in mid-2010 caused the Restaurant's business to drop significantly. Such press reports and Mr. Van Dyke's death led to a wide spread misbelief that the Restaurant had closed. In has taken concerted efforts by the owner and staff of the businesses to bring profitability back up to close to 2009 levels.

All Debtors operate from an office located in a former house adjacent to the Restaurant on N. Cherokee Road, Social Circle, Georgia 30025 (the "Office Building"). The Office Building is to be surrendered to the first lien holder, Wells Fargo, as unnecessary to the Restaurant's reorganization and without equity. The Office Building is Tract 1 in Attachment 2.

On March 1, 2011, all real property which had been jointly owned by E. Louis Van Dyke and Billie R. Van Dyke was transferred to Billie R. Van Dyke pursuant to her Years Support Petition filed in the Probate Court of Walton County, Georgia, upon Mr. Van Dyke's death. Pursuant to the Years Support Order, all 2010 property tax obligations were deemed paid. Mr. Van Dyke's personal property was also inherited by Mrs. Van Dyke, including his stock in the Debtor companies.

In March 2011, Debtors engaged a turn-around consultant, J.D. Holmes of Holmes & Associates, Inc. As a result of Mr. Holmes' efforts to build business for the Restaurant while reducing labor and food costs, the Restaurant has been returned to profitability. See Section VI Financial Information below for further detail.

As part of the plan, the Restaurant is issuing a private offering to sell preferred stock in the Restructured Debtor Restaurant with a per share value of $5000.00. The money to be raised will be used to fund the Plan and make certain repairs to the Restaurant. Attachment 5 hereto is the Private Placement Memorandum and supporting exhibits.

## B. Summary of Activities in Debtor's Chapter 11 Case

Debtors' Chapter 11 cases were instituted on July 20, 2010. The cases are pending before the United States Bankruptcy Court, Middle District of Georgia, Athens Division. Debtors have continued in possession of its assets and no Trustee has been appointed.

In conjunction with the Chapter 11 petition filings, Debtors filed several motions seeking what is commonly referred to as "first day" relief. This first day relief was designed to meet the goals of (1) continuing Debtors' business operations in Chapter 11 with as little disruption as possible, (2) maintaining the confidence and support of tenants, employees, and other key constituencies, and (3) establishing procedures for the smooth and efficient administration of the Chapter 11 case. The Court approved the requested first day relief in various orders ("First day Orders") entered on July 30, 2010.

Subsequently, Debtors sought and obtained authority to employ:

a)    the undersigned as its bankruptcy legal counsel;

b)    Chapel and Ward, Inc. as its accountant;

c)    King Industrial Realty as its realtor to market commercial property in Walton County, Georgia;

d)    Germaine Curtain, Esq. as its special counsel for securities matters;

e)    J.D. Holmes of Holmes & Associates, Inc. as its turnaround consultant; and

f)    United Talking Rock Realty as its realtor to market properties owned by Bille R. Van Dyke located in Dawson County, Georgia.

Debtors also sought and successfully obtained authority to use cash collateral of Wells Fargo, in the form of rents, on an interim and final basis, in accordance with a budget.

## IV.  SUMMARY OF THE PLAN

Debtors' Plan provides for the satisfaction of all allowed administrative claims on the Effective Date or as soon as practicable thereafter. As to each administrative claim allowed thereafter, payment will be made as soon as practicable.

Debtors' Plan also provides for the satisfaction of all priority tax indebtedness either in cash or over a five year period in installments with interest as provided in 11 U.S.C. § 1129.

## A.  Claim(s) of Wells Fargo Bank

Wells Fargo holds a first priority security interest on the 7.112 Acres and the Magnolia Hall Property. The Wells Fargo claim of $2,893,124.09 is to be treated as follows. Reorganized Debtors will retain the 2.408 acres, Tract 2 of Attachment 2, secured to Wells Fargo which contain the Restaurant and Gift

Shop. The secured claim for the retained property, including all real estate, personal property and intangibles, is valued at $825,000.00. This secured claim will be paid over ten (10) years at 8% interest in monthly payments of $10,009.53.

Tracts 1 and 3 in Attachment 2 will be surrendered to Wells Fargo for credit on the debt of $500,000.00 on the Village (Tract 3) and $165,000.00 on the Office Building (Tract 1). The Wells Fargo debt balance shall be further reduced by $450,000.00 for credit on Magnolia Hall which has been surrendered to the Bank.

The balance of the Wells Fargo claim, $928,124.09 is undersecured and will be treated as part of Class 2.

Wells Fargo and Mrs. Van Dyke shall execute a reciprocal easement allowing full ingress and egress to the properties to be owned by each and to the retention ponds on Tract 3.

## B. Undersecured and Unsecured Claims

The following creditors have liens subordinate to Wells Fargo on all or part of the 7.112 Acres or on Magnolia Hall: Georgia Department of Community Affairs, One Georgia Authority, Georgia Cities Foundation, Inc., EverHome Mortgage and Sunbelt Builders, Inc. Due to the superior liens held by Wells Fargo, the claims of these creditors will be treated as undersecured claims, as subsets of Class 2.

Undersecured and unsecured claimants will receive a distribution of 4.5% of their allowed claims to be paid in quarterly payments for thirty-six (36) months commencing one month from the Effective Date, without interest.

## C. New Equity Membership Interests

The Blue Willow Inn Restaurant, Inc. is privately enlisting new investors to purchase shares of preferred, voting stock for $5,000.00 per share. Attached as Attachment 5 is the Private Placement Memorandum which sets forth the terms of the offering. The funds raised will be used to fund the Plan and infuse new equity into the Restaurant for improvements.

## D. Funding for the Plan

Funding of the Plan shall derive from the operations of the Restaurant and Gift Shop and infusion of new value from the offering of new stock to investors. The Reorganized Debtors will be owned by Billie R. Van Dyke. Mrs. Van Dyke will continue to earn $52,000.00 per year for her employment as manager. Further, Mrs. Van Dyke will retain her equity interest in the reorganized Debtors. The value of this equity interest will be subject to the new equity preferred membership interests.

## E. Other Plan Provisions

Debtor will reject all executory contracts and unexpired leases not previously rejected. All claims arising from the rejection of any executory contracts and unexpired leases shall be treated as general unsecured claims.

# THE ABOVE SUMMARY IS A BROAD OUTLINE OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH HAS BEEN FILED CONTEMPORANEOUSLY HEREWITH.

## V. DISCUSSION OF BEST INTEREST OF CREDITORS: TREATMENT IN A CHAPTER 11 VS. CHAPTER 7

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Then unsecured creditors are paid from any remaining sales proceeds according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the amount of

total allowed unsecured claims. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

For the Court to be able to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. After considering the effect that a Chapter 7 liquidation would have on the value of the Debtor's estate, including the costs of and claims resulting from a Chapter 7 liquidation, the adverse effect of a forced sale on the prices of Debtor's assets, and, the Debtors have determined that confirmation of the Plan will provide each holder of a claim or interest with a recovery that is no less than each such holder would receive pursuant to liquidation of Debtor's assets under Chapter 7 liquidation.

Attached as Attachment 6 is a liquidation analysis (the "Liquidation Analysis") demonstrating the basis for Debtors' belief as stated herein. Since the Liquidation Analysis has not been audited or reviewed by an independent public accountant, no opinion or any other form of assurance as to its accuracy is expressed. The Liquidation Analysis reflects the Debtors' estimate of the value that may be realized by Reorganized Debtors' estates and the potential recoveries that may be available to holders of allowed claims and allowed equity interests if the Reorganized Debtors' assets were liquidated and the proceeds distributed in accordance with Chapter 7 of the Bankruptcy Code. Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors, are subject to inherent economic and competitive uncertainties and contingencies beyond the control of the Reorganized Debtors, and are based upon assumptions with respect to liquidation decisions that are subject to change. Accordingly, there can be no assurance that the values and costs reflected in the Liquidation Analysis would be realized if the Reorganized Debtors' assets were, in fact, to undergo such a liquidation.

For purposes of the Liquidation Analysis, it is assumed hypothetically that a plan of reorganization could not ultimately be confirmed at the confirmation hearing and, on or about that date, the Chapter 11 case is converted to a Chapter 7 case. In connection with the hypothetical commencement of the Chapter 7 case, it is assumed that the roles of the Debtors terminate on or about the hypothetical conversion date and a Chapter 7 trustee is appointed to, among other things, manage the liquidation process and distribute the liquidation proceeds ultimately realized in accordance with the priorities established by the Bankruptcy Code. In such a case, the Chapter 7 trustee would have to consider,

and ultimately pursue, one or more recovery strategies other than the Plan.

The classification and dollar amounts of estimated allowed claims incorporated within the Liquidation Analysis are subject to modification pending further analysis and the receipt of additional information with respect to such claims.

## VI. FINANCIAL INFORMATION

### A.    Summary of Financial Reports and Projection

Despite the difficulties of the recent past, especially in 2010, the Restaurant is recovering its profitability. Year-to-date in 2011, the Restaurant's profitability is running 5.2%, almost back to the rate pre-foreclosure and pre-bankruptcy, in 2009, when it was 5.7%. The following discussion highlights the historical and *pro forma* financial reports found as exhibits to Attachment 5, the Private Placement Memorandum. These reports demonstrate that by reducing food and labor costs, trimming debt and shedding bankruptcy expenses, the Plan is feasible and in the best interest of creditors.

Mr. Holmes has prepared the exhibits appended to Attachment 5 from the business records and accountant compilations of the Debtors. Attachment 5, Exhibit A, provides income and profit/loss figures from 2008 to 2011 year-to-date. The figures for 2010 demonstrate the impact of the publicity surrounding the threatened foreclosure and bankruptcy. See also, Exhibit B. The numbers for 2011 are on track to approach the profit realized in 2009.

Most of the profits in 2011 have accrued in the last three months through a combination of increased prices and lower costs. As shown on Attachment 5, Exhibit C, food costs as compared to sales have declined from just over 42% in January 2011 to 32% in June as a result of procurement changes. Likewise, as Attachment 5, Exhibit D depicts, labor costs have also declined from just over 40% to 32% sales during the same period. Direct labor costs have declined to 20%. Exhibit D of Attachment 5.

Exhibits E1-E4 of Attachment 5 are *pro forma* financial statements for July through December 2011 demonstrating that the Restaurant can make the payments scheduled in the Plan while timely meeting all ordinary course of business expenses and ending the year with a profit of $2,738.00 (or $29,536.00 after subtracting the on paper loss from the sale of the vehicle). See Exhibit E-1, Attachment 5. It is important to note that total 2011 expenses will include

approximately $97,800.00 in bankruptcy-related costs, plus $2,200 for Magnolia Hall.

This projection is based on the Restaurant's actual revenues for the first half of 2011. Plan proponents believe this is a conservative projection. The Restaurant is undertaking more marketing and advertising to increase the number of guests. Early efforts have focused on social media because it is virtually without cost. The response has been far greater than expected. It is anticipated that a broader based advertising effort will substantially increase customers and further erode the impression that the Restaurant is closed.

Exhibit F of Attachment 5 is a *pro forma* statement projecting 2012 revenues at 90% of those in 2009. Plan proponents believe this is a conservative estimate.

## VII. ANALYSIS OF CLAIMS AND APPROXIMATE DISTRIBUTIONS TO CREDITORS UNDER THE PLAN

### A. Projected Administrative Expenses

Debtors provide the following as an estimate of administrative expenses incurred and to be incurred in connection with confirmation of the Plan and closing of the Bankruptcy Estate:

| | |
|---|---|
| Bankruptcy Counsel fees and expenses | $25,000.00 |
| Accountants' fees and expenses | $ 5,000.00 |
| U.S. Trustee fees through 3rd quarter 2011 | $ 5,200.00 |
| U.S. FoodService Administrative Claim under 11 U.S.C. § 503(b)9) allowed by the Court by Order entered 3/4/11 | $ 11,504.30 |
| Sysco Administrative Claim under 11 U.S.C. § 503(b)(9) allowed by the Court by Order entered 3/4/11 | $ 11,155.59 |
| Other miscellaneous administrative expenses | $    250.00 |

**Total administrative expenses incurred in
connection with confirmation and closing**       $58,109.89

## B.  Projected Priority Claims

As of the date of this Disclosure Statement, the priority claims of the Restaurant and Gift Shop totaling $230,352.65 are as follows:

| Name Of Claimant | Amount Of Claim |
|---|---|
| Internal Revenue Service | |
| Restaurant | $105,035.51 |
| Gift Shop | $ 15,644.15 |
| Georgia Department of Revenue | |
| Restaurant | $109,672.99 |

These claims will be paid on the Effective Date, or as soon thereafter as practical, but in no event later than the end of five (5) years from the Petition Date. If Debtor pays over time, interest will be paid on the claim, not to exceed 7.5% per annum.  All sums paid to the taxing authorities through the Plan for post-petition priority taxes are to be designated to priority tax liabilities only.

## C.  Projected Plan Pay-outs

Projected approximate initial pay-outs under Debtors' Plan are as follows:

| Category or Class of Claim | Initial Payment |
|---|---|
| Administrative Expenses - one time payment | $ 58,105.89 |
| Priority Claims - initial payment | $125,000.00 |

| General Unsecured - initial payment | $ 2,671.00 |
|---|---|
| Wells Fargo first monthly payment | $ 10,009.53 |
| **Total Initial Pay-out** | **$195,786.42** |

## IX. INFORMATION RELEVANT TO THE RISKS POSED TO CREDITORS UNDER THE PLAN

Based on future projections of profitability and the infusion of new capital, Debtors Restaurant and Gift Shop should be able to fund the initial pay-out, as well, the subsequent payments, assuming no catastrophic event occurs to either business.

## X. FEDERAL AND STATE TAX IMPLICATIONS TO CREDITORS

Debtors do not believe that there are any adverse federal and state tax implications to creditors by virtue of the treatment of their claims under the Plan, except to the extent that any creditor has written off all or a portion of its claim against Debtors as a bad debt.

In any event creditors are well advised to consult their tax advisors as to whether the Plan provides any individual adverse tax implications.

## XI. CONCLUSION

Debtors submit that their Plan provides for an orderly and expeditious payment of its indebtedness to its creditors while maintaining a unique and valuable asset to the community. Debtors further submit that the alternative of a Chapter 7 liquidation does not appear to Debtors as a viable method of maximizing recovery to creditors in this case. A pad-locked restaurant is worth far less than an important ongoing concern.

By: _/s/ Billie R. Van Dyke_
Billie R. Van Dyke

ATTACHMENT 1

ATTACHMENT 2

## Exhibit "A"

**Tract I:** All that certain tract or parcel of land situate, lying and being located in **Land Lot 96 of the 1st Land District, City of Social Circle, Walton County, Georgia,** containing **0.862 OF AN ACRE,** being designated as **Tract 1,** as shown on that certain plat of survey entitled "Louis Van Dyke" as prepared by Von Itter & McGee, Inc., dated August 25, 2004, of record in **Plat Book 103, Page 16,** Clerk's Office, Walton Superior Court, which plat of survey is incorporated herein by reference for further description. This being the same property described in Warranty Deed dated January 6, 1992, recorded in **Deed Book 389, Page 312,** Warranty Deed dated May 10, 1993, recorded in **Deed Book 460, Page 143,** Warranty Deed dated June 28, 1996, recorded in **Deed Book 669, Page 60,** Warranty Deed dated November 29, 1996, recorded in **Deed Book 712, Page 328,** Warranty Deed of Gift dated September 11, 2007, recorded in **Deed Book 2797, Page 83,** and Warranty Deed dated July 8, 2003, recorded in **Deed Book 1729, Page 96,** said Clerk's Office.

**Tract 2:** All that certain tract or parcel of land situate, lying and being located in **Land Lot 96 of the 1st Land District, City of Social Circle, Walton County, Georgia,** containing **TWO AND 408/1000THS (2.408) ACRES**, being designated as **Tract 2,** as shown on that certain plat of survey entitled "Louis Van Dyke" as prepared by Von Itter & McGee, Inc., dated August 25, 2004, of record in **Plat Book 103, Page 16,** Clerk's Office, Walton Superior Court, which plat of survey is incorporated herein by reference for further description. This being the same property described in Warranty Deed dated January 6, 1992, recorded in **Deed Book 389, Page 312,** Warranty Deed dated May 10, 1993, recorded in **Deed Book 460, Page 143,** Warranty Deed dated June 28, 1996, recorded in **Deed Book 669, Page 60,** Warranty Deed dated November 29, 1996, recorded in **Deed Book 712, Page 328,** Warranty Deed of Gift dated September 11, 2007, recorded in **Deed Book 2797, Page 83,** and Warranty Deed dated July 8, 2003, recorded in **Deed Book 1729, Page 96,** said Clerk's Office.

**Tract 3:** All that certain tract or parcel of land situate, lying and being located in **Land Lot 96 of the 1st Land District, City of Social Circle, Walton County, Georgia,** containing **THREE AND 842/1000THS (3.842) ACRES,** being designated as **Tract 3,** as shown on that certain plat of survey entitled "Louis Van Dyke" as prepared by Von Itter & McGee, Inc., dated August 25, 2004, of record in **Plat Book 103, Page 16,** Clerk's Office, Walton Superior Court, which plat of survey is incorporated herein by reference for further description. This being the same property described in Warranty Deed dated January 6, 1992, recorded in **Deed Book 389, Page 312,** Warranty Deed dated May 10, 1993, recorded in **Deed Book 460, Page 143,** Warranty Deed dated June 28, 1996, recorded in **Deed Book 669, Page 60,** Warranty Deed dated November 29, 1996, recorded in **Deed Book 712, Page 328,** Warranty Deed of Gift dated September 11, 2007, recorded in **Deed Book 2797, Page 83,** and Warranty Deed dated July 8, 2003, recorded in **Deed Book 1729, Page 96,** said Clerk's Office.



# LEGEND

I.P.F. = IRON PIN FOUND
I.P.S. = IRON PIN SET (1/2" RE-BAR)
R.B.F. = RE-BAR FOUND
R.B.S. = RE-BAR SET
O.T. = OPEN TOP
C.T. = CRIMPED TOP
R/W = RIGHT OF WAY
P.L. = PROPERTY LINE
C.L. = CENTER LINE
B.L. = BUILDING LINE
L.L. = LAND LOT LINE
L.L.L. = LAND LOT LINE
C.W.D. = GEORGIA SCUBA DISTRICT
P. = POWER POLE
-P- = POWER LINE
-X- = FENCE LINE
R. = RADIUS
CHD. = CHORD
TAN. = TANGENT
N/F = NOW OR FORMERLY
D.B. = DEED BOOK
PG. = PLAT BOOK
PG. = PAGE
D.E. = DRAINAGE EASEMENT
S.E. = SEWER EASEMENT
S.F. = FIRE HYDRANT
M.H. = MANHOLE
C.B. = CATCH BASIN
999.0 E. = EXISTING SPOT ELEVATION
999.0 F. = FINISHED SPOT ELEVATION
999.0 P. = PROPOSED SPOT ELEVATION
F.F.E. = FINISHED FLOOR ELEVATION
⇒ = DIRECTION OF SURFACE DRAINAGE

FILED AND RECORDED 10-5-07
AT 12:08 A.M/P.M.
PLAT BOOK 103 PAGE 16
CLERK SUPERIOR COURT  HB
WALTON COUNTY, GEORGIA

50' R/W    GA. HWY 11

SURVEY REFERENCES
MAP 14 PAR 150  BILLIE R. & E. LOUIS VAN DYKE
MAP 14 PAR 120  D.B. 713 PG. 326
               E. LOUIS VAN DYKE
               D.B. 868 PG. 60
MAP 14 PAR 151  BILLIE R. & E. LOUIS VAN DYKE
               D.B. 1059 PG. 35
MAP 14 PAR 122  E. LOUIS VAN DYKE
               D.B. 480 PG. 143
MAP 14 PAR 119  PERRY H. HERNDON
               D.B. 130 PG. 3
MAP 14 PAR 118  INEZ BROWN
               D.B. 460 PG. 454
MAP 14 PAR 115  ROBERTE. & ALICIA C. BAILEY
               D.B. 1231 PG. 49
MAP 14 PAR 116  ROBERTE. & ALICIA C. BAILEY
               D.B. 1077 PG. 452
MAP 14 PAR 113  MICHAEL B. & JOY C. SCARBROUGH
               PG. 595 PG. 38
MAP 14 PAR 152  W.D. PARTEE
               D.B. 29 PG. 422

N/F
W.D. Partee
D.B. 29 PG. 422

TRACT 1
0.862 ACRES
TAX MAP 14, PAR 151

TRACT 2
2.408 ACRES
TAX MAP 14, PAR 150

2 STORY
FRAME
V/BASE

FOUNTAIN

2 STORY BRICK
AND FRAME
RESTAURANT

POOL
CONCRETE

GIFT SHOP

N/F
Michael Boyd &
Joy Scarbrough
D.B. 595 PG. 38

N/F
Robert & Alicia Bailey
D.B. 1077 PG. 452

APPARENT
CORE.

N/F
Robert & Alicia Bailey
D.B. 1231 PG. 49

TRACT 3
3.842 ACRES
TAX MAP 14, PAR 120
TAX MAP 14, PAR 119
TAX MAP 14, PAR 122
COMBINED

N/F
INEZ BROWN
D.B. 460 PG. 454

NORTH DOGWOOD AVE.    50' R/W

I hereby certify that this plat meets the requirements of
the City and the Subdivision Ordinance of the City of
Social Circle, Georgia

Signature _____
Mayor/City Manager, City of Social Circle
Date 5-05-2007

TOTAL AREA = 7.112

GRAPHIC SCALE - FEET
50  0  50  100  150

NOTE:  ALL IMPROVEMENTS NOT SHOWN

## NOTES:

1. The field data upon which this plat is based
   has a closure precision of one foot in 61256
   feet and an angular error of 2" per angle
   point, and was adjusted by LEAST SQUARES.

2. The equipment used to obtain the linear and
   angular measurements was a Topcon GTS-303

3. This plat has been calculated for closure
   and is found to be accurate within one foot
   in 990,326"

NOTE: THE DESCRIBED PROPERTY IS NOT IN
      A DESIGNATED FLOOD HAZARD AREA.

| RECOMBINATION PLAT FOR: | **LOUIS VAN DYKE** | | |
|---|---|---|---|
| LOT:  BLOCK:  S/D: | | UNIT:  PHASE: | |
| LAND LOT(S) 96 | 1st District | WALTON COUNTY, GEORGIA | |
| SCALE:  1" = 50' | CITY OF SOCIAL CIRCLE | DATE: 8/25/04 | |

*Von Itter & McGee, Inc.*
LAND SURVEYORS AND ENGINEERS
2205 HWY. 81 SW
Loganville, Georgia 30052
770-466-4002

JOB NO  04-044RECOMB

ATTACHMENT 3

<u>Print This Article</u>

# Burgess: Blue Willow Inn a local treasure

By Madeline Burgess
Columnist
April 23, 2011

*Two birds flying high,*
*A Chinese vessel, sailing by*
*A bridge with three men, sometimes four,*
*A willow tree, hanging o'er.*
*A Chinese temple, there it stands,*
*Built upon the river sands.*
*An apple tree, with apples on,*
*A crooked fence to end my song.*
(Blue Willow poem from Wikipedia - author unknown)

"Do you realize that we could have named our restaurant the Yellow Brick House? That's what Louis wanted to name it!" according to Billie Van Dyke. He liked naming things after colors, such as "brown dog" or "gray cat." The John Upshaw House (circa 1917) was acquired by the Van Dykes in 1991 for use as a restaurant. It was built with yellow brick exterior walls, hence Louis's proposed name.

"Well, I didn't care for that name, needless to say," Billie continued. "Since Louis and I absolutely loved the "Blue Willow" china pattern, I thought: why not call our restaurant the Blue Willow Inn and, thankfully, our friends agreed."

When Billie and Louis were first married they found a Blue Willow teapot at an antique shop for 25 cents (things were much cheaper then). Louis loved antiques and Billie loved blue and white porcelain. The couple bought a Blue Willow platter next, and as time passed they acquired enough plates for breakfast settings. Louis was working afternoons at that time; so on the weekends they arranged breakfast "dates" using their newly acquired Blue Willow pieces. Many, many Blue Willow pieces later, the restaurant was born and blossomed following a visit by the famous columnist, Lewis Grizzard. It has attracted visitors from all over the world. During the Olympics, the German chancellor made it a point to visit the Blue Willow during his visit to the United States.

Recently, there have been widely circulated reports that the Blue Willow has closed. Nothing could be further from the truth. Like so many businesses, the restaurant has faced its share of recession-induced financial challenges, made even more severe by the untimely and tragic passing of Louis in November. However, the Blue Willow has remained up and running. The restaurant is now under the protection of a Chapter 11 bankruptcy and is working with the court to develop a viable reorganization plan.

In the meantime, Billie is running the show - and oh, what a show it is! Guests at the Blue Willow continue to experience the warm, friendly hospitality and charm of a gracious historic restaurant. They also continue to enjoy the same wonderful Southern cuisine.The restaurant has become a local destination and enjoys the strong, wide-spread support of the Social Circle community. Local residents recently were asked to describe their impressions and feelings about the Blue Willow Inn. These are some of their comments:

• "The Rotary Club of Social Circle has been meeting weekly at the Blue Willow for more than 20 years and every member has enjoyed every meal. I believe that our feelings can be summed up in a comment made recently by Dr. Michelle Plaster upon her return from a three-month military obligation, when she remarked, 'it sure is great to be back with the club and be able to eat at the Blue Willow.' - Frank Sherrill, president, Social Circle Rotary Club

• "The Blue Willow Inn represents the true essence of what makes Social Circle such a wonderful place to live or visit. When you think of The Blue Willow Inn you are immediately reminded of 'a kinder, gentler time' when fellowship and hospitality was a way of life. Enjoying delicious Southern "comfort food" served by a warm friendly staff in a beautiful old South setting with friends and family or business associates is what the Blue Willow Inn is all about." - Jackie Rainwater, development chairman, Better Hometown Business

• "Recently, my daughters were here and the eldest wanted a Blue Willow cookbook. I bought her one at the gift store and before we left Ms. Billie Van Dyke saw it and wrote her a short note and signed it for her. It immediately became her treasured cookbook and she called me a month later to tell me how much she and her husband loved it, and that they had tried a different meal from it almost every night. That type of personal touch leads me to believe that everyone who visits the Blue Willow will get that same down home special treatment that is appreciated and remembered." - City Manager Doug White

• "Since I have lived here my entire life, the Blue Willow is in my memory from years ago. When I was a child I swam in the pool. My oldest brother played little league baseball on the field that is now the parking lot and the large columns on the front porch had beehives in them. So when I visit there now, of course, it is quite different but the memories are still great. I'm glad it's alive and enjoyed by all that come to visit." - Robin Smith, assistant branch manager, Pinnacle Bank

• "It is so nice to be able to treat employees as well as visitors to a meal at the Blue Willow. When we have guests in the school system, their first question is, 'Do we get to eat at the Blue Willow?' We often need a place to accommodate large groups, and we are thankful to have the Blue Willow so conveniently located, offering good food and friendly service." - Barbara Wright, Social Circle City Schools

• "The Blue Willow brings in much revenue to the city. We have a great place to take guests from out of town - the restaurant is known nationwide." - Ollie James, Social Circle resident

• "The Blue Willow is more than a restaurant. It has consistently been a community-minded business and a true partner with our City." - Hal Dally, chairman, Downtown Development Authority of Social Circle

• "The Blue Willow has put Social Circle on the map and it's an important economic engine. Many in this city work there and have taken family and friends there for special occasions. The lovely, well maintained gardens contribute to the beauty of our city." - Crenin Mills, chairman, Social Circle Tree Commission and owner of Flower Mills

• "I've taken the Blue Willow cookbook to South Africa as a gift for friends. Everywhere I go people know about the Blue Willow and, so, it's become an important connection with the world. My daughter and son worked there in the 1990's and it was great for them to have that employment experience in our town." - Jamie Peterson, Social Circle resident

The Blue Willow is now offering "To Go" plates for local customers between 11 a.m. and 2 p.m. daily. The takeout menu changes daily. You can choose a one-meat, three-vegetable plate, a vegetable plate of four vegetables, or a two-meat, three-vegetable plate. All plates include dessert and, of course, there are extras at a nominal cost. Call (770) 404-2131 for the daily menu.

You need to come to Social Circle, "Georgia's Greatest Little Town," and enjoy a delicious meal at the Blue Willow Inn. Or take a Blue Willow "To Go" plate home. You'll be glad you did.

http://www.covnews.com/archives/19291/

ATTACHMENT 4

All that tract or parcel of land lying and being in Land Lot 96 of the First Land District, Walton County, Georgia, located in the City of Social Circle, containing 1.2822 acres, more or less, as shown on a plat of survey for E. Louis Van Dyke and Billie R. Van Dyke, dated September 20, 1995, certified by Gerald T. Batchelor, Ga. R.L.S. No. 2238, which is recorded at Plat Book 67, Page 164, Walton County Records. Said survey and the record thereof are incorporated herein for a more complete description of the subject property.

Said property was conveyed to James C. Snyder and Clafton C. Snyder as joint tenants with right of survivorship by Warranty Deed from Helen J. Simberg dated 11/30/81, recorded at Deed Book 173, Page 146, Walton County Records. James C. Snyder died 10/6/86 a resident of Jefferson County, Alabama.

# ATTACHMENT 5

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## BLUE WILLOW INN RESTAURANT, INC.
294 North Cherokee Road
Social Circle, Georgia 30025

Telephone: (770)-464-2131                              E-mail: jdholmes140@aol.com

An offering of
3% voting, cumulative, non-participating preferred stock

**Maximum Offering Amount: $200,000**          **Minimum Offering Amount: $175,000**
**Price per share of Preferred Stock: $5,000**
**MINIMUM PURCHASE – 1 Share**

Blue Willow Inn Restaurant, Inc., a Georgia corporation (referred to as the "Company"), is offering by means of this Confidential Private Placement Memorandum (this "Memorandum") a minimum of Thirty-five (35) shares of the Company's 3% voting, non-cumulative and non-participating preferred stock (the "Shares") and a maximum of Forty (40) Shares at an offering price of Five Thousand Dollars ($5,000) per Share, with a minimum purchase of One (1) Share for each Investor, for a minimum of One Hundred Seventy-five Thousand dollars ($175,000) (the "Minimum Offering Amount") and a maximum of Two Hundred Thousand dollars ($200,000) (the "Maximum Offering Amount"), to qualified Investors who meet the Investor Suitability Requirements set forth in this Memorandum (see "INVESTOR QUALIFICATION" at page 17). Each Investor must agree and represent that he, she or it is purchasing the Shares for investment purposes only, and not with the intent to resell. Each Investor must execute and deliver to the Company a Subscription Agreement in the form contained as an exhibit to this Memorandum in order to be considered for acceptance as an Investor in the Company.

Unless and until the Company receives and accepts Subscription Agreements to purchase the Minimum Offering Amount of Shares and the court in the Company's bankruptcy proceedings approves the reorganization plan (see: "THE COMPANY'S BUSINESS…Proposed Bankruptcy Plan of Reorganization" at page 13) the Company will not issue any Shares. If the Minimum Offering Amount is not raised by the expiration of the Offering Period, as it may be extended, this Offering will terminate and all Subscription Agreements will terminate.

THESE SECURITIES ARE SPECULATIVE AND INVESTMENT IN THE SHARES INVOLVES A SIGNIFICANT DEGREE OF RISK (SEE "RISK FACTORS" ON PAGE 9-11).

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

|                | Offering Price | Selling Commissions | Proceeds to Company |
|----------------|----------------|---------------------|---------------------|
| Per Share      | $5,000         | $0                  | $5,000              |
| Minimum Shares | $175,000       | $0                  | $175,000            |
| Maximum Shares | $200,000       | $0                  | $200,000            |

The Shares are being offered on a "best efforts, minimum/maximum" basis. This Offering will commence on July 29, 2011, and will end on September 30, 2011, unless extended by the Company in its sole discretion. We reserve the right to terminate the Offering at any time. We will not provide any notice to Investors that we have either terminated or extended the Offering.

The date of this Private Placement Memorandum is July 29, 2011

**Name:** _____          **Offering Memo #** _____

1

# TABLE OF CONTENTS

| | Page |
|---|---|
| IMPORTANT NOTICES.......................................................................................................... | 2 |
| OFFERING SUMMARY......................................................................................................... | 5 |
| RISK FACTORS.................................................................................................................... | 9 |
| USE OF PROCEEDS.............................................................................................................. | 11 |
| DETERMINATION OF OFFERING PRICE............................................................................ | 11 |
| OWNERSHIP OF THE COMPANY....................................................................................... | 11 |
| PLAN OF DISTRIBUTION.................................................................................................... | 11 |
| THE COMPANY'S BUSINESS............................................................................................... | 12 |
| EXECUTIVE OFFICERS AND DIRECTORS........................................................................ | 15 |
| DESCRIPTION OF SECURITIES.......................................................................................... | 16 |
| INVESTOR QUALIFICATION.............................................................................................. | 17 |
| RESTRICTIONS OF TRANSFER......................................................................................... | 17 |
| INDEMNIFICATION ........................................................................................................... | 18 |
| CAPITALIZATION............................................................................................................... | 18 |
| TRANSACTIONS WITH RELATED PERSONS..................................................................... | 18 |
| ADDITIONAL MATERIAL AVAILABLE UPON REQUEST................................................ | 19 |
| EXHIBITS............................................................................................................................. | 20 |
| EXHIBIT A:    ADJUSTED COMPILED FINANCIAL STATEMENTS – YEAR-ENDING 2008, 2009, 2010, & SIX MONTHS 2011<br>EXHIBIT B:    GRAPH OF WEEKLY SALES (2009 THRU 6/30/2011)<br>EXHIBIT C:    GRAPH OF WKLY FOOD COST VS SALES (2011YTD)<br>EXHIBIT D:    GRAPH OF WKLY PAYROLL VS SALES (2011YTD)<br>EXHIBIT E1-E4:    JULY – DECEMBER 2011 PROFORMA STATEMENTS<br>EXHIBIT F1-F4:    2012 PROFORMA STATEMENTS<br>EXHIBIT G1-G4:    6 MOS ENDING 6/30/11 FINANCIAL STATEMENTS<br>EXHIBIT H1-H4:    2010 YEAR-END FINANCIAL STATEMENTS<br>EXHIBIT I:    SUBSCRIPTION AGREEMENT | |

**NOTICE TO GEORGIA RESIDENTS ONLY:** THESE SECURITIES HAVE BEEN ISSUED OR SOLD IN RELIANCE ON PARAGRAPH (6) OF CODE SECTION 10-5-10 OF THE "GEORGIA UNIFORM SECURITIES ACT OF 2008" AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

You are urged to read this Memorandum carefully. You must conduct and rely on your own evaluation of the Company and the terms of this Offering, including the merits and risks involved in making a decision to buy the Shares in the Company.

You and your representatives, if any, will be asked to acknowledge in the Subscription Agreement that you were given the opportunity to obtain additional information and that you did so or elected to waive the opportunity. Any additional information provided will be given in writing and will be provided to all other potential Investors via a supplement to this Offering Memorandum

No representations or warranties of any kind are intended, nor should any be inferred with respect to the economic viability of this investment or with respect to any benefits that may result from an investment in the Shares. The Company and our officers do not in any way represent, guarantee, or warrant an economic gain or profit with regard to our business, or that favorable income tax consequences will flow from an investment in the Shares. We do not in any way represent or warrant the advisability of buying the Shares. Any projections or other forward-looking statements or opinions contained in this Memorandum constitute estimates by us based on sources that we deem to be reliable, but the accuracy of this information is not guaranteed, nor should you consider the information all-inclusive.

You should not consider the contents of this Memorandum as legal, business, or tax advice. Prior to making a decision to buy any Shares, you should carefully review and consider the information contained in this Memorandum and should consult your own attorneys, business advisors and tax advisors as to legal, business and tax related matters concerning this Offering.

RESTRICTIONS ON USE OF THIS MEMORANDUM

This Memorandum is furnished for the sole use of the recipient listed on the cover page hereto, and for the sole purpose of providing information regarding the offer and sale of the Shares described in this Memorandum. In order to help ensure that this Offering is not made to persons we are not familiar with, recipient agrees to keep this information confidential and further agrees not to reproduce.

**The recipient, by accepting delivery of this Memorandum, agrees to return this Memorandum, including all enclosed or attached documents and all other documents provided in connection with this Offering, if recipient does not elect to purchase any of the Shares offered by this Memorandum, to: Blue Willow Inn Restaurant, Inc., Attn: Vice President of Investor Relations, 294 North Cherokee Road, Social Circle, Georgia 30025.**

**We have not authorized any other use of this information. Any distribution of this Memorandum to a person other than representatives of the person or entity named on the cover page**

3

is unauthorized, and any reproduction of this Memorandum or the disclosure of any of its contents to any person of which we are not aware and which may not be an accredited investor, without our prior written consent is prohibited.

The delivery of this Memorandum or other information does not imply that the Memorandum or other information is correct as of any time subsequent to the date appearing on the cover of this Memorandum.

## EXCLUSIVE NATURE OF PRIVATE PLACEMENT MEMORANDUM

The delivery of this Memorandum does not constitute an offer in any jurisdiction to any person to whom such offer would be unlawful in such jurisdiction. You should rely *only* on the information contained in this Memorandum, as it may be supplemented from time to time. The information contained in this Memorandum supersedes any other information provided to potential Investors. We have not authorized any person to provide any information or to make any representations except to the extent contained in this Memorandum. If any such unauthorized representations are given or made, such information and representations must not be relied upon as having been authorized by Blue Willow Inn Restaurant, Inc.

In the event any Investor raises a question about a material issue, the Company will do its best to respond to the request. Any additional information provided that is not covered in this Offering Memorandum will be given in writing and will be provided to all other potential Investors via a supplement to this Offering Memorandum

This Memorandum is not an offer to sell, nor is it seeking an offer to buy, securities in any state where the offer or sale is not permitted. The information in this Memorandum is accurate as of the date on the front cover, but the information may have changed since that date.

## RESTRICTED SECURITIES

The Shares offered by this Memorandum have not been registered with, or approved, by the United States Securities and Exchange Commission, nor have the Shares or this Memorandum been filed with or reviewed by the attorney general of any State or the securities regulatory authority of any State. This Offering is based on the exemption from such registration as set forth in §4(2) and Rule 506 of Regulation D of the Securities Act of 1933, as amended.

The investment described in this Memorandum involves significant risks, and is offered only to Investors who can afford to assume such risks for an indefinite period of time and who agree to purchase the Shares *only* for investment purposes and not with a view toward the transfer, resale, exchange or further distribution of the Shares.

## NO PUBLIC MARKET FOR THE SHARES

There will be no public market for the Shares issued pursuant to this Memorandum. Federal and State securities laws limit the resale or other transfer of the Shares, and it is therefore recommended that each prospective Investor seek counsel should they desire more information about transferring Shares.

The price of the Shares described in this Memorandum has been arbitrarily determined by the Company, and each prospective Investor should make an independent evaluation of the fairness of such price under all the circumstances as described in this Memorandum.

No person is authorized to give any information or make any representation in connection with this Memorandum, except such information as is contained or referenced in this Memorandum. Only information or representations contained or referenced in this Memorandum may be relied upon as having been made by the Company. Prospective Investors who have questions concerning the terms and conditions of this Memorandum or who desire additional information or documentation to verify the information contained in this Memorandum should contact J.D. Holmes, our Vice President of Investor Relations. Projections or forecasts contained in this Memorandum, or other materials, must be viewed only as estimates. Although the projections contained in this Memorandum are based upon assumptions that the Company believes to be reasonable, the actual performance of the Company may depend upon factors beyond the control of the Company. No assurance can be given that the Company's actual performance will match its intended results.

FORWARD-LOOKING STATEMENTS

Certain statements in this Memorandum constitute "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. All statements that address expectations or projections about the future, including statements about development, market position, expected expenditures and financial results, are forward-looking statements. For example, nearly all the disclosure in the "PLAN OF OPERATION" Section of this Memorandum constitutes "forward-looking" statements.

Some of the forward-looking statements may be identified by words like "expects," "anticipates," "plans," "intends," "projects," "indicates," and other similar expressions. Any statements contained herein that are not statements of historical fact may be deemed to be forward-looking statements. These statements are not guarantees of future performance and involve a number of risks, uncertainties, and assumptions. Accordingly, actual results or performance of Blue Willow Inn Restaurant, Inc. may differ significantly (positively or negatively) from forward-looking statements made in this Memorandum. Unanticipated events and circumstances are likely to occur. Factors that might cause such differences include, but are not limited to, those discussed under the heading "RISK FACTORS," which prospective Investors should carefully consider. These factors include, but are not limited to, risks associated with the general economic conditions in the area, the inability of the Investors to "cash out" of their investment, and the risk that the Company will not have sufficient income and available cash to make the payments required by the plan of reorganization submitted by the Company to the Bankruptcy Court on July 29, 2011 (which we will refer to in this document as the "Reorganization Plan") all other expenses of the business and to pay the cash dividend on the Shares. This list of factors is not exclusive. We undertake no obligation to update any forward-looking statements.

EXHIBITS AND INFORMATION AVAILABLE UPON REQUEST

This Memorandum is supplemented by the Financial Statements attached as Exhibits A, G1-G4, & H1-H4, plus Financial Projections attached as Exhibits E1-E4 & F1-F4, and the Subscription Agreement attached as Exhibit I . We will make certain information available to Investors upon request, including our Articles of Incorporation and agreements (if any) with related parties.

---

## OFFERING SUMMARY

In this Memorandum, "Blue Willow Inn Restaurant, Inc.," "Company," "we," "our," and "us" refer to Blue Willow Inn Restaurant, Inc. "You" refers to the reader of this Memorandum. This summary

highlights the information contained elsewhere in this Memorandum. Because this is only a summary, it does not contain all of the information that may be important to you. For a more complete understanding of this Offering, we encourage you to read this entire Memorandum and the documents to which we refer you. You should read this summary together with the more detailed information and financial statements, and the notes to those statements appearing elsewhere in this Memorandum.

**The Company.** Blue Willow Inn Restaurant, Inc. (the "Company" or the "Restaurant") was formed on September 24, 1992 as a Georgia corporation. It is a privately held company owned by members of the Van Dyke family. The Company is in the restaurant business. Our executive offices are located at the Restaurant at:

294 North Cherokee Road
Social Circle, GA 30025
Tel: (770) 464-2131

The Company operated profitably for years.

Over the years, the Van Dykes, the sole shareholders of the Company, expanded the businesses operated on the real property around the Restaurant to include a gift shop, an event facility, and a mixed-use office-retail center with unique tenants offering merchandise not found in area. The gift shop and office retail center are operated as separate corporations owned exclusively by the Van Dykes. The real property on which each of these separate businesses is located is owned by the Van Dykes, personally.

The Van Dykes caused all of these entities (which we will refer to collectively as the "Other Businesses"), and the Company, to guaranty the debt of the other entities (this is also referred to as a "cross guaranty") and pledged all of their respective assets to secure the guarantees. As a result, the secured claims against the Company are approximately Three Million Eight Hundred Thousand Dollars ($3,800,000). Additionally, the Internal Revenue Service and the Georgia Department of Revenue are owed a total of $230,000 by the Company.

As a result of the recent economic recession, the Other Businesses failed in varying degrees and have defaulted on their respective obligations and the Company was called to perform on its guaranty of the $3,800,000.

In order to prevent foreclosure on the Restaurant building and the real property on which it is located, Mr. and Mrs. Van Dyke filed a bankruptcy claim with respect to the Company and the Other Businesses on July 20, 2010.

All of such filings have been consolidated into one case. The Company believes it will be able to continue operating profitably if it can complete a bankruptcy reorganization plan on the terms substantially similar to those described in "THE COMPANY'S BUSINESS....Proposed Bankruptcy Plan of Reorganization" on page 13.

The bankruptcy Reorganization Plan that Company proposes calls for, among other things, that the Company raise a minimum of One Hundred Seventy Five Thousand Dollars ($175,000). It is for this purpose that this Offering is made. A copy of the Reorganization Plan can be obtained from the Company upon request.

**The Offering.** The Shares, which represent equity ownership in the Company, offered by this Memorandum will be issued and sold by the Company for Five Thousand Dollars ($5,000) per Share,

payable in immediately available funds at the time all conditions-precedent to this subscription are achieved. The minimum purchase per Investor is One (1) Share.

**Preferred Stock Terms.**

*3% Annual Dividend*: Each Share will be entitled to a 3% annual cash dividend, which is $150.00 per Share ("3% Cash Dividend"); provided that the Company will only pay the 3% Cash Dividend to the extent it has available net income and cash to do so.

*Voting.* The holders of Shares have the right to vote on any matter relating to the Company, with each Share having one vote and common stock and Shares will vote as one class. Therefore, the holders of the Shares will have a minimum of 25.9 % of the total voting power and a maximum of 28.6% of the total voting power of the Company, which in both cases is a minority percentage of the vote. Consequently, the holders of the Shares will not have the power to control the outcome of any matter presented to the shareholders for a vote.

*Cumulative*:    Any amount of the 3% Cash Dividend not paid in any year due to insufficient net income and cash will accrue and must be paid in following periods before any dividends are paid to the holder of the Company's  common stock. 3% Cash Dividend

*Non-participating*:    After the holder of the Shares have received the entire 3% Cash Dividend for each year, on a cumulative basis, the holder of the Shares are not entitled to receive any additional dividends, even if dividends are paid to the holders of the Company's common stock.

*Meal Coupon Dividend*:    Each holder of a Share is entitled to receive twelve "Meal Coupons" per calendar year. The Meal Coupons entitle the holder to a free meal at the Company. The Meal Coupons must be used in the calendar year to which they relate. The Meal Coupons may be transferred by the holder to any other person. The Company has valued the Meal Coupons based on a formula described in detail on page 16 under "DESCRIPTION OF SECURITIES...Preferred Stock Terms."  As the prices charged by the Company change the value of the Meal Coupons will change. The value of each Meal Coupon for 2011 is $17.64. Each holder of a Share will receive a 1099-DIV to reflect the issuance of the Meal Coupons. The number of Meal Coupons for 2011 will be four (4) due to the relatively short time remaining in the calendar year.

*Callable:* At its sole option, any or all of the preferred shares may be purchased by the Company by paying the shareholder(s) $5,500 per Share for a premium of $500 per share.

*Liquidation preference*:    In the event the Company's assets are liquidated as a result of dissolution of the Company, each holder of a Share will have a priority over the holders of common stock to receive up to five thousand dollars ($5000) from any funds remaining after all debts and other obligations are paid by the Company.

**Management.**

The President of the Company is Mrs. Billie Van Dyke. She and her recently deceased husband founded and operated the Company since its inception in 1992. The President's role in the Company is to oversee the general operation of the Company.  The Company believes that she is recognized as the "face" of the Restaurant, and has come to be known as the "persona" of the Company.

The day to day operations of the Company are managed primarily by William Edgerly, the Vice President-Operations.

JD Holmes is the Vice President- Investor Relations. His role is to spear head the reorganization of the Company resulting from the bankruptcy, and is primarily responsible for raising funds through the sale of securities of the Company.

Patsy Joiner is the Company's Secretary, as well as its office manager.

Shirley Edgerly is the Company's Treasurer, as well as the chief hostess at the Restaurant. She is William Edgerly's wife.

**Investor Qualifications.** We are offering the Shares only to "Accredited" investors, as defined by Regulation D under the Securities Act of 1933, as amended, provided that the Company may agree, in its sole discretion, to issue Shares to a sophisticated, but not accredited Investor. The Company will not sell more than thirty five (35) Shares to investors who are not accredited investors.

Notwithstanding the foregoing, the Company may reject the subscription of any Investor for any reason, in the Company's sole discretion.

**Subscription Agreement.** Each Investor will be required to enter into a Subscription Agreement in the form attached as **Exhibit I** to this Memorandum.

**Minimum Investment.** One (1) Share at Five Thousand Dollars ($5,000).

**Offering Period.** This Offering will commence on or about July 29, 2011, and will terminate on September 30, 2011, unless extended by the Company (see "PLAN OF DISTRIBUTION" at page 11). We reserve the right to terminate the Offering at any time. We will not provide any notice that we have either extended or terminated the Offering. The Company currently intends to continue this Offering until the Maximum Offering Amount is raised.

**Restrictions on Transferability.** The Shares sold in this Offering will be restricted securities under the Securities Act of 1933, as amended, and will not be transferable except in compliance with the Securities Act and applicable state securities laws.

**Summary of Financial Data.** Exhibit A is a year-end, internally-prepared, unaudited adjusted summary of the last three complete years, 2008, 2009, 2010, and 2011YTD using figures from the financial statements compiled by the Company's independent accountant. During 2008 and 2009, much of the Restaurant's expenses were over-burdened by the costs associated with the Village and with Magnolia Hall, the event facility. During 2010, the costs associated with the Bankruptcy filing have also distorted the true financial picture of the restaurant. An attempt has been made in this exhibit to extract the costs associated with the Village, Magnolia Hall, and the bankruptcy to reveal the profitability of the Restaurant by itself in each year.

Exhibit E1-E4 is a six-month income-and-expense projection for the balance of 2011.
Exhibit F1-F4 is a projection for 2012. These projections are based upon historical revenue data, adjusted for anticipated changes in seasonal and economic conditions. We believe them to be conservative estimates.
Exhibit G1-G4 is the Income Statement for the six-month period ending June 30, 2011.

Exhibit H1-H4 is the Income Statement and Balance Sheet for the year ending 12/31/2010 as prepared by the Company's public accounting firm.

## RISK FACTORS

You should carefully consider the risks and uncertainties described below before you decide to buy the Shares. While these are the significant risks and uncertainties we believe are most important for you to consider, you should know that they are not the only ones facing us. If any of the following risks actually occurs, our business, financial condition or results of operations would suffer. In these circumstances, either the Shares will not be issued (See: "THE COMPANY'S BUSINESS.... Bankruptcy" at page 13) the value of the Shares will likely decline, and you could lose all or part of the money you paid to buy our Shares.

## RISKS RELATED TO OUR BUSINESS

### Failure to obtain sufficient votes to Approve the Bankruptcy Reorganization Plan

Our Chapter 11 Reorganization Plan commits the Company to pay a discounted amount to all creditors, with a different discount offered to the different classes of Creditors. (See: "THE COMPANY'S BUSINESS..... Proposed Bankruptcy Plan of Reorganization" at page 13. If we are unsuccessful in obtaining the necessary fifty-percent (50%) of the number of all claimants in a creditor class, representing at least two-thirds (2/3rds) of the total dollar amount of all creditor claims in each class to vote in favor of the Plan, and the bankruptcy court approves our Reorganization Plan, the Company will terminate this Offering and all subscriptions accepted by the Company will be terminated and the Subscription Agreements will become null and void. Consequently, no Shares will be sold to Investors unless and until the Company obtains the necessary consents.

### We may be impacted by general economic conditions.

The restaurant business is susceptible to negative trends in the local and/or regional economies. The success of our business depends on the overall strength of the economy generally. Further deterioration in the local and regional economic climate would adversely affect the restaurant industry, resulting in an adverse impact on the Company's business, financial condition, and results of operations.

## RISKS RELATED TO THIS OFFERING

There is no present market for the Shares. We have arbitrarily set the price of the Shares based on the amount that is needed by the Company and not based on what the Company is worth, based on any method of valuation. The offering price for the Shares should not be considered an indication of the actual value of the Shares and is not based on our net worth or prior earnings. We cannot assure you that the Shares could be resold by you at the offering price or at any other price, and the resale of the Shares is limited by State and Federal securities laws.

### There is no public market for the Shares.

There is currently no public market for any of the Shares and we do not expect a public market will ever develop. Moreover, even if a public market does develop, any sale of our Shares may be made only pursuant to an effective registration statement under Federal and applicable State securities laws or

exemptions from such laws. Consequently, there is no means by which an Investor can recoup the initial investment.

**No Assurance the Dividends will be Paid.**

The holder of Shares are entitled to receive the 3% Cash Dividend (or $150 per Share) annually to the extent of net income after all other obligations have been paid. There is no assurance that the Company will generate net income sufficient to pay all or any portion if the 3% Cash Dividend with respect to any year.

**Tax on Meal Coupons dividend.**

The Company is required by law to issue a 1099-DIV to all holders of Shares to reflect the value of the Meal Coupons, so that each such holder includes the value of the Meal Coupons in the holder's taxable income for such year. The holder of Shares will have taxable income on the value of the Meal Coupons even if they are not used. Further, the holder may not receive any portion of the 3% Cash Dividend in cash, so the holder may not receive sufficing cash to pay the taxes on the value of the Meal Coupons.

**No Ability for "Cashing out" the Investment in the Shares.**

The issuance of the Shares has not been registered with the Securities and Exchange Commission, so the Shares are not publicly traded. Resale of the Shares by the holders must be done in compliance with the Federal and applicable State securities laws and there is no market for such resale. Further, the Company is seeking to reorganize so it can continue operations. It has no plans to sell the business or buyout the holders of the Shares at any time in the future. Consequently, other than a private resale in compliance with an exemption from registration under the Securities laws or the Company offers to buy back the Shares, the holders of Shares have no means to recoup their investment of $5000 per Share. It is not likely that the Company will buy back the Shares.

**3% Cash Dividends May Not be Paid**

The 3% cash annual dividend ($150 per Share) will be paid only if sufficient net income and cash funds are available to do so. While the 3% Cash Dividend is cumulative, so that if a dividend payment is not made in full in any year, the shortfall must be paid in following years before dividends can be made to Mrs. Van Dyke, in her capacity as the holder of all the outstanding common stock. There is no limit on the amount that Mrs. Van Dyke may be paid by the Company as a salary and bonus, in her capacity as the president and CEO of the Company. Consequently, there is no assurance that the 3% Cash Dividend will be paid in any year or at all.

**No Restrictions on Dividends Paid to Holders of Common Stock.**

So long as the 3% Cash Dividend is paid to all holders of Shares with respect to each year on a cumulative basis, all remaining net income may be distributed to the holders of common stock, with no requirement to reserve any funds to pay the 3% Cash Dividend in following years.

**No Right to Proceeds from Sale of Business in Excess of the $5000 Liquidation Preference.**

In the event of a sale of substantially all the assets of the Company, followed by liquidation of the Company, the holders of Shares are entitled to receive up to $5000 per Share plus any accrued and unpaid 3% Cash Dividends, with no right to any funds in excess of the $5000 plus any accrued and unpaid 3% Cash Dividends. If there are insufficient sales proceeds to pay $5000 to each holder of Shares, those

holders will share what is available, up to $5000 per Share. If the sales proceeds are sufficient to pay all holders of Shares $5000 plus any accrued and unpaid 3% Cash Dividends that is all the holders of Shares are entitled to; they will not have any right to any amounts in excess of $5000(plus any accrued and unpaid 3% Cash Dividends) even if there are funds available. All funds in excess of the $5000 (plus and accrued and unpaid 3% Cash Dividends) to each holder of Shares will be paid to the owners of the common stock. Currently, Mrs. Van Dyke owns all shares of common stock.

## USE OF PROCEEDS

**Minimum Offering Amount Raised.** The Gross Proceeds from the Minimum Offering Amount of One Hundred Seventy-five Thousand Dollars ($175,000) will be used as follows:

- One-hundred Twenty-five Thousand dollars ($125,000) will be used to reduce to approximately One Hundred Five Thousand Dollars ($105,000) the outstanding tax obligations owed to the Internal Revenue service and the Georgia Department of Revenue such that the balance can be paid off in forty-four sixty (44) months at approximately $2,700 per month.
- Fifty Thousand dollars ($50,000) will be used to pay Administrative expenses incurred during the pendency of the bankruptcy, and which must be paid on the effective date after confirmation.
- Any excess capital raised, up to the Maximum Offering Amount of Two Hundred Thousand Dollars ($200,000), will be used for working capital for the restaurant.

## DETERMINATION OF OFFERING PRICE

The price of the Shares described in this Memorandum has been arbitrarily determined by the management based exclusively on the One Hundred Seventy Five Thousand it needs for the Plan and the number of Investors that may purchase under a Regulation D offering under the regulations under the Securities Act of 1933, as amended. The value of the Company was not considered in determining the price of the Shares. Each prospective Investor should make an independent evaluation of the fairness of such price under all the circumstances as described in this Memorandum.

## OWNERSHIP OF THE COMPANY

Mrs. Billie Van Dyke owns One Hundred percent (100%) of the common stock of the Company, of which there are 10,000 shares of common stock authorized and 100 issued.

## PLAN OF DISTRIBUTION

**Offering of the Shares.**

The officers of the Company, primarily Mr. Holmes, will offer the Shares to prospective Investors. This Offering is made solely through this Memorandum, and without any form of general solicitation or advertising. The Company, its officers and directors will use their best efforts during the offering period to find eligible Investors who desire to subscribe to the Shares in the Company. These Shares are offered on a "best efforts minimum/maximum" basis, and there is no assurance that any or all of the Shares will be sold. No fees will be paid in connection with this offering.

This Offering will commence on July 29, 2011, and will terminate on September 30, 2011, subject to extension at the discretion of the Company and unless the Maximum Offering Amount has been raised at an earlier time, in which event the Offering will terminate at that point. The Company reserves the right to terminate the Offering at any time. We may not provide any notice that we have extended or terminated the Offering.

## THE COMPANY'S BUSINESS

**General.** The Company was formed on September 24, 1992 to operate a Southern buffet-style restaurant offering lunch and dinner seven days a week. Pricing is "all-inclusive," including non-alcoholic beverages and desserts.

The Company was founded in 1992 by Louis and Billie Van Dyke. The Restaurant, housed in a Greek-Revival mansion of approximately 8,000 square feet at 294 N. Cherokee Road in Social Circle, Georgia, serves a Southern-style buffet with all-inclusive pricing. It has served both ordinary people, as well as celebrities such as Louis Grizzard, actor Carol O'Conner, actor Larry Hagman (aka "J.R. Ewing"), former University of Georgia Head Coach Vince Dooley, and numerous politicians including former Senator Sam Nunn, former Governor Carl Sanders, former Governor Sonny Perdue, and Governor Nathan Deal.

The Company was managed by Louis Van Dyke as President and CEO. His wife Billie, as Vice-president, was the public *persona* of the Restaurant, serving as hostess.

## Other Businesses

*Event Facility.* In 1995, the Van Dykes acquired another mansion at 147 N. Cherokee Road in Social Circle, and named it Magnolia Hall. This building was used as an event facility, with the Company providing the food for events held there. This acquisition of the business of the Event Facility was made by the Company, and the real property was purchased by the Van Dykes, personally. Both acquisitions were financed by Wachovia Bank (now Wells Fargo Bank).

*Gift Shop.* In 1993, the Van Dykes built and own a gift shop on the real estate adjacent to the Restaurant. The gift shop sells memorabilia of the Restaurant and other unique gift items, and served as an enhancement of the Blue Willow "experience." The gift shop is a separate corporation. The assets of that corporation will be acquired by, and all liabilities of that corporation will be assumed by, the Company under the Reorganization Plan.

*Retail-Office Center.* In 2007 the Van Dykes began to develop the land behind the Restaurant into a mixed-use office-retail center with tenants offering merchandise not found otherwise in Social Circle.

*The Company's Guarantees.* Substantially all the financing for the Other Businesses is guaranteed by the Company, and the Company has granted a security interest in substantially all of its assets to secure the guaranty.

*Economic Downturn.* When it was poised to open in 2008, the Village had its necessary tenants signed up. However, the real estate bubble burst, and the tenants defaulted on their lease obligations even before it opened.

Successful at first, the failing economy also had a deleterious effect on the Event Facility Hall, and it was unable to attract enough event business to cover its costs of operation. The Company attempted to cover the costs, including debt service, of the Office-Retail Center and Event Facility, and expended any reserves the Company may have had. The Event Facility ceased operation at the end of 2008.

**Bankruptcy.** To prevent foreclosure of the Company's assets and the building in which the Restaurant is located, the Van Dykes filed for Chapter 11 bankruptcy protection on July 20, 2010 for the Company as well as for the Retail-Office Center, the Event Facility, and the Gift Shop entities, as well as themselves personally, as they own all the real estate on which the Restaurant and the Other Businesses are located.

The Company believes that the negative publicity of the threatened foreclosure and subsequent bankruptcy filing generated the public perception that the Restaurant had gone out of business. Beginning in the summer of 2010, the customer traffic declined significantly from previous years.

On Thanksgiving Eve 2010, Louis Van Dyke passed away unexpectedly. His wife, Billie, assumed the position of chief executive officer. The Company believes that news of Mr. Van Dyke's death increased the perception that the Restaurant had closed its doors. The Restaurant struggled to remain open.

The Restaurant's traffic began to pick up in the Spring of 2011. After losing money in 2010, the Company started making consistent net income in April 2011, and has been profitable since, in spite of being burdened by costs associated with the bankruptcy.

*Turnaround Consultant.* In late March 2011, a turnaround consultant, Mr. J.D. Holmes of Holmes & Associates, Inc., was retained to assist the Company in its restructuring through bankruptcy. Additionally, Mr. Holmes has assisted in the institution of numerous operational and marketing improvements for the restaurant. Mr. Holmes' compensation has been in the form of free meals.

## Proposed Bankruptcy Plan of Reorganization.

Due to its guarantees, the Company is liable to Wells Fargo for approximately Two Million Nine Hundred Thousand Dollars ($2,900,000) and it owes the Internal Revenue Service and the Georgia Department of Revenue are owed a total of approximately Two Hundred Thirty Thousand Dollars ($230,000). The unsecured debt of the Restaurant is approximately $2,100,000, which includes the claims of Wells Fargo and other creditors that had a security interest in collateral, but the collateral is worth less than the debt it secured. Consequently, these creditors hold unsecured claims for their claims in excess of the value of the collateral.

The Company desires to keep the gift shop, as it is complimentary to the operations of the Restaurant.

Plan was filed by the Company on July 29, 2011 and calls for the following:

1. The Company will (i) purchase substantially all the assets of, and assume substantially all the liabilities of, the Gift Shop entity, and (ii) purchase the approximately 2.408 acres on which the Restaurant and Gift Shop operations are located. The purchase price for the 2.408 acres with improvements is proposed to be $825,000, which is proposed to be financed by

Wells Fargo with no money down and a note to be repaid over ten years at 8% interest rate, calling for equal monthly payments of $10,009 over ten years. The proposal is that these note payments will satisfy all "secured" claims against the Company. The balance of the amounts owed to Wells Fargo will be re-classified as "unsecured claims".

2.  The Company will raise a minimum of One Hundred and Seventy Five Thousand Dollars ($175,000) from the sale of preferred stock, pursuant to this Offering Memorandum. One Hundred Twenty-five Thousand Dollars are proposed to be used to reduce the tax liabilities to One Hundred Five Thousand ($105,000), with the balance to be paid with interest over 44 months in monthly installments of approximately $2,700. Fifty Thousand ($50,000) will be used as we exit bankruptcy to pay administrative bankruptcy claims, including the legal fees for bankruptcy counsel, US Trustee fees and two food vendors with "super-priority" claims.

    The general unsecured creditors, of which Wells Fargo is the largest, will receive four-and-one-half percent (4.5%) of their claim paid over three years, without interest, in equal quarterly payments of approximately $8,000.

**Additional Financing.** The Company does not anticipate the need for any additional financing to support its operations after it exits bankruptcy upon completion of the Reorganization Plan. The Board of Directors has sole authority to determine if the Company needs additional financing and to arrange such financing on terms the Board determines to be acceptable.

**Insurance.** The Company maintains sufficient general liability insurance to adequately insure all property. It will continue to maintain adequate insurance.

**Competition.** We believe that the Blue Willow Inn is a unique restaurant concept. Its Southern elegance, housed in a landmark Greek-Revival mansion with its all-inclusive pricing, sets it apart from other restaurants. As such, we believe it has no local competition. Further, based on its reputation we have found that many of our customers travel over 100 miles to eat at the Company. However, if all restaurants are considered, Blue Willow is more expensive that many local eating establishments. The number of restaurants with table service within 5 miles of the Company is about eight. The Company believes that its closest comparable competitor is The Dillard House in Dillard, Georgia, which is approximately 100 miles away.

**Reports to Share Holders.** The Company will distribute annually to each shareholder a financial statement as of December 31 each year. Such statements will include an unaudited compilation balance sheet and income statement disclosing the Company's income and expenses for the completed year. The annual report will be prepared substantially in accordance with Generally Accepted Accounting Principles (GAAP). The Company intends to use an independent certified public accountant for its financial statements, as well as tax returns.

Each shareholder of the Company, or their duly authorized representative, may inspect the books and records of the Company at any time during normal business hours. Each shareholder requesting to inspect the books shall provide at least five (5) business days' prior written notice to the President.

**Litigation.** The Company is not a party to, nor is any of its property subject to any pending legal proceeding at this time, other than the existing Chapter 11 bankruptcy proceedings.

**Off-Balance Sheet Arrangements.** The Company does not have, not is it expected to have, any material "off-balance sheet" arrangements.

## EXECUTIVE OFFICERS AND DIRECTORS

**President and CEO. and Director** Billie Van Dyke, age 74, is the President and Chief Executive Officer of the Company, as well as the sole shareholder. Mrs. Van Dyke is an employee at will and receives an annual salary of $52,000. Mrs. Van Dyke has been working at the Restaurant since she and her now deceased husband founded in 1992. Mrs. Van Dyke has recently filed, personally, as well as for three businesses she owns, including the Company, for protection under the Federal bankruptcy laws. She has not been the subject of a criminal proceeding.

**Vice President and COO and Director.** William "Chip" Edgerly, age 55, has 20 years of experience in the restaurant industry. Until 2006, he was the operations manager of the Company for fifteen years. In 2006, after a dispute with his step-father, Louis, he purchased a tractor-trailer and became an independent contractor for Federal Express. He returned to full-time position as Chief Operating Officer with the Company in March 2011, a few months after his step-father died. He manages the kitchen staff, the purchasing function, and maintenance for the Restaurant. Mr. Edgerly has not filed for protection under the Federal bankruptcy laws or State insolvency laws, nor has he been the subject of a criminal proceeding. He has a high school education.

**Vice President- Investor Relations and Director.** Mr. J.D. Holmes , age 69, of Holmes & Associates, Inc., was retained on March 14, 2011 to assist the Company in its restructuring. Mr. Holmes owns and operates a turn-around consulting firm. Holmes has a Bachelor's Degree in Mechanical Engineering, and a Masters of Business Administration. Beginning in 1975, he was employed for over ten years as a professional turnaround specialist in CEO-level positions. During this period, he turned around three companies in diverse industries. The first of these, a foundry, he successfully engineered through Chapter XI bankruptcy in 1975. In 1985, Holmes formed his own consulting firm, Holmes & Associates, Inc. Mr. Holmes' compensation has been in the form of free meals.

**Secretary.** Patsy Joiner, age 69, serves as the Company's secretary. She also has the role of office manager for the Company. In this capacity, Ms. Joiner keeps the books and accounting records of the Company. She also reconciles the daily cash reports, prepares checks for signature, and makes bank deposits. She joined the Company in 2005.

Ms. Joiner has not filed for protection under the Federal bankruptcy laws or State insolvency laws, nor has he been the subject of a criminal proceeding.

**Treasurer.** Shirley Edgerly, age 49, is the Company's Treasurer, as well as the chief hostess at the Restaurant. She is William Edgerly's wife. Mrs. Edgerly has not filed for protection under the Federal bankruptcy laws or State insolvency laws, nor has she been the subject of a criminal proceeding. She has a high school education.

## DESCRIPTION OF SECURITIES

**The Offering.** The Shares, which represent equity ownership in the Company, offered by this Memorandum will be issued and sold by the Company for Five Thousand Dollars ($5,000) per Share,

payable in immediately available funds at the time all conditions-precedent to this subscription are achieved. The minimum purchase per Investor is One (1) Share per Investor.

**Preferred Stock Terms.**

*3% Annual Dividend*: Each Share will be entitled to a 3% annual cash dividend, which is $150.00 per Share ("3% Cash Dividend"); provided that the Company will only pay the 3% Cash Dividend to the extent it has available net income and cash to do so.

*Voting.* The holders of Shares have the right to vote on any matter relating to the Company, with each Share having one vote and common stock and Shares will vote as one class. Therefore, the holders of the Shares will have a minimum of 25.9 % of the total voting power and a maximum of 28.6% of the total voting power of the Company, which in both cases is a minority of the vote. Consequently, the holders of the Shares will not have the power to control the outcome of any matter presented to the shareholders for a vote.

*Cumulative*: Any amount of the 3% Cash Dividend not paid in any year due to insufficient net income and cash will accrue and must be paid in following periods before any dividends are paid to the holder of the Company's common stock.

*Non-participating*: After the holder of the Shares have received the entire 3% Cash Dividend for each year, on a cumulative basis, the holder of the Shares are not entitled to receive any additional dividends, even if dividends are paid to the holders of the Company's common stock.

*Callable:* At its sole option, any or all of the preferred shares may be purchased by the Company by paying the shareholder(s) $5,500 per Share for a premium of $500 per share.

*Meal Coupon Dividend*: Each holder of a Share is entitled to receive twelve "Meal Coupons" per calendar year, which will be distributed in January of each calendar year. The Meal Coupons entitle the holder to a free meal at the Company. The Meal Coupons must be used for any meal offered by the Restaurant in the calendar year to which they relate. The Meal Coupons may be transferred by the holder to any other person. The Company has valued the Meal Coupons based on a weighted average formula described below. As the prices charged by the Company change the value of the Meal Coupons will change. The weighted average value of the Meal Coupons for 2011 is $70.56. Each holder of a Share will receive a 1099-DIV to reflect the issuance of the Meal Coupons. The number of Meal Coupons for 2011 will be four (4) due to the relatively short time remaining in the calendar year.

The weighted average value of the Meal Dividend is calculated as follows: Each week there are five meals priced at $14.95; four meals priced at $16.95; two meals priced at $23.95; one meal at $18.95; and one meal priced at $19.95. The weighted average meal price for these thirteen opportunities is $17.64 per meal. Therefore, four coupons equates to $70.56 for 2011.

*Liquidation preference*: In the event the Company's assets are liquidated as a result of dissolution of the Company, each holder of a Share will have a priority over the holders of common stock to receive up to five thousand dollars ($5000) from any funds remaining after all debts and other obligations are paid by the Company, including unpaid 3% Cash Dividends relating to any prior year.

The Company expects to issue certificates to evidence the Shares. The certificates will be issued in accordance with the provisions of this Memorandum.

## INVESTOR QUALIFICATION

Prospective Investors who desire to purchase the Shares in this Offering must complete a Subscription Agreement, attached as Exhibit I to this Memorandum, and deliver it to us. Accredited Investors who subscribe for the purchase of Shares should indicate their status as Accredited Investors by marking the applicable paragraph in the Subscription Agreement.

After raising the Minimum Offering Amount, and upon confirmation of the Plan of Reorganization by the bankruptcy court, Preferred Stock certificates will be issued in such names as shall be provided for in the accepted Subscription Agreements, and shall be delivered by us to the Investors as soon as practicable following confirmation by the Court. The certificates for the Shares will be delivered to the address specified in the applicable Subscription Agreement.

The Company reserves the right to accept, or reject, any subscription in whole or in part, in the sole discretion of the Board of Directors.

We are offering the Preferred Stock Shares primarily to "accredited investors" as defined in Rule 501(a) of Regulation D of the Securities Act of 1933, as amended; provided that the Company may accept a subscription from up to thirty five (35) Investors that are not accredited investors, in the sole discretion of the Board of Directors. Joint purchasers must each separately qualify under one or more of the tests. The definition of "accredited investor" is included in the Subscription Agreement attached as Exhibit I to this Memorandum.

We will review the Subscription Agreements with ordinary due diligence and will rely on the representations made by the Investors in the Subscription Agreements in assessing the Investor's ability to qualify as an accredited investor.

## RESTRICTIONS OF TRANSFER

The Shares have not been registered with the Securities and Exchange Commission under the Securities Act of 1933, as amended, and are being offered in reliance upon an exemption under §4(2) and Rule 506 of Regulation D of the Securities Act of 1933, as amended, and the rules and regulations thereunder. The Shares have not been registered under the securities laws of any State and will be offered pursuant to an exemption from registration in each State. A purchaser may transfer or dispose of the Shares only if such Shares are subsequently registered under the Securities Act of 1933, or if an exemption from registration is available, and pursuant to an opinion of counsel acceptable to the Company and its counsel to the effect that the Shares may be transferred without violation of the registration requirements of the Securities Act of 1933, or any other securities laws.

## INDEMNIFICATION

The Company's Articles of Incorporation provide that the Company must indemnify and hold harmless the Officers and Directors, Investors, and other persons, including consultants, from and against any and all claims and demands whatsoever arising in connection with the Company; provided, however, that the Company will not indemnify any person for any liability that results from intentional misconduct or

a knowing violation of law, or for any transaction for which the person received a personal benefit in violation or breach of any provision of a written agreement.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be allowed for the Company's directors and officers and or any employee of the Company pursuant to the foregoing provisions, or otherwise, the Company has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable.

## CAPITALIZATION

The Company's Articles of Incorporation provide that the Company is authorized to issue 10,000 shares of Common Stock, with a par value of $10.00 per share of common stock. There are currently 100 shares issued, all to Mrs. Van Dyke. There are no options or other rights to acquire any securities in the Company.

The Board of Directors of the Company has resolved to authorize preferred stock to provide for this Offering.

The Company is currently insolvent and subject to the jurisdiction of the Bankruptcy Court. For further information regarding the Company's debts, you are encouraged to review the Reorganization Plan, which may be obtained from the Company upon written request.

## TRANSACTIONS WITH RELATED PERSONS

Mrs. Van Dyke is the sole stockholder of the Company's common stock, giving her full rights to elect all directors. As such, Mrs. Van Dyke has ultimate control over the Company. She is currently an at-will employee and entitled to an annual salary of $52,000; however, she can remove the entire board of Directors as well as the officers and can change her compensation in any way she pleases.

Mr. Edgerly is Mrs. Van Dyke's son. He is employed on an at-will basis and is currently entitled to an annual salary of $31,200.

Shirley Edgerly, Mr. Edgerly's wife, serves as chief hostess, and manages the shift hostesses and server staff. She is an at-will employee and is currently entitled to an annual salary of $12,000.

In the event the Company buys the Gift Shop and 2.408 acres of real estate, these purchases will be made from the bankruptcy estate of those businesses, which are also entirely owned by Mrs. Van Dyke. The Company believes that the purchase price for those assets is reasonable.

## ADDITIONAL MATERIAL AVAILABLE UPON REQUEST

This Memorandum is supplemented by the Financial Statements attached as Exhibits A, G1-G4, & H1-H4plus Financial Projections attached as Exhibits E1-E4 & F1-F4, and the Subscription Agreement attached as Exhibit I. Also, we are including Exhibits B, C, and D in order to illustrate revenue and operating improvements made in 2011 to date. We will make certain information available to Investors upon request, including our Articles of Incorporation and bylaws, and agreements (if any) with related parties.

Additionally, you and your representatives, if any, will be asked to acknowledge in the Subscription Agreement that you were given the opportunity to obtain additional information to verify the accuracy of the information contained herein and that you did so or elected to waive the opportunity. Any additional information provided will be given in writing and will be provided to all other potential Investors via a supplement to this Offering Memorandum

You may mail requests for information to:

Blue Willow Inn Restaurant, Inc.
294 N. Cherokee Road
Social Circle, GA 30025
Attn: Investor Relations Director

Or contact: Mr. J.D. Holmes
Investor Relations Director
Tel: (770) 265-4298
E-mail: jdholmes140@aol.com

# EXHIBIT A

### Adjusted Income Statements FY08, FY09, FY10, FY11YTD

Comments:  These income statements have been restated to deduct the non-restaurant costs of the Village, Magnolia Hall, bankruptcy-related, and other non-restaurant expenses.  The purpose is to illustrate the net income generated by the restaurant itself.

| Exhibit "A" | | |
|---|---|---|

| Prepared: | 7/25/2011 |
|---|---|
| Prepared by: | J.D. Holmes |

| BLUE WILLOW INN (RESTAURANT ONLY) |
|---|
| Income Statements (Compilations) |
| *Adjusted to eliminate Magnolia Hall & Bankruptcy Costs.* |
| **Source: Statements from Accountant's Compilations** |

| | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| | | | | (6 months) |
| Net Sales | $ 2,690,569 | $ 2,674,211 | $ 2,371,783 | $ 1,092,093 |
| LESS: Magnolia Hall Revenue | $ (96,386) | $ - | $ - | $ - |
| Net Sales - Blue Willow Restaurant | $ 2,594,183 | $ 2,674,211 | $ 2,371,783 | $ 1,092,093 |
| | | | | |
| Cost of Goods Sold: | $ 944,198 | $ 932,378 | $ 942,778 | $ 394,239 |
| Gross Profit: | $ 1,649,985 | $ 1,741,833 | $ 1,429,005 | $ 697,855 |
| Gross Profit - %: | 63.6% | 65.1% | 60.3% | 63.9% |
| | | | | |
| Expenses - Total | $ 1,881,596 | $ 1,610,517 | $ 1,429,430 | $ 707,237 |
| LESS: Magnolia Hall Expense | $ (85,648) | $ (21,587) | $ (6,402) | $ (2,147) |
| LESS: Loss on Forced Sale of Vehicle | $ - | $ - | $ - | $ (26,798) |
| Net Expense - Restaurant Operation | $ 1,795,948 | $ 1,588,930 | $ 1,423,028 | $ 678,292 |
| | | | | |
| Net Profit/(Loss) - Restaurant - $ | $ (145,963) | $ 152,903 | $ 5,977 | $ 19,563 |
| Net Profit/(Loss) - Restaurant - % | -5.6% | 5.7% | 0.3% | 1.8% |
| | | | | |
| **Extraordinary Expense Add-backs** | | | | |
| Chapter 11 US Trustee Fee | $ - | $ - | $ 4,875 | $ 9,750 |
| Bankruptcy Costs - Miscellaneous | | | | $ 10,000 |
| Bankruptcy Legal & Acctg. Fees | $ - | $ - | $ 9,615 | $ 17,330 |
| | $ - | $ - | $ 14,490 | $ 37,080 |
| | | | | |
| Profit/(Loss) - Restaurant - $ | $ (145,963) | $ 152,903 | $ 20,467 | $ 56,643 |
| Profit/(Loss) - Restaurant - % | -5.4% | 5.7% | 0.9% | 5.2% |

| NOTES |
|---|
| **The purpose of this adjusted compilation is to show the profitability of the restaurant itself without being burdened by extra-ordinary bankruptcy-related and other non-restaurant expenses.** |

1. 2008 expenses are inflated due to spending an unknown amount of money on the Village and Lou's Soda Shop.
2. 2009 profit is inflated to an unknown extent because not paying or accruing suppliers. The restaurant operates on a Cash Basis accounting. Since filing for bankruptcy in mid-2010, all expenses have been paid when due. The restaurant will be on an Accrual Basis in 2012.
3. 2010 sales revenues fell dramatically on notice of foreclosure and bankruptcy filing.
4. 2011 six-month profit excludes $26,798 loss on forced sale of Lexus.

# EXHIBIT B

## Graph of Weekly Sales (2009 thru 6/30/2011)

Comments:   This graph shows the weekly net sales since January 2009, which is prior to the threats of foreclosure and ultimately the bankruptcy filing and Louis Van Dyke's death.  The polynomial trendline illustrates the decline in revenues in 2010, which we believe were caused by the perception that the Blue Willow was closed.

Exhibit B

## Blue Willow Inn Restaurant
## Jan 2009 - July 2011

$90,000.00
$80,000.00
$70,000.00
$60,000.00
$50,000.00
$40,000.00
$30,000.00
$20,000.00
$10,000.00
$-

1/11/2009
2/11/2009
3/11/2009
4/11/2009
5/11/2009
6/11/2009
7/11/2009
8/11/2009
9/11/2009
10/11/2009
11/11/2009
12/11/2009
1/11/2010
2/11/2010
3/11/2010
4/11/2010
5/11/2010
6/11/2010
7/11/2010
8/11/2010
9/11/2010
10/11/2010
11/11/2010
12/11/2010
1/11/2011
2/11/2011
3/11/2011
4/11/2011
5/11/2011
6/11/2011
7/11/2011

Net Sales
Poly. (Net Sales)

# EXHIBIT C

## Graph of Wkly Food Cost vs Sales (2011 YTD)

Comments:   Since January 2011 average food cost have declined from about 42% of sales to 32% of sales.  This is largely due to improved procurement and a 13% price increase in May.

Exhibit _C_



# Wkly Food Cost vs Sales %

# EXHIBIT D

### Graph of Wkly Payroll vs Sales (2011 YTD)

<u>Comments:</u>   Since January 2011 average gross payroll has declined from about
40% to 32% as a result of a few layoffs, and better control.  Of this percentage,
Direct Labor has declined to 20% of revenues and holding.

Exhibit __D__



Wkly Payroll vs Sales %

— Payroll vs Sales %

— Linear (Payroll vs Sales %)

80.0%
70.0%
60.0%
50.0%
40.0%
30.0%
20.0%
10.0%
0.0%

01/09/11    03/09/11    05/09/11    07/09/11

# EXHIBIT E

## July – December 2011 ProForma Statements

Comments:  The revenue assumptions for this six-month ProForma are that they will average at midway between 2009 and 2010 revenues for the same months. We believe this to be a conservative estimate since 2011 revenues are approaching 2009 levels.

# Exhibit E1



| | |
|---|---|
| BLUE WILLOW INN RESTAURANT, INC. | |
| ProForma 6 Months 2011 | |
| Assumes $175,000 in Pfd Stock | |

| | | Updated: | 7/26/2011 |
|---|---|---|---|
| | | Prepared by: | JD Holmes |

| INCOME STATEMENT | NOTES | 2011 June | 2011 July | 2011 August | 2011 September | 2011 October | 2011 November | 2011 December | 2011 7-Mo Total |
|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | |
| Restaurant Gross Revenue (Net) | A | $ 181,040 | $ 175,000 | $ 178,000 | $ 185,586 | $ 162,331 | $ 215,349 | $ 215,023 | $ 1,312,328 |
| [Revenue per week] | | $ 41,811 | $ 40,416 | $ 41,109 | $ 42,860 | $ 37,490 | $ 49,734 | $ 49,659 | |
| **VARIABLE COSTS** | | | | | | | | | |
| Cost of Sales (Incl. cooking oil) | B | $ 56,502 | $ 56,000 | $ 56,960 | $ 59,387 | $ 51,946 | $ 68,912 | $ 68,807 | $ 418,514 |
| Direct Labor | C | $ 29,206 | $ 35,000 | $ 35,600 | $ 37,117 | $ 32,466 | $ 43,070 | $ 43,005 | $ 255,464 |
| Payroll Tax on DL (9.0%) | | $ 2,629 | $ 3,150 | $ 3,204 | $ 3,341 | $ 2,922 | $ 3,876 | $ 3,870 | $ 22,992 |
| General Supplies | D | $ 3,816 | $ 5,058 | $ 5,144 | $ 5,363 | $ 4,691 | $ 6,224 | $ 6,214 | $ 36,511 |
| Creditcard Fees | E | $ 4,195 | $ 3,343 | $ 3,400 | $ 3,545 | $ 3,101 | $ 4,113 | $ 4,107 | $ 25,803 |
| Total V.C.: | | $ 96,349 | $ 102,550 | $ 104,308 | $ 108,753 | $ 95,126 | $ 126,194 | $ 126,004 | $ 759,283 |
| | | | | | | | | | |
| Gross Margin - $ | | $ 84,692 | $ 72,450 | $ 73,692 | $ 76,832 | $ 67,205 | $ 89,154 | $ 89,020 | $ 553,045 |
| Gross Margin - % | | 46.8% | 41.4% | 41.4% | 41.4% | 41.4% | 41.4% | 41.4% | 42.1% |
| | | | | | | | | | |
| **FIXED GS&A COSTS** | | | | | | | | | |
| Salaries - Admin. (incl Contract Labor) | F | $ 21,899 | $ 24,294 | $ 24,294 | $ 24,294 | $ 24,294 | $ 24,294 | $ 24,294 | $ 167,661 |
| Payroll Tax on Salaries (9.0%) | | $ 2,650 | $ 2,186 | $ 2,186 | $ 2,186 | $ 2,186 | $ 2,186 | $ 2,186 | $ 15,769 |
| Advertising/Promotional | Z | $ 124 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 18,124 |
| Bank Charges | Z | $ - | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 300 |
| Depreciation Expense | G | $ 314 | $ 314 | $ 314 | $ 314 | $ 314 | $ 1,967 | $ 1,967 | $ 5,504 |
| Dishwash Lease & Supplies | Y2 | $ 1,893 | $ 796 | $ 796 | $ 796 | $ 796 | $ 796 | $ 796 | $ 6,668 |
| Dues & Subscriptions, Biz Licenses | Y1 | $ - | $ 215 | $ 215 | $ 215 | $ 215 | $ 215 | $ 215 | $ 1,287 |
| Interest expense - WF | H | $ 20,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 5,500 | $ 5,470 | $ 70,970 |
| Interest expense - Priority Claims | J | | | $ - | $ - | $ - | $ 637 | $ 624 | $ 1,260 |
| Insurance | K | $ 9,151 | $ 5,678 | $ 5,678 | $ 5,678 | $ 5,678 | $ 5,678 | $ 5,678 | $ 43,216 |
| Laundry/Uniforms & Ee Uniform Svc | Y1 | $ 1,363 | $ 1,840 | $ 1,840 | $ 1,840 | $ 1,840 | $ 1,840 | $ 1,840 | $ 12,403 |
| Maintenance & Repairs (incl Landscape) | Z | $ 3,509 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 27,509 |
| Miscellaneous Expense | Z | $ 733 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 7,933 |
| Office Supplies & Expense | Y1 | $ 1,341 | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 | $ 1,400 | $ 9,739 |
| Professional Fees - Accounting | Z | $ 1,143 | $ 1,200 | $ 2,600 | $ 1,200 | $ 1,200 | $ 400 | $ 400 | $ 8,143 |
| Professional Fees - Legal | L | $ - | $ - | $ - | $ - | $ - | $ 51,000 | 0 | $ 51,000 |
| Professional Fees - UST | M | $ - | $ 4,875 | $ - | | $ 4,875 | | | $ 9,750 |
| Property Tax & AdValorem Tax | N | $ 550 | $ 550 | $ 550 | $ 550 | $ 550 | $ 550 | $ 550 | $ 3,850 |
| Telephone | Y1 | $ 943 | $ 750 | $ 750 | $ 750 | $ 750 | $ 750 | $ 750 | $ 5,445 |
| Utilities | Y1 | $ 8,939 | $ 7,962 | $ 7,962 | $ 7,962 | $ 7,962 | $ 7,962 | $ 7,962 | $ 56,713 |
| Vehicle Expense | Y1 | $ 134 | $ 501 | $ 501 | $ 501 | $ 501 | $ 501 | $ 501 | $ 3,142 |
| Website Maintenance | Y1 | $ - | $ 205 | $ 205 | $ 205 | $ 205 | $ 205 | $ 205 | $ 1,233 |
| Total Fixed SG&A: | | $ 74,685 | $ 71,016 | $ 67,541 | $ 66,141 | $ 71,016 | $ 114,131 | $ 63,088 | $ 527,618 |
| | | | | | | | | | |
| Net Profit - $ | | $ 10,007 | $ 1,434 | $ 6,151 | $ 10,691 | $ (3,811) | $ (24,977) | $ 25,931 | $ 25,427 |
| Net Profit - % | | 5.5% | 0.8% | 3.5% | 5.8% | -2.3% | -11.6% | 12.1% | 1.9% |

| BALANCE SHEET | | 2011 | 2011 | 2011 | 2011 | 2011 | 2011 | 2011 |
|---|---|---|---|---|---|---|---|---|
| ASSETS | | June | July | August | September | October | November | December |
| **Current Assets** | | | | | | | | |
| Cash - Operating Account | R | $ 32,775 | $ 35,073 | $ 42,088 | $ 53,643 | $ 50,696 | $ 64,151 | $ 77,209 |
| Total Cash on Hand - EOM: | | $ 32,775 | $ 35,073 | $ 42,088 | $ 53,643 | $ 50,696 | $ 64,151 | $ 77,209 |
| | | | | | | | | |
| Security Deposits | | $ 1,740 | $ 1,740 | $ 1,740 | $ 1,740 | $ 1,740 | $ 1,740 | $ 1,740 |
| Inventory | | $ 14,120 | $ 14,120 | $ 14,120 | $ 14,120 | $ 14,120 | $ 14,120 | $ 14,120 |
| Total Current Assets: | | $ 48,635 | $ 50,933 | $ 57,948 | $ 69,503 | $ 66,556 | $ 80,011 | $ 93,069 |
| | | | | | | | | |
| **Fixed Assets** | | | | | | | | |
| Land | | $ - | $ - | $ - | $ - | $ - | $ 200,000 | $ 200,000 |
| Buildings | | $ - | $ - | $ - | $ - | $ - | $ 625,000 | $ 625,000 |
| Equipment & Furnishings | | $ 278,336 | $ 278,336 | $ 278,336 | $ 278,336 | $ 278,336 | $ 278,336 | $ 278,336 |
| Less: Cum. Depreciation | | $ (222,053) | $ (222,367) | $ (222,681) | $ (222,995) | $ (223,309) | $ (225,276) | $ (227,244) |
| Net Fixed Assets: | | $ 56,283 | $ 55,969 | $ 55,655 | $ 55,341 | $ 55,027 | $ 878,060 | $ 876,092 |
| | | | | | | | | |
| Total Assets: | | $ 104,917 | $ 106,902 | $ 113,603 | $ 124,844 | $ 121,583 | $ 958,071 | $ 969,162 |
| | | | | | | | | |
| **LIABILITIES** | | | | | | | | |
| **Current Liabilities** | | | | | | | | |
| Accounts Payable | P | $ 226,079 | $ 226,079 | $ 226,079 | $ 226,079 | $ 226,079 | $ - | $ - |
| Taxes Payable - Georgia | J | $ 134,741 | $ 134,741 | $ 134,741 | $ 134,741 | $ 134,741 | $ - | $ - |
| Taxes Payable - IRS | J | $ 109,697 | $ 109,697 | $ 109,697 | $ 109,697 | $ 109,697 | $ - | |
| Accrued Property Taxes | N | $ 3,300 | $ 3,850 | $ 4,400 | $ 4,950 | $ 5,500 | $ 6,050 | $ 550 |
| | | | | | | | | |
| Total Current Liabilities: | | $ 473,817 | $ 474,367 | $ 474,917 | $ 475,467 | $ 476,017 | $ 6,050 | $ 550 |
| | | | | | | | | |
| **Long-term Liabilities** | | | | | | | | |
| Notes Payable - Wells Fargo | | $ - | $ - | $ - | $ - | $ - | $ 825,000 | $ 820,490 |
| Notes Payable - IRS & GDOR | J | $ - | $ - | $ - | $ - | $ - | $ 105,353 | $ 103,255 |
| Notes Payable - Unsecured Claims | P | $ - | $ - | $ - | $ - | $ - | $ 98,415 | $ 95,681 |
| Total Long-term Liabilities: | | $ - | $ - | $ - | $ - | $ - | $ 1,028,768 | $ 1,019,427 |
| | | | | | | | | |
| **EQUITY** | | | | | | | | |
| Capital | | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 |
| Capital - Preferred Stock | S | $ - | $ - | $ - | $ - | $ - | $ 175,000 | $ 175,000 |
| Retained Earnings | | $ (356,717) | $ (356,717) | $ (356,717) | $ (356,717) | $ (356,717) | $ (229,053) | $ (229,053) |
| Dividends - Preferred | S | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Dividends - Common | U | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Net Income/(Loss) | | $ (12,682) | $ (11,248) | $ (5,097) | $ 5,594 | $ 1,783 | $ (23,194) | $ 2,738 |
| Total Stockholders' Equity: | | $ (368,899) | $ (367,465) | $ (361,314) | $ (350,623) | $ (354,434) | $ (76,747) | $ (50,815) |
| | | | | | | | | |
| Total Liabilities & Equity: | | $ 104,918 | $ 106,902 | $ 113,603 | $ 124,844 | $ 121,583 | $ 958,071 | $ 969,162 |
| Verification of Balance | | $ (0) | $ - | $ - | $ - | $ - | $ - | $ - |

# Exhibit E3

## NOTES TO PRO FORMA STATEMENTS

**A. Revenues projected as follows:**

Based upon July thru December 2011 being mid-way between revenue generated in same months of 2009 and 2010. June actual.

| | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|
| | $ 180,902 | $ 175,000 | $ 178,000 | $ 185,586 | $ 162,331 | $ 215,349 | $ 215,023 |

**B. Assumes food cost at % of sales average.** | 32.0% |

**C. Assumes direct labor average % of sales.** | 20.0% |

**D. General Supplies average % of sales.** | 2.89% |

**E. Creditcard fees average % of sales.** | 1.91% |

**F. Administrative Salaries:**

| | | Wkly | Monthly | Annual |
|---|---|---|---|---|
| Billie Van Dyke | Owner | $ 1,000.00 | $ 4,330 | $ 52,000 |
| William "Chip" Edgerly | GM | $ 300.00 | $ 1,299 | $ 15,600 |
| Patsy Joiner | Bkpr | $ 687.52 | $ 2,977 | $ 35,751 |
| Dominick Stella | Kitchen Mgr | $ 1,043.15 | $ 4,517 | $ 54,244 |
| Kathy Gulney | Asst Mgr | $ 520.00 | $ 2,252 | $ 27,040 |
| Carrie Humphrey | Asst Mgr | $ 663.82 | $ 2,874 | $ 34,519 |
| Tom Van Dyke | Scheduler | $ 375.00 | $ 1,624 | $ 19,500 |
| Shirley Edgerly | Recep | $ 217.50 | $ 942 | $ 11,310 |
| Troy Mullinax | Maint | $ 340.00 | $ 1,472 | $ 17,680 |
| William Van Dyke | Maint | $ 101.16 | $ 438 | $ 5,260 |
| Matthew Whitney - 3 days/wk | Landscape | $ 362.40 | $ 1,569 | $ 18,845 |
| **Total Fixed Salaries:** | | $ 5,610.55 | $ 24,294 | $ 291,749 |

**G. Depreciation expense assumes building straight-line depreciation:**

Currently depreciating at $313.92 per month thru Oct.

| | Purch. Price | Term | Annual | Monthly | |
|---|---|---|---|---|---|
| Land | $ 200,000 | 0 | 0 | 0 | |
| Bldg | $ 625,000 | 31.5 | $ 19,841 | $ 1,653 | Assumes real estate valued at $ 200,000 |
| Equipment | $ 278,336 | 7 | $ 39,762 | $ 314 | Existing, including L/H Improvements and Landscap |
| Total: | $ 903,336 | | | $ 1,967 | |

**H. Mortgage to Wells Fargo**

| 1ST PMT | Client | | LENDER | Amt Financed | APR | Term (Mos) | Mo. Pmt. | Last Pmt |
|---|---|---|---|---|---|---|---|---|
| Nov-11 | Blue Willow Inn | | WellsFargo | $ 825,000 | 8.00% | 120 | $10,010 | Oct-21 |
| | | | Chart of Acct. #: | | | | | |

| DATE | PMT NO. | B.O.M. BAL. | Mo. Pmt. | INTEREST | PRINCIPLE | E.O.M. BAL. | | |
|---|---|---|---|---|---|---|---|---|
| Nov-11 | 1 | $ 825,000 | $10,009.53 | $ 5,500.00 | $4,509.53 | $ 820,490 | | |
| Dec-11 | 2 | $ 820,490 | $10,009.53 | $ 5,469.94 | $4,539.59 | $ 815,951 | | |
| Jan-12 | 3 | $ 815,951 | $10,009.53 | $ 5,439.67 | $4,569.85 | $ 811,381 | | |
| Feb-12 | 4 | $ 811,381 | $10,009.53 | $ 5,409.21 | $4,600.32 | $ 806,781 | | |
| Mar-12 | 5 | $ 806,781 | $10,009.53 | $ 5,378.54 | $4,630.99 | $ 802,150 | | |
| Apr-12 | 6 | $ 802,150 | $10,009.53 | $ 5,347.66 | $4,661.86 | $ 797,488 | | |
| May-12 | 7 | $ 797,488 | $10,009.53 | $ 5,316.59 | $4,692.94 | $ 792,795 | | |
| Jun-12 | 8 | $ 792,795 | $10,009.53 | $ 5,285.30 | $4,724.23 | $ 788,071 | | |
| Jul-12 | 9 | $ 788,071 | $10,009.53 | $ 5,253.80 | $4,755.72 | $ 783,315 | | |
| Aug-12 | 10 | $ 783,315 | $10,009.53 | $ 5,222.10 | $4,787.43 | $ 778,528 | | |
| Sep-12 | 11 | $ 778,528 | $10,009.53 | $ 5,190.18 | $4,819.34 | $ 773,708 | | |
| Oct-12 | 12 | $ 773,708 | $10,009.53 | $ 5,158.05 | $4,851.47 | $ 768,857 | | |
| Nov-12 | 13 | $ 768,857 | $10,009.53 | $ 5,125.71 | $4,883.82 | $ 763,973 | | |
| Dec-12 | 14 | $ 763,973 | $10,009.53 | $ 5,093.15 | $4,916.37 | $ 759,057 | | |

**J. Debt service to IRS & GDOR:**
Reduced by $125,000 from Pfd Stock
Includes $15,644 from Gift Shop

| 1ST PMT | Client | | LENDER | Amt Financed | APR | Term (Mos) | Mo. Pmt. | Last Pmt |
|---|---|---|---|---|---|---|---|---|
| Nov-11 | Blue Willow Inn | | IRS/GDOR | $ 105,353 | 7.25% | 44 | $2,734 | Jun-15 |
| | | | Chart of Acct. #: | | | | | |

## Exhibit E4

| DATE | PMT NO. | B.O.M. BAL. | Mo. Pmt. | INTEREST | PRINCIPLE | E.O.M. BAL. | | |
|---|---|---|---|---|---|---|---|---|
| Nov-11 | 1 | $ 105,353 | $2,733.90 | $ 636.51 | $2,097.39 | $ 103,255 | | |
| Dec-11 | 2 | $ 103,255 | $2,733.90 | $ 623.83 | $2,110.06 | $ 101,145 | | |
| Jan-12 | 3 | $ 101,145 | $2,733.90 | $ 611.09 | $2,122.81 | $ 99,022 | | |
| Feb-12 | 4 | $ 99,022 | $2,733.90 | $ 598.26 | $2,135.64 | $ 96,887 | | |
| Mar-12 | 5 | $ 96,887 | $2,733.90 | $ 585.36 | $2,148.54 | $ 94,738 | | |
| Apr-12 | 6 | $ 94,738 | $2,733.90 | $ 572.38 | $2,161.52 | $ 92,577 | | |
| May-12 | 7 | $ 92,577 | $2,733.90 | $ 559.32 | $2,174.58 | $ 90,402 | | |
| Jun-12 | 8 | $ 90,402 | $2,733.90 | $ 546.18 | $2,187.72 | $ 88,214 | | |
| Jul-12 | 9 | $ 88,214 | $2,733.90 | $ 532.96 | $2,200.94 | $ 86,013 | | |
| Aug-12 | 10 | $ 86,013 | $2,733.90 | $ 519.66 | $2,214.23 | $ 83,799 | | |
| Sep-12 | 11 | $ 83,799 | $2,733.90 | $ 506.29 | $2,227.61 | $ 81,572 | | |
| Oct-12 | 12 | $ 81,572 | $2,733.90 | $ 492.83 | $2,241.07 | $ 79,331 | | |
| Nov-12 | 13 | $ 79,331 | $2,733.90 | $ 479.29 | $2,254.61 | $ 77,076 | | |
| Dec-12 | 14 | $ 77,076 | $2,733.90 | $ 465.67 | $2,268.23 | $ 74,808 | | |

| K. Insurance | 2008 | 2009 | 2010 | Proj. | |
|---|---|---|---|---|---|
| Insurance - General Liability | $ 37,015 | $ 23,304 | $ 53,274 | $ 24,000 | 2009 Approx. |
| Insurance - Group | $ 27,831 | $ 30,174 | $ 40,177 | $ 30,000 | 2009 Approx. |
| Insurance - W.C. (@1.8% of PR) | $ 35,298 | $ 16,642 | $ 10,140 | $ 14,130 | $ 785,000 Projected Payroll 12 mos |
| Total: | $ 100,144 | $ 70,120 | $ 103,591 | $ 68,130 | |

L. Includes Administrative Claims payable on Effective Date of Plan, assumed to occur in November 2011.

M. Fees to US Trustee.

N. Property taxes assumed at 0.8% of Fair Mkt Value, payable in November 2012. Accured each month.

| FMV | Rate | Ann. Tax |
|---|---|---|
| $ 825,000 | 0.8% | $ 6,600 |
| | | $ 550 |

P. Accounts Payable converted to Notes Payabel over 36 months. Total pre-petition amount based upon Claims Register and Proofs of Claim.

| | | | |
|---|---|---|---|
| General Unsecured debt: | $ 2,186,997 | | Includes $31,462 in unsecured claims on the gift shop. |
| Distribution % | 4.5% | | |
| Net Due to General Unsecured Claimants: | $ 98,415 | | |
| Term: | 36 | Months | |
| Mo Pmt: | $ 2,733.75 | Per Month | |

Q. Retained Earnings adjusted in November 2011 to reflect discount from Accounts Payable in Chapter 11.

R. Cash in November 2011 Includes $24,000 in net proceeds from Preferred Stock issue.

S. Assumes raising equity of: $ 175,000
Dividends at annual percent: 3.0%

Y1. Using historical data from 2009.
Y2. Using historical data from 2010.

Z. Budgeted

# EXHIBIT F

## 2012 ProForma Statements

<u>Comments:</u>   The revenue projections for 2012 are at 90% of the same months for 2009.  Current restaurant revenues are approaching 2009 levels.  We believe this to be a conservative estimate.



Exhibit F1

**BLUE WILLOW INN RESTAURANT, INC.**
ProForma for 2012
Assumes $175,000 in Pfd Stock

| INCOME STATEMENT | NOTES | 2012 January | 2012 February | 2012 March | 2012 April | 2012 May | 2012 June | 2012 July | 2012 August | 2012 September | 2012 October | 2012 November | 2012 December | 2012 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | | | | | | |
| Restaurant Gross Revenue (Net) | A | 138,534 | 173,544 | 189,515 | 220,509 | 228,181 | 216,784 | 161,369 | 194,522 | 167,027 | 146,098 | 193,814 | 193,521 | 2,223,418 |
| (Revenue per week) | | 31,994 | 40,079 | 43,768 | 50,926 | 52,698 | 50,066 | 37,268 | 44,924 | 38,574 | 33,741 | 44,761 | 44,693 | 42,758 |
| **VARIABLE COSTS** | | | | | | | | | | | | | | |
| Cost of Sales (incl. cooking oil) | B | 44,331 | 55,534 | 60,645 | 70,563 | 73,018 | 69,371 | 51,638 | 62,247 | 53,449 | 46,751 | 62,020 | 61,927 | 711,494 |
| Direct Labor | C | 27,707 | 34,709 | 37,903 | 44,102 | 45,636 | 43,357 | 32,274 | 38,804 | 33,405 | 29,220 | 38,763 | 38,704 | 444,684 |
| Payroll Tax on DL (8.0%) | | 2,494 | 3,124 | 3,411 | 3,969 | 4,107 | 3,902 | 2,905 | 3,501 | 3,006 | 2,630 | 3,489 | 3,483 | 40,022 |
| General Supplies | D | 4,004 | 5,015 | 5,477 | 6,373 | 6,594 | 6,265 | 4,664 | 5,622 | 4,827 | 4,222 | 5,601 | 5,593 | 64,257 |
| Creditcard Fees | E | 2,646 | 3,315 | 3,620 | 4,212 | 4,358 | 4,141 | 3,082 | 3,715 | 3,190 | 2,790 | 3,702 | 3,696 | 42,467 |
| Total V.C. | | 81,181 | 101,697 | 111,056 | 129,219 | 133,714 | 127,035 | 94,562 | 113,990 | 97,878 | 85,613 | 113,575 | 113,403 | 1,302,923 |
| | | | | | | | | | | | | | | |
| Gross Margin - $ | | 57,353 | 71,847 | 78,459 | 91,291 | 94,467 | 89,748 | 66,807 | 80,532 | 69,149 | 60,484 | 80,239 | 80,118 | 920,495 |
| Gross Margin - % | | 41.4% | 41.4% | 41.4% | 41.4% | 41.4% | 41.4% | 41.4% | 41.4% | 41.4% | 41.4% | 41.4% | 41.4% | 41.4% |
| | | | | | | | | | | | | | | |
| **FIXED GS&A COSTS** | | | | | | | | | | | | | | |
| Salaries - Admin. (incl Contract Labor) | F | 25,593 | 25,593 | 25,593 | 25,593 | 25,593 | 25,593 | 25,593 | 25,593 | 25,593 | 25,593 | 25,593 | 25,593 | 307,112 |
| Payroll Tax on Salaries (9.0%) | | 2,303 | 2,303 | 2,303 | 2,303 | 2,303 | 2,303 | 2,303 | 2,303 | 2,303 | 2,303 | 2,303 | 2,303 | 27,640 |
| Advertising/Promotional | N | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| Bank Charges | N | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| Depreciation Expense | G | 1,967 | 1,967 | 1,967 | 1,967 | 1,967 | 1,967 | 1,967 | 1,967 | 1,967 | 1,967 | 1,967 | 1,967 | 23,608 |
| Dishwash Lease & Supplies | Y2 | 796 | 796 | 796 | 796 | 796 | 796 | 796 | 796 | 796 | 796 | 796 | 796 | 9,549 |
| Dues & Subscriptions, Biz Licenses | Y1 | 215 | 215 | 215 | 215 | 215 | 215 | 215 | 215 | 215 | 215 | 215 | 215 | 2,574 |
| Interest expense - WF | H | 5,440 | 5,409 | 5,379 | 5,348 | 5,317 | 5,285 | 5,254 | 5,222 | 5,190 | 5,158 | 5,126 | 5,093 | 63,220 |
| Interest expense - Priority Claims | J | 611 | 598 | 585 | 572 | 559 | 546 | 533 | 520 | 506 | 493 | 479 | 466 | 6,469 |
| Insurance | K | 5,678 | 5,678 | 5,678 | 5,678 | 5,678 | 5,678 | 5,678 | 5,678 | 5,678 | 5,678 | 5,678 | 5,678 | 68,130 |
| Lawn/Mulch & Ext Uniform Svc | Y1 | 1,840 | 1,840 | 1,840 | 1,840 | 1,840 | 1,840 | 1,840 | 1,840 | 1,840 | 1,840 | 1,840 | 1,840 | 22,080 |
| Maintenance & Repairs (incl Landscape, Pest Control) | N | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 48,000 |
| Miscellaneous Expense | N | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 14,400 |
| Office Supplies & Expense | Y1 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 16,797 |
| Professional Fees - Accounting | N | | 2,000 | | | | | | | | | 300 | | 2,300 |
| Professional Fees - Legal | L | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| Professional Fees - Other | M | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Property Tax & Ad Valorem Tax | N | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 6,600 |
| Telephone | Y1 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 9,005 |
| Utilities | Y1 | 7,962 | 7,962 | 7,962 | 7,962 | 7,962 | 7,962 | 7,962 | 7,962 | 7,962 | 7,962 | 7,962 | 7,962 | 95,547 |
| Vehicle Expense | Y1 | 501 | 501 | 501 | 501 | 501 | 501 | 501 | 501 | 501 | 501 | 501 | 501 | 6,017 |
| Website Maintenance | Y1 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 2,465 |
| Total Fixed SG&A | | 65,111 | 67,024 | 67,024 | 64,980 | 64,936 | 64,892 | 64,847 | 64,802 | 64,757 | 64,711 | 64,965 | 64,619 | 780,714 |
| | | | | | | | | | | | | | | |
| Net Profit - $ | | (7,758) | 6,779 | 11,435 | 26,310 | 29,531 | 24,857 | 1,960 | 15,730 | 4,392 | (4,227) | 15,273 | 15,498 | 139,781 |
| Net Profit - % | | -5.6% | 3.9% | 6.0% | 11.9% | 12.9% | 11.5% | 1.2% | 8.1% | 2.6% | -2.9% | 7.9% | 8.0% | 6.3% |

# Exhibit F2

| BALANCE SHEET ASSETS | | 2012 January | 2012 February | 2012 March | 2012 April | 2012 May | 2012 June | 2012 July | 2012 August | 2012 September | 2012 October | 2012 November | 2012 December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | | | | | | | |
| Cash - Operating Account | R | $ 62,585 | $ 62,455 | $ 72,188 | $ 76,253 | $ 108,744 | $ 126,516 | $ 121,348 | $ 119,904 | $ 127,079 | $ 115,588 | $ 123,553 | $ 115,097 |
| Total Cash on Hand - EOM: | | $ 62,585 | $ 62,455 | $ 72,188 | $ 76,253 | $ 108,744 | $ 126,516 | $ 121,348 | $ 119,904 | $ 127,079 | $ 115,588 | $ 123,553 | $ 115,097 |
| | | | | | | | | | | | | | |
| Security Deposits | | $ 1,740 | $ 1,740 | $ 1,740 | $ 1,740 | $ 1,740 | $ 1,740 | $ 1,740 | $ 1,740 | $ 1,740 | $ 1,740 | $ 1,740 | $ 1,740 |
| Inventory | | $ 14,120 | $ 14,120 | $ 14,120 | $ 14,120 | $ 14,120 | $ 14,120 | $ 14,120 | $ 14,120 | $ 14,120 | $ 14,120 | $ 14,120 | $ 14,120 |
| Total Current Assets: | | $ 78,445 | $ 78,315 | $ 88,048 | $ 92,113 | $ 124,604 | $ 142,376 | $ 137,208 | $ 135,764 | $ 142,939 | $ 131,449 | $ 139,413 | $ 130,957 |
| | | | | | | | | | | | | | |
| **Fixed Assets** | | | | | | | | | | | | | |
| Land | | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 | $ 200,000 |
| Buildings | | $ 625,000 | $ 625,000 | $ 625,000 | $ 625,000 | $ 625,000 | $ 625,000 | $ 625,000 | $ 625,000 | $ 625,000 | $ 625,000 | $ 625,000 | $ 625,000 |
| Equipment & Furnishings | | $ 278,336 | $ 278,336 | $ 278,336 | $ 278,336 | $ 278,336 | $ 278,336 | $ 278,336 | $ 278,336 | $ 278,336 | $ 278,336 | $ 278,336 | $ 278,336 |
| Less: Cum. Depreciation | | $ (229,211) | $ (231,178) | $ (233,146) | $ (235,113) | $ (237,080) | $ (239,048) | $ (241,015) | $ (242,982) | $ (244,950) | $ (246,917) | $ (248,884) | $ (250,852) |
| Net Fixed Assets: | | $ 874,125 | $ 872,157 | $ 870,190 | $ 868,223 | $ 866,255 | $ 864,288 | $ 862,321 | $ 860,353 | $ 858,386 | $ 856,419 | $ 854,451 | $ 852,484 |
| | | | | | | | | | | | | | |
| Total Assets: | | $ 952,570 | $ 950,473 | $ 958,238 | $ 960,335 | $ 990,859 | $ 1,006,664 | $ 999,528 | $ 996,118 | $ 1,001,325 | $ 987,867 | $ 993,864 | $ 983,441 |
| | | | | | | | | | | | | | |
| **LIABILITIES** | | | | | | | | | | | | | |
| **Current Liabilities** | | | | | | | | | | | | | |
| Accounts Payable | P | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Taxes Payable - Georgia | J | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Taxes Payable - IRS | J | $ - | | | | | | | | | | | |
| Accrued Property Taxes | N | $ 1,100 | $ 1,650 | $ 2,200 | $ 2,750 | $ 3,300 | $ 3,850 | $ 4,400 | $ 4,950 | $ 5,500 | $ 6,050 | $ 6,600 | $ 550 |
| Total Current Liabilities: | | $ 1,100 | $ 1,650 | $ 2,200 | $ 2,750 | $ 3,300 | $ 3,850 | $ 4,400 | $ 4,950 | $ 5,500 | $ 6,050 | $ 6,600 | $ 550 |
| | | | | | | | | | | | | | |
| **Long-term Liabilities** | | | | | | | | | | | | | |
| Notes Payable - Wells Fargo | | $ 815,951 | $ 811,381 | $ 806,781 | $ 802,150 | $ 797,488 | $ 792,795 | $ 788,071 | $ 783,315 | $ 778,528 | $ 773,708 | $ 768,857 | $ 763,973 |
| Notes Payable - IRS & GDOR | J | $ 101,145 | $ 99,022 | $ 96,887 | $ 94,738 | $ 92,577 | $ 90,402 | $ 88,214 | $ 86,013 | $ 83,799 | $ 81,572 | $ 79,331 | $ 77,076 |
| Notes Payable - Unsecured Claims | P | $ 92,947 | $ 90,214 | $ 87,480 | $ 84,746 | $ 82,012 | $ 79,279 | $ 76,545 | $ 73,811 | $ 71,077 | $ 68,344 | $ 65,610 | $ 62,876 |
| Total Long-term Liabilities: | | $ 1,010,043 | $ 1,000,617 | $ 991,147 | $ 981,634 | $ 972,077 | $ 962,476 | $ 952,830 | $ 943,140 | $ 933,404 | $ 923,623 | $ 913,797 | $ 903,925 |
| | | | | | | | | | | | | | |
| **EQUITY** | | | | | | | | | | | | | |
| Capital | | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 |
| Capital - Preferred Stock | S | $ 175,000 | $ 175,000 | $ 175,000 | $ 175,000 | $ 175,000 | $ 175,000 | $ 175,000 | $ 175,000 | $ 175,000 | $ 175,000 | $ 175,000 | $ 175,000 |
| Retained Earnings | | $ (226,315) | $ (226,315) | $ (226,315) | $ (226,315) | $ (226,315) | $ (226,315) | $ (226,315) | $ (226,315) | $ (226,315) | $ (226,315) | $ (226,315) | $ (226,315) |
| Dividends - Preferred | S | $ - | $ - | $ 5,250 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Dividends - Common | U | $ - | $ - | $ - | $ (10,000) | $ - | $ - | $ - | $ - | $ (10,000) | $ - | $ - | $ (10,000) |
| Net Income/(Loss) | | $ (7,758) | $ (979) | $ 10,456 | $ 36,767 | $ 66,297 | $ 91,154 | $ 93,114 | $ 108,844 | $ 113,236 | $ 109,009 | $ 124,283 | $ 139,781 |
| Total Stockholders' Equity: | | $ (58,573) | $ (51,794) | $ (35,109) | $ (24,049) | $ 15,482 | $ 40,339 | $ 42,298 | $ 48,028 | $ 62,421 | $ 58,194 | $ 73,467 | $ 78,966 |
| | | | | | | | | | | | | | |
| Total Liabilities & Equity: | | $ 952,570 | $ 950,473 | $ 958,238 | $ 980,335 | $ 990,859 | $ 1,006,664 | $ 999,528 | $ 996,118 | $ 1,001,325 | $ 987,867 | $ 993,864 | $ 983,441 |
| Verification of Balance | | $ (0) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

# Exhibit _F3_

## NOTES TO PRO FORMA STATEMENTS

**A. Revenues projected as follows:**
**Assumes revenues at 90% of 2009**

| 2012 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| January | February | March | April | May | June | July | August | September | October | November | December |
| $ 138,534 | $ 173,544 | $ 189,515 | $ 220,509 | $ 228,181 | $ 216,784 | $ 161,369 | $ 194,522 | $ 167,027 | $ 146,098 | $ 193,814 | $ 193,521 |

**B.** Assumes food cost at % of sales average.  **32.0%**

**C.** Assumes direct labor average % of sales.  **20.0%**

**D.** General Supplies average % of sales.  **2.89%**

**E.** Creditcard fees average % of sales.  **1.91%**

**F. Administrative Salaries:**

| | | Wkly | Monthly | Annual |
|---|---|---|---|---|
| Billie Van Dyke | Owner | $ 1,000.00 | $ 4,330 | $ 52,000 |
| William "Chip" Edgerly | GM | $ 600.00 | $ 2,598 | $ 31,200 |
| Patsy Joiner | Bkpr | $ 687.52 | $ 2,977 | $ 35,751 |
| Dominick Stella | Kitchen Mgr | $ 1,043.15 | $ 4,517 | $ 54,244 |
| Kathy Guiney | Asst Mgr | $ 520.00 | $ 2,252 | $ 27,040 |
| Carrie Humphrey | Asst Mgr | $ 663.82 | $ 2,874 | $ 34,519 |
| Tom Van Dyke | Scheduler | $ 375.00 | $ 1,624 | $ 19,500 |
| Shirley Edgerly | Recep | $ 217.50 | $ 942 | $ 11,310 |
| Troy Mullinax | Maint | $ 340.00 | $ 1,472 | $ 17,680 |
| William Van Dyke | Maint | $ 101.16 | $ 438 | $ 5,260 |
| Matthew Whitney - 3 days/wk | Landscape | $ 362.40 | $ 1,569 | $ 18,845 |
| **Total Fixed Salaries:** | | $ 5,910.55 | $ 25,593 | $ 307,349 |

**G.** Depreciation expense assumes building straight-line depreciation:

|  | Purch. Price | Term | Annual | Monthly | |
|---|---|---|---|---|---|
| Land | $ 200,000 | 0 | 0 | 0 | |
| Bldg | $ 625,000 | 31.5 | $ 19,841 | $ 1,653 | Assumes real estate valued: $ 200,000 |
| Equipment | $ 278,336 | 7 | $ 39,762 | $ 314 | Existing, including L/H Improvements and Landscaping |
| Total: | $ 903,336 | | | $ 1,967 | |

:ing

**H.** Mortgage to Wells Fargo

| 1ST PMT | Client | | LENDER | Amt Financed | APR | Term (Mos) | Mo. Pmt. | Last Pmt |
|---|---|---|---|---|---|---|---|---|
| Nov-11 | Blue Willow Inn | | WellsFargo | $ 825,000 | 8.00% | 120 | $10,010 | Oct-21 |
| | Chart of Acct. #: | | | # | # | | | |

| DATE | PMT NO. | B.O.M. BAL. | Mo. Pmt. | INTEREST | PRINCIPLE | E.O.M. BAL. | | |
|---|---|---|---|---|---|---|---|---|
| Nov-11 | 1 | $ 825,000 | $10,009.53 | $ 5,500.00 | $4,509.53 | $ 820,490 | | |
| Dec-11 | 2 | $ 820,490 | $10,009.53 | $ 5,469.94 | $4,539.59 | $ 815,951 | | |
| Jan-12 | 3 | $ 815,951 | $10,009.53 | $ 5,439.67 | $4,569.85 | $ 811,381 | | |
| Feb-12 | 4 | $ 811,381 | $10,009.53 | $ 5,409.21 | $4,600.32 | $ 806,781 | | |
| Mar-12 | 5 | $ 806,781 | $10,009.53 | $ 5,378.54 | $4,630.99 | $ 802,150 | | |
| Apr-12 | 6 | $ 802,150 | $10,009.53 | $ 5,347.66 | $4,661.86 | $ 797,488 | | |
| May-12 | 7 | $ 797,488 | $10,009.53 | $ 5,316.59 | $4,692.94 | $ 792,795 | | |
| Jun-12 | 8 | $ 792,795 | $10,009.53 | $ 5,285.30 | $4,724.23 | $ 788,071 | | |
| Jul-12 | 9 | $ 788,071 | $10,009.53 | $ 5,253.80 | $4,755.72 | $ 783,315 | | |
| Aug-12 | 10 | $ 783,315 | $10,009.53 | $ 5,222.10 | $4,787.43 | $ 778,528 | | |
| Sep-12 | 11 | $ 778,528 | $10,009.53 | $ 5,190.18 | $4,819.34 | $ 773,708 | | |
| Oct-12 | 12 | $ 773,708 | $10,009.53 | $ 5,158.05 | $4,851.47 | $ 768,857 | | |
| Nov-12 | 13 | $ 768,857 | $10,009.53 | $ 5,125.71 | $4,883.82 | $ 763,973 | | |
| Dec-12 | 14 | $ 763,973 | $10,009.53 | $ 5,093.15 | $4,916.37 | $ 759,057 | | |

**J.** Debt service to IRS & GDOR:
Reduced by $125,000 from Pfd Stock
Includes $15,644 from Gift Shop

| 1ST PMT | Client | | LENDER | Amt Financed | APR | Term (Mos) | Mo. Pmt | Last Pmt |
|---|---|---|---|---|---|---|---|---|
| Nov-11 | Blue Willow Inn | | IRS/GDOR | $ 105,353 | 7.25% | 44 | $2,734 | Jun-15 |
| | Chart of Acct. #: | | | # | # | | | |

| DATE | PMT NO. | B.O.M. BAL. | Mo. Pmt. | INTEREST | PRINCIPLE | E.O.M. BAL. |
|---|---|---|---|---|---|---|
| Nov-11 | 1 | $ 105,353 | $2,733.90 | $ 636.51 | $2,097.39 | $ 103,255 |
| Dec-11 | 2 | $ 103,255 | $2,733.90 | $ 623.83 | $2,110.06 | $ 101,145 |
| Jan-12 | 3 | $ 101,145 | $2,733.90 | $ 611.09 | $2,122.81 | $ 99,022 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Feb-12 | 4 | $ | 99,022 | $2,733.90 | $ | 598.26 | $2,135.64 | $ 96,887 |
| Mar-12 | 5 | $ | 96,887 | $2,733.90 | $ | 585.36 | $2,148.54 | $ 94,738 |
| Apr-12 | 6 | $ | 94,738 | $2,733.90 | $ | 572.38 | $2,161.52 | $ 92,577 |
| May-12 | 7 | $ | 92,577 | $2,733.90 | $ | 559.32 | $2,174.58 | $ 90,402 |
| Jun-12 | 8 | $ | 90,402 | $2,733.90 | $ | 546.18 | $2,187.72 | $ 88,214 |
| Jul-12 | 9 | $ | 88,214 | $2,733.90 | $ | 532.96 | $2,200.94 | $ 86,013 |
| Aug-12 | 10 | $ | 86,013 | $2,733.90 | $ | 519.66 | $2,214.23 | $ 83,799 |
| Sep-12 | 11 | $ | 83,799 | $2,733.90 | $ | 506.29 | $2,227.61 | $ 81,572 |
| Oct-12 | 12 | $ | 81,572 | $2,733.90 | $ | 492.83 | $2,241.07 | $ 79,331 |
| Nov-12 | 13 | $ | 79,331 | $2,733.90 | $ | 479.29 | $2,254.61 | $ 77,076 |
| Dec-12 | 14 | $ | 77,076 | $2,733.90 | $ | 465.67 | $2,268.23 | $ 74,808 |

## K. Insurance

| | 2008 | 2009 | 2010 | Proj. | | |
|---|---|---|---|---|---|---|
| Insurance - General Liability | $ 37,015 | $ 23,304 | $ 53,274 | $ 24,000 | 2009 Approx. | |
| Insurance - Group | $ 27,831 | $ 30,174 | $ 40,177 | $ 30,000 | 2009 Approx. | |
| Insurance - W.C. (@1.8% of PR) | $ 35,298 | $ 16,642 | $ 10,140 | $ 14,130 | $ 785,000 | Projected Payroll 12 mos |
| Total: | $ 100,144 | $ 70,120 | $ 103,591 | $ 68,130 | | |

L. Includes Administrative Claims payable on Effective Date of Plan, assumed to occur in November 2011.

M. Monthly retainer to J.D. Holmes

N. Property taxes assumed at 0.8% of Fair Mkt Value, payable in November 2012. Accrued each month.

| FMV | Rate | Ann. Tax |
|---|---|---|
| $ 825,000 | 0.8% | $ 6,600 |
| | | $ 550 |

P. Accounts Payable converted to Notes Payabel over 36 months. Total pre-petition amount based upon Claims Register and Proofs of Claim.

| | | |
|---|---|---|
| General Unsecured debt: | $ 2,185,997 | Includes $31,462 in unsecured claims on the gift shop. |
| Distribution % | 4.5% | |
| Net Due to General Unsecured Claimants: | $ 98,415 | |
| Term: | 36 | Months |
| Mo Pmt: | $ 2,733.75 | Per Month |

Q. Retained Earnings adjusted in November 2011 to reflect discount from Accounts Payable in Chapter 11.

R. Cash in November 2011 includes $24,000 in net proceeds from Preferred Stock issue.

| S. Assumes raising equity of: | $ 175,000 |
|---|---|
| Dividends at annual percent: | 3.0% |

Y1. Using historical data from 2009.
Y2. Using historical data from 2010.

Z. Budgeted

# EXHIBIT G

## 6 mos ending June 30, 2011 Financial Statements

<u>Comments:</u>   The financial statements compiled by our public accounts do not include all of the liabilities of the restaurant that are included in the bankruptcy filing.  This is largely because of the cross-collateralization agreements between the various business operations.  These financial statements were prepared using a Cash Basis accounting.  However, since the restaurant has no Accounts Receivable, and no vendor credit extension, the income statement is a fair representation of the actual results for the first six months of 2011, which includes the non-restaurant costs associated with the bankruptcy, as well as Magnolia Hall.

Exhibit _G1_

## Blue Willow Inn Restaurant, Inc.
## Balance Sheet
## As of June 30, 2011

### Assets

| | | |
|---|---:|---:|
| **Current Assets** | | |
| Cash | 32,774.76 | |
| Accounts Receivable | 198,542.38 | |
| Inventory | 14,120.11 | |
| **Total Current Assets** | | 245,437.25 |
| | | |
| **Fixed Assets** | | |
| Furniture/Fixtures/Equipment | 192,872.03 | |
| Less Accumulated Depreciation | (222,053.15) | |
| **Net Fixed Assets** | | (29,181.12) |
| | | |
| **Other Assets** | | |
| Deposits | 1,740.00 | |
| Leasehold Improvements | 78,848.03 | |
| Landscaping | 6,615.70 | |
| **Total Other Assets** | | 87,203.73 |
| | | |
| **Total Assets** | | $ 303,459.86 |

Exhibit *G-2*

## Blue Willow Inn Restaurant, Inc.
## Balance Sheet
## As of June 30, 2011

### Liabilities and Stockholders' Equity

**Current Liabilities**

| | | |
|---|---|---|
| Notes Payable | 283,163.80 | |
| Accounts Payable | 61,360.72 | |
| Sales Tax Payable | 113,200.46 | |
| Payroll Tax Payable | 108,796.84 | |
| **Total Current Liabilities** | | 566,521.82 |

**Long-Term Liabilities**

**Total Long-Term Liabilities**

**Stockholder's Equity**

| | | |
|---|---|---|
| Common Stock | 500.00 | |
| Retained Earnings | (254,179.71) | |
| Net Income/Loss-Current Year | (9,382.25) | |
| **Total Stockholders' Equity** | | (263,061.96) |
| **Total Liabilities & Stockholders' Equity** | | $ 303,459.86 |

Exhibit *63*

### Blue Willow Inn Restaurant, Inc.
### Income Statement
### For the 1 Month and 6 Months Ended  June 30, 2011

| | 1 Month June 30, 2011 | % | 6 Months June 30, 2011 | % |
|---|---|---|---|---|
| **Revenue** | | | | |
| Revenue | 180,902.14 | 100.00 | 1,091,256.51 | 100.00 |
| **Total Revenue** | 180,902.14 | 100.00 | 1,091,256.51 | 100.00 |
| | | | | |
| **Cost of Sales** | | | | |
| Cost of Sales | 56,502.24 | 31.23 | 381,946.08 | 35.00 |
| Cooking Oil | 0.00 | 0.00 | 12,292.46 | 1.13 |
| **Total Cost of Sales** | (56,502.24) | (31.23) | (394,238.54) | (36.13) |
| | | | | |
| **Gross Profit** | 124,399.90 | 68.77 | 697,017.97 | 63.87 |
| | | | | |
| **Other Income** | | | | |
| Sales Tax Commission | 138.32 | 0.08 | 836.87 | 0.08 |
| Sale of Asset (Lexus) | 0.00 | 0.00 | 15,079.44 | 1.38 |
| Cost of Asset (Lexus) | 0.00 | 0.00 | (41,877.71) | (3.84) |
| **Total Other Income** | 138.32 | 0.08 | (25,961.40) | (2.38) |
| | | | | |
| **Operating Expenses** | | | | |
| Administrative Salaries | 21,898.97 | 12.11 | 125,956.54 | 11.54 |
| Direct Labor | 29,206.25 | 16.14 | 231,735.40 | 21.24 |
| Donations | 100.00 | 0.06 | 100.00 | 0.01 |
| Contract Labor | 238.88 | 0.13 | 1,532.96 | 0.14 |
| Laundry/Uniforms | 1,362.94 | 0.75 | 7,520.67 | 0.69 |
| Employee Uniform Service | 0.00 | 0.00 | 57.75 | 0.01 |
| Credit Card Fees | 4,195.13 | 2.32 | 20,816.94 | 1.91 |
| Dishwash System Supplies | 1,578.04 | 0.87 | 7,284.66 | 0.67 |
| Dishwash System Lease | 315.00 | 0.17 | 1,350.50 | 0.12 |
| Utilities | 8,939.31 | 4.94 | 60,033.62 | 5.50 |
| Telephone | 942.52 | 0.52 | 5,138.19 | 0.47 |
| Music Royalties | 140.14 | 0.08 | 564.62 | 0.05 |
| Maintenance/Repairs | 2,659.07 | 1.47 | 16,620.40 | 1.52 |
| Pest Control | 850.00 | 0.47 | 2,590.00 | 0.24 |
| Security Service | 0.00 | 0.00 | 396.00 | 0.04 |
| Vehicle Expense | 133.83 | 0.07 | 1,718.51 | 0.16 |
| Payroll Taxes | 5,279.11 | 2.92 | 39,159.78 | 3.59 |
| Other Taxes & Licenses | 0.00 | 0.00 | 875.00 | 0.08 |
| Office Expense | 1,340.51 | 0.74 | 5,895.60 | 0.54 |
| Supplies | 3,816.39 | 2.11 | 31,502.53 | 2.89 |
| Depreciation | 313.92 | 0.17 | 2,508.54 | 0.23 |
| Professional Fees | 1,142.50 | 0.63 | 17,330.00 | 1.59 |
| U S Trustee Quarterly Fees | 0.00 | 0.00 | 9,750.00 | 0.89 |
| Interest | 20,000.00 | 11.06 | 40,000.00 | 3.67 |
| Insurance | 9,151.34 | 5.06 | 47,140.48 | 4.32 |

## Blue Willow Inn Restaurant, Inc.
### Income Statement
### For the 1 Month and 6 Months Ended  June 30, 2011

|  | 1 Month<br>June 30, 2011 | % | 6 Months<br>June 30, 2011 | % |
|---|---|---|---|---|
| Advertising | 123.85 | 0.07 | 1,883.08 | 0.17 |
| Postage & Freight | 253.96 | 0.14 | 977.05 | 0.09 |
| **Total Operating Expenses** | (113,981.66) | (63.01) | (680,438.82) | (62.35) |
| **Net Income (Loss)** | $  10,556.56 | 5.84 | $  (9,382.25) | (0.86) |

# EXHIBIT H

## 2010 Year-end Financial Statements

<u>Comments:</u>  The financial statements compiled by our public accounts do not include all of the liabilities of the restaurant that are included in the bankruptcy filing.  This is largely because of the cross-collateralization agreements between the various business operations.  Furthermore, these statements were prepared on a Cash Basis, and are over-burdened by non-restaurant expenses associated with the Village, Magnolia Hall, and the bankruptcy.  Financial statements in 2012 and beyond will be prepared using a full-accrual method.

# Exhibit H1

## Blue Willow Inn Restaurant, Inc.
## Balance Sheet
## As of December 31, 2010

### Assets

**Current Assets**

| | | |
|---|---:|---:|
| Cash | 3,948.31 | |
| Accounts Receivable | 199,022.38 | |
| Inventory | 13,533.65 | |
| **Total Current Assets** | | 216,504.34 |

**Fixed Assets**

| | | |
|---|---:|---:|
| Furniture/Fixtures/Equipment | 249,784.74 | |
| Less Accumulated Depreciation | (235,079.61) | |
| **Net Fixed Assets** | | 14,705.13 |

**Other Assets**

| | | |
|---|---:|---:|
| Deposits | 1,740.00 | |
| Leasehold Improvements | 78,848.03 | |
| Landscaping | 6,615.70 | |
| **Total Other Assets** | | 87,203.73 |
| | | |
| **Total Assets** | | $ 318,413.20 |

Exhibit *H2*

## Blue Willow Inn Restaurant, Inc.
## Balance Sheet
## As of December 31, 2010

### Liabilities and Stockholders' Equity

**Current Liabilities**

| | | |
|---|---|---|
| Notes Payable | 278,375.42 | |
| Accounts Payable | 61,360.72 | |
| Sales Tax Payable | 117,056.06 | |
| Payroll Tax Payable | 106,588.48 | |
| **Total Current Liabilities** | | 563,380.68 |

**Long-Term Liabilities**

| | |
|---|---|
| **Total Long-Term Liabilities** | |

**Stockholder's Equity**

| | | |
|---|---|---|
| Common Stock | 500.00 | |
| Retained Earnings | (244,718.09) | |
| Net Income/Loss-Current Year | (749.39) | |
| **Total Stockholders' Equity** | | (244,967.48) |

| | |
|---|---|
| **Total Liabilities & Stockholders' Equity** | $ 318,413.20 |

## Blue Willow Inn Restaurant, Inc.
## Income Statement
### For the 1 Month and 12 Months Ended December 31, 2010

| | 1 Month December 31, 2010 | % | 12 Months December 31, 2010 | % |
|---|---|---|---|---|
| **Revenue** | | | | |
| Revenue | 243,339.08 | 100.00 | 2,370,053.61 | 100.00 |
| Total Revenue | 243,339.08 | 100.00 | 2,370,053.61 | 100.00 |
| | | | | |
| **Cost of Sales** | | | | |
| Cost of Sales | 92,414.72 | 37.98 | 919,997.39 | 38.82 |
| Cooking Oil | 0.00 | 0.00 | 22,780.74 | 0.96 |
| Total Cost of Sales | (92,414.72) | (37.98) | (942,778.13) | (39.78) |
| | | | | |
| **Gross Profit** | 150,924.36 | 62.02 | 1,427,275.48 | 60.22 |
| | | | | |
| **Other Income** | | | | |
| Sales Tax Commission | 160.17 | 0.07 | 1,729.52 | 0.07 |
| Total Other Income | 160.17 | 0.07 | 1,729.52 | 0.07 |
| | | | | |
| **Operating Expenses** | | | | |
| Administrative Salaries | 12,399.82 | 5.10 | 52,399.82 | 2.21 |
| Direct Labor | 60,838.57 | 25.00 | 689,994.59 | 29.11 |
| Contract Labor | 442.25 | 0.18 | 17,053.93 | 0.72 |
| Laundry/Uniforms | 1,301.65 | 0.53 | 17,184.01 | 0.73 |
| Employee Uniform Service | (37.00) | (0.02) | (257.46) | (0.01) |
| Bank Charges | 750.00 | 0.31 | 2,784.35 | 0.12 |
| Credit Card Fees | 2,865.63 | 1.18 | 42,125.95 | 1.78 |
| Rent | 0.00 | 0.00 | 23,000.00 | 0.97 |
| Rent-Equipment | 0.00 | 0.00 | 144.45 | 0.01 |
| Dishwash System Supplies | 1,229.42 | 0.51 | 6,836.99 | 0.29 |
| Dishwash System Lease | 195.00 | 0.08 | 2,712.18 | 0.11 |
| Utilities | 9,538.45 | 3.92 | 108,509.66 | 4.58 |
| Telephone | 623.40 | 0.26 | 11,571.12 | 0.49 |
| Music Royalties | 22.27 | 0.01 | 626.91 | 0.03 |
| Maintenance/Repairs | 3,140.20 | 1.29 | 55,898.66 | 2.36 |
| Pest Control | 0.00 | 0.00 | 4,780.00 | 0.20 |
| Security Service | 0.00 | 0.00 | 198.00 | 0.01 |
| Vehicle Expense | 245.00 | 0.10 | 5,845.45 | 0.25 |
| Payroll Taxes | 6,331.07 | 2.60 | 73,277.01 | 3.09 |
| Other Taxes & Licenses | (175.57) | (0.07) | 3,806.16 | 0.16 |
| Office Expense | 1,146.78 | 0.47 | 12,619.84 | 0.53 |
| Supplies | 6,419.65 | 2.64 | 79,504.50 | 3.35 |
| books | 0.00 | 0.00 | 93.00 | 0.00 |
| Meetings & Seminars | 0.00 | 0.00 | 396.00 | 0.02 |
| Depreciation | 522.26 | 0.21 | 6,267.12 | 0.26 |
| Professional Fees | 1,180.00 | 0.48 | 9,615.00 | 0.41 |
| Management Fees | 4,000.00 | 1.64 | 45,500.00 | 1.92 |

# Exhibit _H4_

**Blue Willow Inn Restaurant, Inc.**
**Income Statement**
**For the 1 Month and 12 Months Ended  December 31, 2010**

| | 1 Month<br>December 31,<br>2010 | % | 12 Months<br>December 31,<br>2010 | % |
|---|---|---|---|---|
| Employee background check fee | 0.00 | 0.00 | 35.00 | 0.00 |
| U S Trustee Quarterly Fees | 0.00 | 0.00 | 4,875.00 | 0.21 |
| Interest | (892.65) | (0.37) | 33,788.37 | 1.43 |
| Insurance | 1,487.23 | 0.61 | 96,565.20 | 4.07 |
| Dues & Subscriptions | 0.00 | 0.00 | 352.50 | 0.01 |
| Advertising | 576.60 | 0.24 | 17,091.05 | 0.72 |
| Postage & Freight | 78.74 | 0.03 | 4,321.41 | 0.18 |
| Meals,Corporate | 0.00 | 0.00 | 238.62 | 0.01 |
| **Total Operating Expenses** | (114,228.77) | (46.94) | (1,429,754.39) | (60.33) |
| **Net Income (Loss)** | $   36,855.76 | 15.15 | $   (749.39) | (0.03) |

# **EXHIBIT I**

## **Subscription Agreement with Investor Suitability Questionnaire**

# DIRECTIONS FOR THE COMPLETION OF THE SUBSCRIPTION DOCUMENTS

Prospective investors must complete all of the Subscription Documents contained in this package in the manner described below. For purposes of these Subscription Documents, the "Investor" is the person for whose account the shares of 3% voting, cumulative, non-participating preferred stock of Blue Willow Inn Restaurant, Inc. (the 'Shares") are being purchased. Another person with investment authority may execute the Subscription Documents on behalf of the Investor, but should indicate the capacity in which he/she is doing so and the name of the Investor.

1.    Subscription Agreement:

   a.   Fill in amount of the proposed investment.

   b.   Date, print name/capacity/title of the Investor and sign

2.    Investor Questionnaire:

   a.   In Section A, each Investor should fill in the Investor's name, address, tax identification or social security number, telephone, fax numbers and e-mail address and respond to the questions in items 7 and 8, if applicable.

   b.   Each Investor should check the box or boxes in Section B that are next to the categories under which the Investor qualifies as an accredited investor. If an Investor does not qualify as an Accredited Investor, please check the box that indicates that you are not an accredited investor.

   c.   Each entity should respond to the questions in Section D.

   d.   Date, print name/capacity/title of the Investor and sign

3.    Delivery of Subscription Documents:

Two completed and signed copies of the signature page of the Subscription Agreement, as well as a completed and signed W-9 and the Investor Questionnaire, together with any required evidence of authorization, should be delivered to the company at the following address:

<div align="center">

BLUE WILLOW INN RESTAURANT, INC.
294 North Cherokee Road
Social Circle, Georgia 30025
Attn: J.D. Holmes

</div>

Inquiries regarding subscription procedures should be directed to J.D. Holmes at (770) 265-4298. If the Investor's subscription is accepted by the Company, a fully executed set of the Subscription Documents will be returned to the Investor.

4.    Payment of Subscription:

Payment of the Investor's subscription should be made by wire transfer to Blue Willow Inn Restaurant, Inc.'s account specified in this Subscription Agreement, or by bank check or certified funds made payable to "Blue Willow Inn Restaurant, Inc." and delivered to the address provided herein.

**BLUE WILLOW INN RESTAURANT, INC.**
**294 North Cherokee Road**
**Social Circle, Georgia 30025**
Attn: J.D. Holmes
770-265-4298

**SUBSCRIPTION AGREEMENT**

Greetings:

1. <u>Subscription.</u> The undersigned (the "Investor") subscribes for and agrees to purchase:

    _____ shares of 3% Voting Cumulative Non-Participating Preferred Stock (the "Shares") at a price of $5,000 per Share.

    The Investor acknowledges that this subscription (i) is irrevocable, (ii) is conditioned upon acceptance by the Company and approval by the Bankruptcy Court, and (iii) may be accepted or rejected in whole or in part by the Company in its sole discretion. No funds will be accepted by the Company until the Bankruptcy Court has approved this Offering and confirmed the Bankruptcy Plan of Reorganization and obtaining subscription agreements to purchase the Minimum Offering Amount of $175,000.

2. <u>Representations, Warranties and Covenants.</u> To induce the Company to accept this subscription, the Investor represents and warrants as follows:

    (a) The Investor has been furnished the Private Placement Memorandum.

    (b) The Investor has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Shares, is able to bear the risks of an investment in the Shares and understands the risks of, and other considerations relating to, a purchase of the Shares.

    (c) The Investor (i) will not transfer or deliver any Shares except in accordance with the restrictions set forth under State and Federal law and (ii) is acquiring the Shares to be acquired hereunder for the Investor's own account for investment purposes only and not with a view to resale or distribution.

    (d) The Investor understands that the Shares have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), the securities laws of any state or the securities laws of any other jurisdiction, nor is such registration contemplated. The Investor understands and agrees further that the Shares must be held indefinitely unless they are subsequently registered under the Securities Act and these laws or an exemption from registration under the Securities Act and these laws covering the sale of the Shares is available. The Investor understands that legends stating that the Shares have not been registered under the Securities Act and these laws and setting out or referring to the restrictions on the transferability and resale of the Shares will be placed on all documents, if any, evidencing the Shares. The Investor's overall commitment to purchase the Shares and other investments that are not readily marketable is not disproportionate to the Investor's net worth and the Investor has no need for immediate liquidity in the Investor's investment in the Shares.

2

(e) To the full satisfaction of the Investor, if Investor has requested such information in writing, the Investor has been furnished with the materials listed as being available, as described in the Private Placement Memorandum.

( f ) None of the following has ever been represented, guaranteed or warranted to the Investor by or on behalf of the Company: (i) that the Company will be profitable or that the Investor will receive cash dividends on the Shares; or (ii) that the past performance or experience on the part of the Company or any of its employees, agents or affiliates will in any way indicate the possibility of payment of cash dividend.

(g) The Investor is not relying upon any information, representation or warranty by the Company or any of its agents in determining to invest in the Company other than that which is set forth in the Private Placement Memorandum dated July 29, 2011. The Investor has consulted to the extent deemed appropriate by the Investor with the Investor's own advisers as to the financial, tax, legal and related matters concerning an investment in the Shares and on that basis believes that an investment in the Shares is suitable and appropriate for the Investor.

(h) If the Investor is not a natural person, the Investor has the power and authority to enter into this Subscription Agreement and each other document required to be executed and delivered by or on behalf of the Investor in connection with this subscription for Shares, and to perform its obligations thereunder and consummate the transactions contemplated thereby, and the person signing this Subscription Agreement on behalf of the Investor has been duly authorized to execute and deliver this Subscription Agreement and each other document required to be executed and delivered by the Investor in connection with this subscription for Shares. If the Investor is an individual, the Investor has all requisite legal capacity to acquire and hold the Shares and to execute, deliver and comply with the terms of each of the documents required to be executed and delivered by the Investor in connection with this subscription for Shares. Such execution, delivery and compliance by the Investor does not represent a breach of, or constitute a default under, any instruments governing the Investor, any applicable law, regulation or order to which the Investor is subject, or any agreement to which the Investor is a party or by which the Investor is bound. This Subscription Agreement has been duly executed by the Investor and constitutes a valid and legally binding agreement of the Investor.

(i) If the Investor is, or is acting on behalf of, an individual retirement account (an "IRA"), (i) the decision to invest in the Company was made by a fiduciary (within the meaning of Section 3(21) of ERISA and the regulations thereunder) (the "Custodian") of the Plan which is unrelated to the Company or any of its employees, representatives or affiliates and which is duly authorized to make such an investment decision on behalf of the IRA; (ii) the Custodian, in consultation with his/her counsel, has taken into consideration its fiduciary duties under ERISA, including the diversification requirements of Section 404(a)(1)(c) of ERISA, in authorizing; the IRA's investment in the Company, and has concluded that such investment is prudent; (iii) the IRA's subscription to invest in the Company and the purchase of Shares contemplated thereby is in accordance with the terms of the IRA's governing instruments and complies with all applicable requirements of ERISA and the U.S. Internal Revenue Code of 1984, as amended (the "Code"); (iv) the Custodian acknowledges and agrees that neither the Company nor any of its employees, representatives or affiliates will be a fiduciary with respect to the IRA as a result of the IRA's investment in the Company, and the Custodian has not relied on, and is not relying on, the investment advice of any such person with respect to the IRA's investment in the Company; and (v) the IRA is not an employee benefit plan or trust within the meaning of, and subject to, the provisions of the ERISA, other than an IRA, including self-directed IRAs.

(j) The Investor was offered the Shares in the State listed in the Investor's permanent address set forth in the Investor Questionnaire attached hereto or previously provided to the Company and intends that the securities law of that State govern the Investor's subscription.

3. <u>Further Advice and Assurances.</u> All information that the Investor has provided to the Company, including the information in the attached Investor Questionnaire, is correct and complete as of the date hereof, and the Investor agrees to notify the Company immediately if any representation, warranty or information contained in this Subscription Agreement, including in the attached Investor Questionnaire, becomes untrue at any time. The Investor agrees to provide such information and execute and deliver such documents as the Company may reasonably request from time to time to verify the accuracy of the Investor's representations and warranties herein or to comply with any law or regulation to which the Company may be subject.

4. <u>Indemnity.</u> The Investor understands that the information provided herein and in the attached Investor Questionnaire will be relied upon by the Company for the purpose of determining the eligibility of the Investor to purchase the Shares. The Investor agrees to provide, if requested, any additional information that may reasonably be required to determine the eligibility of the Investor to purchase the Shares. To the maximum extent permitted by law, the Investor agrees to indemnify and hold harmless the Company, and its officers, each other member of the Company, and each of the Company's agents and representatives from and against any loss, damage, or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained in this Subscription Agreement, the Investor Questionnaire or in any other document provided by the Investor to the Company in connection with the Investor's investment in the Shares or otherwise. Notwithstanding any provision of this Subscription Agreement, the Investor does not waive any rights granted to it under applicable securities laws.

5. <u>Payment of Subscription.</u> (a) The Investor shall pay the amount of the Investor's subscription hereunder by wire transfer, bank check or certified funds the account set forth below. No funds will be accepted by the Company until the Bankruptcy Court has approved this Offering and confirmed the Bankruptcy Plan of Reorganization and obtaining subscription agreements to purchase the Minimum Offering Amount of $175,000.

If the Investor's subscription is rejected in whole or in part, the Subscription Agreement shall be promptly returned by the Company to the address designated by the Investor.

(b) Wire transfer payments shall be made to the following account:

      Bank:              _____
      Address:           _____
                            _____
                            _____
      ABA No.           _____
      For the account of   _____
      Account No.       _____

Certified checks or bank checks should be made payable to:

      Blue Willow Inn Restaurant, Inc.

And should be mailed to:

           BLUE WILLOW INN RESTAURANT, INC.
               294 North Cherokee Road
               Social Circle, Georgia 30025
                 Attn: J.D. Holmes

7. <u>Miscellaneous.</u> This Subscription Agreement is not assignable by the Investor without the consent of the Company. This Subscription Agreement, including the Investor Questionnaire, constitutes the entire understanding of the parties with regard to the purchase of the Shares, supersedes all written and oral agreements with respect to the same and may not be waived, modified, changed, discharged, terminated, revoked or canceled except by a writing signed by the parties thereto. The representations and warranties made by the Investor in this Subscription Agreement shall survive the closing of the Investor's investment in the Company and any investigation made by the Company. The attached Investor Questionnaire is an integral part of this Subscription Agreement and shall be deemed incorporated into this Agreement by this reference. This Subscription Agreement may be executed in one or more counterparts, all of which together shall constitute one instrument, and shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to its principles of conflicts of laws. The parties hereby submit to the exclusive jurisdiction of the federal and state courts in Fulton County, Georgia for all purposes of or in connection with this Subscription Agreement. The parties hereby consent to process being served in any suit, action or proceeding of the nature referred to above (i) by the mailing of a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to its address shown below its signature hereon, or (ii) by serving a copy thereof upon any party's authorized agent for service of process (to the extent permitted by applicable law, regardless whether the appointment of such agent for service of process for any reason shall prove to be ineffective or such agent for service of process shall accept or acknowledge such service). The parties agree that such service, to the fullest extent permitted by law, (i) shall be deemed in every respect effective service of process upon it in any such suit, action or, proceeding and (ii) shall be taken and held to be valid personal service upon and personal delivery to it. Nothing herein shall affect any party's right to serve process in any other manner permitted by law.

THE PARTIES HERETO IRREVOCABLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER OR IN CONNECTION WITH THE THIS SUBSCRIPTION AGREEMENT OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A JUDGE AND NOT BEFORE A JURY.

   IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement on the date set forth below.

Date: _____

                         Number of Shares: _____
                         At $5,000 per Share


                         _____
                         (Print Name of Entity)

                         By: _____
                         (Signature)

                         _____
                         (Print Name and Title)

                         INDIVIDUAL INVESTOR:


                         _____
                         (Signature)

(Print Name)

Address of Investor:

_____

_____

The Company hereby accepts the above application for subscription for Shares.

BLUE WILLOW INN RESTAURANT, INC.

By: _____     Date:_____
      Billie Van Dyke, President

6

# INVESTOR QUESTIONNAIRE

## SECTION A.   General Information

1.  Print Full Name of Investor: _____

2.  Address and Contact Person
    for Notices:                 _____
                                 _____

    Attention:                   _____

3.  Telephone Number:            _____

4.  Fax Number:                  _____

5.  Permanent Address:           _____
    (if different from above)    _____

6.  Email address:               _____

7.  U.S. Taxpayer
    Identification or Social
    Security Number:             _____

8.  **INVESTMENT BY IRA'S ONLY:**

    **AGREEMENT OF CUSTODIAN OF INDIVIDUAL RETIREMENT ACCOUNT: The undersigned, being the custodian of the above named individual retirement account, hereby accepts and agrees to this Subscription Agreement.**

    By: _____     _____
        **Signature of Authorized Signatory**      **Print Name of Authorized Signatory**

## SECTION B.   Accredited Investor Status

The Investor represents and warrants that the Investor is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "Securities Act"), and has checked the box or boxes below which are next to the categories under which the Investor qualifies as an accredited investor:

FOR ENTITIES:

(A)    ☐   An entity, including a grantor trust, in. which all of the equity owners are accredited investors (for this purpose, a beneficiary of a trust is not an equity owner, but the grantor of a grantor trust may be an equity owner).

7

(B) ☐ A bank as defined in Section 3(a)(2) of the Securities Act or any savings and loan association or other, institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

(C) ☐ An insurance company as defined in Section 2(13) of the Securities Act.

(D) ☐ A broker-dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Securities Exchange Act").

(E) ☐ An investment company registered under the Investment Company Act of 1940, as amended (the "Investment Company Act").

(F) ☐ A business development company as defined in Section 2(a)(48) of the Investment Company Act.

(G) ☐ A small business investment company licensed by the Small Business Administration under Section 301 (c) or (d) of the Small Business. Investment Act of 1958, as amended.

(H) ☐ A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act").

(I) ☐ An organization described in Section 501(c)(3) of the Internal Revenue Code, a corporation, Massachusetts or similar business trust, or partnership, in each case not formed for the specific purpose of acquiring Interests, with total assets in excess of $5 million.

(J) ☐ A trust with total assets in excess of $5 million not formed for the specific purpose of acquiring Interests, whose purchase is directed by a person with such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Interests.

(K) ☐ An employee benefit plan within the meaning of ERISA if the decision to invest in the Interests is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5 million or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

(L) ☐ A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if the plan has total assets in excess of $5 million.

FOR INDIVIDUALS:

(M) ☐ A natural person with individual net worth (or joint net worth with spouse) in excess of one Million Dollars ($1,000,000). For purposes of this item, "net worth" means the excess of total assets at fair market value, including home, home furnishings and automobiles (and including property owned by a spouse), over total liabilities.

☐ A natural person with individual income (without including any income of the Investor's spouse) in excess of $200,000, or joint income with spouse of $300,000, in each of the two most recent years and who reasonably expects to reach the same income level in the current year.

_____ I am NOT an "accredited investor" (please initial here, if applicable)

8

**SECTION C.  Supplemental Data for Entities ONLY; not natural persons**

If the Investor is an entity, furnish the following: supplemental data (natural persons may skip this Section of the Investor Questionnaire):

1.  Legal form of entity (corporation, partnership, trust, etc.): _____

    Jurisdiction of organization: _____

2.  Was the Investor organized for the specific purpose of acquiring Shares?

    ☐ Yes        ☐ No

If the answer to the above question is "Yes," please contact the Company for additional information that will be required.

3.  Are shareholders, partners or other holders of equity or beneficial interests in the Investor able to decide individually whether to participate, or the extent of their participation, in the Investor's investment in the Company (i.e. can equity holders in the Investor determine whether their capital will form part of the capital invested by the Investor in the Company)?

    ☐ Yes        ☐ No

If the answer to the above question is "Yes," please contact the Company for additional information that will be required.

4.  Please indicate whether or not the Investor is, or is acting on behalf of, (i) an employee benefit plan within the meaning of Section 3(3) of ERISA, whether or not such plan is subject to ERISA, or (ii) an entity which is deemed to hold the assets of any such employee benefit plan pursuant to 29 C.F.R. § 2510.3-101. For example, a plan which is maintained by a foreign corporation, governmental entity or church, a Keogh plan covering no common-law employees and an individual retirement account are employee benefit plans within the meaning of Section 3(3) of ERISA but generally are not subject to ERISA (collectively "Non-ERISA Plans"). In general, a foreign or U.S. entity which is not an operating company and which is not publicly traded or registered as an investment company under the Investment Company Act of 1940, as amended, and in which 25% or more of the value of any class of equity interests is held by employee pension or welfare plans (including an entity which is deemed to hold the assets of any such plan), would be deemed to hold the assets of one or more employee benefit plans pursuant to 29 C.F.R. § 2510.3-101. However, if only Non-ERISA Plans were invested in such an entity, the entity generally would not be subject to ERISA. For purposes of determining whether this 25% threshold has been met or exceeded, the value of any equity interests held by a person (other than such a plan or entity) who has discretionary authority or control with respect to the assets of the entity, or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, is disregarded.

    ☐ Yes        ☐ No

If the Investor is, or is acting on behalf of, such an employee benefit plan, or is an entity deemed to hold the assets of any such plan or plans, please indicate whether or not the Investor is subject to ERISA.

    ☐ Yes        ☐ No

Please indicate whether or not the Investor is a U.S. pension trust or governmental plan qualified under section 401(a) of the Code or a U.S. tax-exempt organization qualified under section 501(c)(3) of the Code.

☐ Yes        ☐ No


5.  Does the amount of the Investor's subscription for Shares exceed 40% of the total assets (on a consolidated basis with its subsidiaries) of the Investor?

☐ Yes        ☐ No

If the question above was answered "Yes," additional information may be required.

6.  (a) Is the Investor a private investment company which is not registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"), in reliance on Section 3(c)(1) or Section 3(c)(7) thereof?

☐ Yes        ☐ No

7.  If the Investor has a taxable year that ends other than on December 31, please indicate the end date of such taxable year-end: _____.


## SECTION D.  Related Parties

Will any other person or persons have a beneficial interest in the Shares to be acquired hereunder (other than as a shareholder, partner or other beneficial owner of equity interests in the Investor)?

☐ Yes        ☐ No

If the question above was answered "Yes, additional information may be required.

If the investor due diligence was performed by a third party, such as a fund administrator or an investor intermediary, with regard to the investor and underlying investors, if applicable, please identify the third party:

_____

The Investor understands that the foregoing information will be relied upon by the Company for the purpose of determining the eligibility of the Investor to purchase Shares in the Company. The Investor agrees to provide, if requested, any additional information that may be reasonably required to substantiate the Investor's status as an "accredited investor", or to otherwise determine the eligibility of the Investor to purchase Shares in the Company. To the maximum extent permitted by law, the Investor agrees to indemnify and hold harmless the Company, its directors, officers, employees, agents, representatives, and other members of the Company from and against any loss, damage or liability due to or arising out of a breach of any representation, warranty or agreement of the Investor contained herein.

**ENTITY INVESTOR:**

_____
(Print Name of Entity)

By:

_____
(Signature)

_____
(Print Name and Title)

Address: _____

Date: _____          _____

**INDIVIDUAL INVESTOR:**

_____
(Signature)

_____
(Print Name)

Address: _____

Date: _____          _____

# ATTACHMENT 6

| VAN DYKE |
| :---: |
| LIQUIDATION ANALYSIS |

| Prepared: | 7/18/2011 |
| :--- | :--- |
| By: | J.D. Holmes |

| ASSETS - RESTAURANT | | | | |
| :--- | ---: | :---: | ---: | :--- |
| Item Description | Fair Mkt Value | % | Liquidation Value | Value Source |
| Inventory | $ 17,500 | 0% | $ - | $50K/wk sales; 35% COGS; 1 wk |
| Furniture & Fixtures | $ 300,000 | 15% | $ 45,000 | Included in RE appraisal |
| Goodwill/Trademarks | $ 200,000 | 0% | $ - | Business broker estimate |
| | | | | |
| TOTALS: | $ 517,500 | | $ 45,000 | |

| ASSETS - GIFT SHOP | | | | |
| :--- | ---: | :---: | ---: | :---: |
| Item Description | Fair Mkt Value | % | Liquidation Value | Value Source |
| Inventory | $ 20,000 | 50% | $ 10,000 | Estimated |
| Furniture & Fixtures | $ 10,000 | 20% | $ 2,000 | Estimated |
| Goodwill/Trademarks | $ 10,000 | 0% | $ - | Estimated |
| | | | | |
| TOTALS: | $ 40,000 | | $ 12,000 | |

| ASSETS - VILLAGE | | | | |
| :--- | ---: | :---: | ---: | :--- |
| Item Description | Fair Mkt Value | % | Liquidation Value | Value Source |
| Inventory | $ - | | $ - | |
| Furniture & Fixtures | $ 30,000 | 20% | $ 6,000 | Estimated |
| Goodwill/Trademarks | $ 50,000 | 0% | $ - | Estimated |
| | | | | |
| | $ 80,000 | | $ 6,000 | |

| ASSETS - VAN DYKE | | | | |
| :--- | ---: | :---: | ---: | :--- |
| Item Description | Fair Mkt Value | % | Liquidation Value | Value Source |
| BWI & Gift Shop (8,986SF; 2.408 acres) | $ 700,000 | 75% | $ 525,000 | WF |
| Magnolia Hall (6,484SF; 1.2822 acres) | $ 475,000 | 75% | $ 356,250 | WF |
| BWI Village (24,377SF; 3.842 acres) | $ 700,000 | 50% | $ 350,000 | WF |
| BWI Office (0.862 Acres) | | | | |
| Mtn. Lots | | | | |
| Residence | $ 160,000 | 75% | $ 120,000 | |
| Automobile - Toyota | | | | |
| Automobile - Honda | | | | |
| Personal Property | | | | |
| | | | | |
| | | | | |
| TOTALS: | $2,035,000 | | $ 1,351,250 | |

| Grand Totals: | $2,672,500 | | $ 1,414,250 | |
| :--- | ---: | :--- | ---: | :--- |

| | Compiled: | 7/23/2011 |
|---|---|---|
| | Compiled by: | J.D. Holmes |

| | Case #10-31267 & #10-31270 | | | | |
|---|---|---|---|---|---|
| | **Blue Willow Inn Restaurant & Gift Shop** | | | | |
| | **CREDITOR** | **UNSECURED** | | | |
| 1 | Muzak | $ | 111.87 | $ | 111.87 | 0% |
| 2 | Heritage Service Group | $ | 136.00 | $ | 247.87 | 0% |
| 3 | David Malcolm | $ | 157.00 | $ | 404.87 | 0% |
| 4 | Pitney Bowes | $ | 159.96 | $ | 564.83 | 0% |
| 5 | SimplexGrinnell | $ | 165.49 | $ | 730.32 | 0% |
| 6 | Cozzini Brothers | $ | 176.00 | $ | 906.32 | 0% |
| 7 | Business Card | $ | 726.84 | $ | 1,633.16 | 0% |
| 8 | Atlantic Pit Service | $ | 750.00 | $ | 2,383.16 | 0% |
| 9 | Citibank South Dakota | $ | 881.41 | $ | 3,264.57 | 0% |
| 10 | Flower Mill Greenhouse | $ | 908.58 | $ | 4,173.15 | 0% |
| 11 | Office Depot | $ | 946.15 | $ | 5,119.30 | 0% |
| 12 | Finch Electric | $ | 983.21 | $ | 6,102.51 | 0% |
| 13 | Bostwick Broadcasting | $ | 1,450.00 | $ | 7,552.51 | 0% |
| 14 | Commercial Appliance Parts | $ | 1,751.31 | $ | 9,303.82 | 0% |
| 15 | Ballard Spahr, LLP | $ | 1,875.00 | $ | 11,178.82 | 0% |
| 16 | Consolidated Copiers Sxerv | $ | 2,428.16 | $ | 13,606.98 | 0% |
| 17 | Social Circle Ace Home Ctr | $ | 3,469.64 | $ | 17,076.62 | 0% |
| 18 | The Walton Tribune | $ | 3,931.59 | $ | 21,008.21 | 0% |
| 19 | Internal Revenue Service | $ | 4,661.77 | $ | 25,669.98 | 0% |
| 20 | WESH-M Radio | $ | 7,155.00 | $ | 32,824.98 | 0% |
| 21 | Funseeker's Network | $ | 8,500.00 | $ | 41,324.98 | 0% |
| 22 | PFG Milton's/Performance Food Gp | $ | 10,686.11 | $ | 52,011.09 | 0% |
| 23 | Allen Smith Conmsulting | $ | 10,775.00 | $ | 62,786.09 | 0% |
| 24 | Phoenix Wholesale Food Svc | $ | 18,000.00 | $ | 80,786.09 | 1% |
| 25 | Hall's Fresh Produce | $ | 23,880.40 | $ | 104,666.49 | 1% |
| 26 | GA. Dept of Revenue (Incl $14K Sls Tax 12/10) | $ | 25,067.58 | $ | 129,734.07 | 1% |
| 27 | U.S. Foodservice | $ | 27,317.64 | $ | 157,051.71 | 1% |
| 28 | AdvanceMe, Inc. | $ | 59,046.00 | $ | 216,097.71 | 3% |
| 29 | Sysco Atlanta, LLC | $ | 68,407.75 | $ | 284,505.46 | 3% |
| 30 | De Lage/Wachovia Bus. Leasing | $ | 68,688.48 | $ | 353,193.94 | 3% |
| 31 | Internal Revenue Service | $ | 80,248.41 | $ | 433,442.35 | 4% |
| 32 | Georgia Dept of Comm. Affairs | $ | 249,667.48 | $ | 683,109.83 | 11% |
| 33 | Georgia Cities Foundation | $ | 250,000.00 | $ | 933,109.83 | 11% |
| 34 | One Georgia Authority | $ | 299,196.42 | $ | 1,232,306.25 | 13% |
| 35 | Wells Fargo Bank | $ | 1,000,000 | $ | 2,232,306.25 | 45% |
| | **Gift Shop Claims:** | $ | 31,462.44 | | | |
| | | | | | | |
| | TOTALS: | $ | 2,263,769 | $ | 7,160,295.99 | |

| | | | |
|---|---|---|---|
| We need: | 18 | Creditors | |
| Representing: | $1,509,933.72 | of claims | |