UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

|  |  |  |
|---|---|---|
| IN RE: | ) | |
|  | ) | Chapter 11 |
| Blue Willow Inn Restaurant, Inc., et al. | ) | |
|  | ) | Case Nos. 10-31267, |
|  | ) | 10-31269, 10-31270 and |
| Debtors. | ) | 10-31266 |
|  | ) | |
|  | ) | Jointly Administered Under |
|  | ) | Case No. <u>10-31267</u> |

_____

# SECOND AMENDED DISCLOSURE STATEMENT
# FOR DEBTORS' CHAPTER 11 JOINT PLAN

Martha A. Miller, Esq.
Martha A. Miller, P.C.
229 Peachtree Street, N.E.
2415 International Tower
Atlanta, Georgia 30303

Counsel for Debtors

Dated: September 20, 2011

## I.  INTRODUCTION

This Amended Disclosure Statement (the "Amended Disclosure Statement") has been prepared pursuant to Section 1125 of the United States Bankruptcy Code on behalf of **Blue Willow Inn Restaurant, Inc., Blue Willow Inn Gift Shop, Inc., Blue Willow Village, Inc. and Billie R. Van Dyke** (hereinafter referred to as "Debtors") in connection with Debtors' solicitation of votes for their Amended Chapter 11 Joint Plan dated September 15
, 2011 (the "Plan").  It contains important information about Debtors and the Plan.

In providing this Amended Disclosure Statement to parties in interest, Debtors expressly seek to enable such parties to make an informed judgment on whether to approve or reject the Plan.

This Amended Disclosure Statement contains a summary of the Plan, general information about Debtors and their Chapter 11 cases and important information concerning Debtors' current and future financial condition.  All attachments referenced herein were attached to, filed and served with the original Disclosure Statement filed on July 29, 2011, and are incorporated as attachments hereto by reference.

The information contained herein has been prepared by Debtors in good faith, based upon information available to Debtors.  Debtors have never caused any of the financial information contained herein to be verified by an audit.  However, all financial information was compiled from the records of Debtors.

The description of the Plan contained in this Amended Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself, which has been filed contemporaneously herewith.  **Each creditor is encouraged to read, consider and carefully analyze the terms and provisions of the Plan which accompanies this Disclosure Statement**.

The statements contained in this Amended Disclosure Statement are made as of the date hereof, unless another time is specified herein, and delivery of this Amended Disclosure Statement shall not create an implication that there has

been no change in the facts set forth herein since the date of this Amended Disclosure Statement and the date the materials relied upon in preparation of this Amended Disclosure Statement were compiled.

Each of the documents attached hereto as attachments, including those exhibits to the Private Placement Memorandum, are incorporated into and are a part of the Disclosure Statement as if set forth in full herein.

This Amended Disclosure Statement may not be relied on for any purpose other than to determine how to vote on the Plan, and nothing contained herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving Debtors or any other party, or be deemed conclusive advice on the tax or other legal effects of the reorganization on holders of claims or interests.

**THIS AMENDED DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER GOVERNMENTAL AGENCY, NOR HAS THE COMMISSION OR ANY SUCH OTHER GOVERNMENTAL AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.**

**THIS AMENDED DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN, WHICH IS ANNEXED HERETO AS ATTACHMENT 1, SHOULD BE READ IN ITS ENTIRETY. ADDITIONALLY, IT MAY BE ADVISABLE FOR CREDITORS TO CONSULT THEIR OWN COUNSEL OR OTHER ADVISORS WITH RESPECT TO THE MATTERS CONTAINED HEREIN.**

**NO REPRESENTATIONS CONCERNING THE DEBTORS, THEIR FUTURE BUSINESS OPERATIONS, FINANCIAL CONDITION OR THE VALUE OF THEIR PROPERTY ARE AUTHORIZED BY DEBTORS OTHER THAN AS SET FORTH IN THIS AMENDED DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO CREDITORS TO SECURE AN ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION.**

## II. BRIEF DISCUSSION OF CHAPTER 11 OF THE BANKRUPTCY CODE

Under Chapter 11 of the Bankruptcy Code a Debtor is afforded an opportunity to rehabilitate its business and to restructure its financial obligations to its creditors. In some instances, a Debtor may also change the structure of its equity securities ("interests") by canceling one or more classes of equity securities or issuing new securities.

In general, a Debtor files a "Chapter 11 Plan" which sets forth a proposal for settlement of the Debtor's debts. A Debtor's debts are classified as either being unsecured or secured, depending on whether the Debtor has pledged any of its property to the creditor as collateral for the debt.

The Bankruptcy Code (the "Code") requires that certain unsecured debts receive priority in payment over other debts. Examples of unsecured debts entitled to priority are expenses and fees incurred during the Chapter 11, wages and certain employee benefits, certain consumer obligations, and taxes.

The Code requires that a Plan propose full cash payment to all priority unsecured creditors except taxing authorities. Taxes under the Code may be paid over time in installments. Unsecured creditors may receive all or a portion of their claims under a Plan.

A Debtor under Chapter 11 may restructure its secured debt by paying its secured creditors in cash in full or in installment payments. A Debtor may also arrange for a secured creditor's collateral to be sold or surrendered.

In any event, unless the creditors agree differently, a Plan must provide creditors with at least the same consideration which creditors would receive in a liquidation of Debtor under Chapter 7 of the Code.

The Debtor or other proponent of a Plan files the Plan with the Clerk of the Bankruptcy Court. The Code requires that a Plan be accompanied by a Disclosure Statement. The Disclosure Statement must contain a summary of the Plan and sufficient information about the Debtor and its financial affairs to enable a creditor or other party in interest to intelligently determine whether to vote for or

against the Plan.

After the Plan and Disclosure Statement are filed, the Court holds a hearing on the adequacy of the Disclosure Statement. If the Court determines that the Disclosure Statement makes proper disclosure, then it is approved and the Plan and Disclosure Statement, along with a ballot are mailed to creditors and equity security holders for vote.

Typically, a date is set by the Court as the last day votes may be counted. The Court also schedules a Confirmation Hearing at which time the votes are counted and the Court hears evidence as to whether the Plan complies with various standards for confirmation under the Code. In order for the Plan to be approved by creditors and interest holders, a vote of two-thirds in amount and a majority in number of creditors of each class of "impaired" creditors who vote must affirmatively vote for the Plan.

If a class of impaired creditors does not accept the Plan, then the Plan may still be confirmed if it is "fair and equitable" respecting such class. The Code defines "fair and equitable" regarding unsecured creditors as generally meaning payment of the entire amount of each creditor's claim or that no class of creditors or interest holders with a lesser priority will receive any consideration under the Plan. Regarding secured creditors, "fair and equitable" generally means that the creditor receives the "indubitable equivalent" of its secured claim or cash or deferred payments with a present value equal to the amount of the secured claim.

When a Plan is confirmed notwithstanding the lack of acceptance of all impaired classes, it is said that the Debtor has effected a "cramdown" of the Plan. "Impaired" means that the creditor or interest holder is not receiving precisely the same rights it was entitled to under its contract with the Debtor. Generally, unless an unsecured creditor receives one hundred percent of its claim in cash, it is said to be impaired.

When a Debtor's Plan is confirmed, the Debtor receives a discharge or release of all indebtedness which it does not pay under the provisions of the Plan. The discharge applies whether or not a creditor received notice of the Chapter 11 proceeding.

## III. GENERAL INFORMATION AND BACKGROUND CONCERNING DEBTOR

### A. General Background

There are four related Chapter 11 cases pending in this Court which have been procedurally consolidated: Blue Willow Inn Restaurant, Inc. ("Restaurant") (Case No. 10-31267); Blue Willow Inn Gift Shop, Inc. ("Gift Shop") (Case No. 10-31270); Blue Willow Village, Inc. ("Village") (Case No. 10-31269); and Billie R. Van Dyke (Case No. 10-31266). Mrs. Van Dyke is the sole owner of the corporate debtors and holds legal title to all real property on which the corporate debtors conduct business. The lead business of these affiliated businesses is the Restaurant. The Restaurant, Village and Gift Shop operate on 7.112 acres ("7.112 Acres") in Social Circle, Georgia. The legal descriptions of the three tracts that comprise the 7.112 Acres with a plat map showing the tracts is attached as Attachment 2.

Debtor Blue Willow Inn Restaurant, Inc. was formed in 1992 to renovate a Greek Revival mansion to operate as a restaurant of fine southern cuisine. Through the hard work and talent of its owners, Louis Van Dyke and Billie R. Van Dyke, husband and wife, the Restaurant has earned a national reputation as a citadel of excellent southern food and cookbooks. It has received awards and been profiled in state and national media as has its owners. The Restaurant employs 62 people. Attached hereto as Attachment 3 is an editorial column from the *Covington News*, published April 23, 2011, which highlights the uniqueness of the Restaurant, its wide renown and substantial significance to the community.

The Restaurant's impact on the regional economy is significant. Regional experts report that a destination restaurant like the Blue Willow brings in eight dollars into the region for every dollar spent at the Restaurant. The Restaurant's sales for 2011 year-to-date of $1,092,093.00[1] translate into money to the community of $8,736,744.00, just for the last six months. Between its position as one of the largest employers in Walton County and its economic impact on the

---

[1] Sales figures are found in Exhibit A to Attachment 5.

region, the Restaurant is of substantial importance to the area.

The Blue Willow Inn Gift Shop, Inc. ("Gift Shop") was created in 1993 to retail the Van Dyke's cookbooks and Restaurant-related memorabilia and gifts. It adjoins the Restaurant on Tract 2, Attachment 2.

These four affiliated Chapter 11 cases were filed on July 20, 2010 to stop the foreclosure of the real property on which the Debtors operate their businesses. Since the filing, the Debtors have acted as procedurally consolidated debtors-in-possession under 11 U.S.C. §§ 1107(a) and 1108.

The Debtors suffered a staggering loss when Co-Debtor and CEO of the entity-debtors, E. Louis Van Dyke, died unexpectedly on Thanksgiving Eve, 2010. Since the Debtor's inception, Mr. Van Dyke had been the inspiration and operations manager of the entity Debtors' operations. Upon his death, Mr. Van Dyke's widow, Billie R. Van Dyke, assumed operational control of the businesses. Mr. Van Dyke's death made it impossible to propose a plan of reorganization until now.

In June 2007, Debtors Louis Van Dyke and Billie R. Van Dyke, became indebted to Wells Fargo's predecessor, Wachovia Bank, for $490,000.00 secured by Magnolia Hall, a circa 1910 Greek Revival mansion located on 1.2822 acres at 147 N. Cherokee Road, Social Circle, Georgia 30025 ("Magnolia Hall Property"). Magnolia Hall was used as an events and catering facility. On October 9, 2008, the Van Dykes borrowed an additional $100,000.00 from Wells Fargo also secured by the Magnolia Hall Property. The Magnolia Hall debt is guaranteed by the Restaurant, Gift Shop, Village and Mrs. Van Dyke. The legal description of Magnolia Hall is in Attachment 4 hereto.

Pursuant to the Consent Order entered August 2, 2011 (Doc. No. 171), Debtors are surrendering Magnolia Hall to the first secured lender on the property, Wells Fargo Bank, N.A. ("Wells Fargo") as being unnecessary to the Restaurant's continued reorganization and burdensome to the reorganization efforts.

On December 4, 2007, all Debtors executed promissory notes or guaranties for a construction loan to build the Village. Security for the construction loan is comprised of the 7.112 Acres upon which is located the Restaurant, Gift Shop, Village and Office Building. All Debtors guaranteed the construction loan.

Debtors executed an interest rate swap agreement with Wells Fargo whereby the bank was obligated to make monthly payments to the Restaurant based upon a variable rate on a specified sum and the Debtors were obligated to the bank to make payments based on a fixed rate on the same specified sum. This was a gamble that the Debtors lost resulting in more than $200,000.00 in additional debt secured by the Restaurant, Gift Shop, Village and Magnolia Hall Properties. All obligations of Wells Fargo are cross-collateralized and guaranteed by all Debtors.

On June 1, 2009, Debtors E. Louis Van Dyke and Billie R. Van Dyke executed a deed to secure debt of the 7.112 Acres to the Downtown Development Authority of Social Circle (the "DDA"). As part of conduit loan transactions, the DDA, in turn, assigned its interest to the Georgia Department of Community Affairs ("GDCA"). The GDCA loaned the Debtors $250,000.00 secured by a deed to secure debt filed June 1, 2009. Also, on June 1, 2009, the DDA executed a deed to secure debt to the Georgia Cities Foundation, Inc., which loaned Debtors $250,000.00. On July 23, 2009, the DDA executed a deed to secure debt and assigned title to One Georgia Authority which also invested $250,000.00 in the Debtors. Most of the funds from these governmental creditors were used to pay down the Wells Fargo loan.

The Debtors experienced financial difficulty when, in 2008, construction of the Village was complete. Pre-construction, all seven units of the Village were leased. Due to the unprecedented recession commencing in 2007, by 2008 all of the pre-construction tenants had defaulted on their agreements. As the recession continues, it has been very difficult to lease the Village retail units.

Press reports about an impending foreclosure of the Restaurant Property in mid-2010 caused the Restaurant's business to drop significantly. Such press reports and Mr. Van Dyke's death led to a wide spread misbelief that the

Restaurant had closed. In has taken concerted efforts by the owner and staff of the businesses to bring profitability back up to close to 2009 levels.

All Debtors operate from an office located in a former house adjacent to the Restaurant on N. Cherokee Road, Social Circle, Georgia 30025 (the "Office Building"). The Office Building is to be surrendered to the first lien holder, Wells Fargo, as unnecessary to the Restaurant's reorganization and without equity. The Office Building is Tract 1 in Attachment 2.

On March 1, 2011, all real property which had been jointly owned by E. Louis Van Dyke and Billie R. Van Dyke was transferred to Billie R. Van Dyke pursuant to her Years Support Petition filed in the Probate Court of Walton County, Georgia, upon Mr. Van Dyke's death. Pursuant to the Years Support Order, all 2010 property tax obligations were deemed paid. Mr. Van Dyke's personal property was also inherited by Mrs. Van Dyke, including his stock in the Debtor companies.

In March 2011, Debtors engaged a turn-around consultant, J.D. Holmes of Holmes & Associates, Inc. As a result of Mr. Holmes' efforts to build business for the Restaurant while reducing labor and food costs, the Restaurant has been returned to profitability. See Section VI Financial Information below for further detail.

As part of the plan, the Restaurant is issuing a private offering to sell preferred stock in the Restructured Debtor Restaurant with a per share value of $5000.00. The money to be raised will be used to fund the Plan and make certain repairs to the Restaurant. Attachment 5 hereto is the Private Placement Memorandum and supporting exhibits.

**B. Summary of Activities in Debtor's Chapter 11 Case**

Debtors' Chapter 11 cases were instituted on July 20, 2010. The cases are pending before the United States Bankruptcy Court, Middle District of Georgia, Athens Division. Debtors have continued in possession of its assets and no Trustee has been appointed.

In conjunction with the Chapter 11 petition filings, Debtors filed several motions seeking what is commonly referred to as "first day" relief. This first day relief was designed to meet the goals of (1) continuing Debtors' business operations in Chapter 11 with as little disruption as possible, (2) maintaining the confidence and support of tenants, employees, and other key constituencies, and (3) establishing procedures for the smooth and efficient administration of the Chapter 11 case. The Court approved the requested first day relief in various orders ("First day Orders") entered on July 30, 2010.

Subsequently, Debtors sought and obtained authority to employ:

a) the undersigned as its bankruptcy legal counsel;

b) Chapel and Ward, Inc. as its accountant;

c) King Industrial Realty as its realtor to market commercial property in Walton County, Georgia;

d) Germaine Curtin, Esq. as its special counsel for securities matters;

e) J.D. Holmes of Holmes & Associates, Inc. as its turnaround consultant; and

f) United Talking Rock Realty as its realtor to market properties owned by Bille R. Van Dyke located in Dawson County, Georgia.

Debtors also sought and successfully obtained authority to use cash collateral of Wells Fargo, in the form of rents, on an interim and final basis, in accordance with a budget.

Co-Debtors, Billie R. Van Dyke and Blue Willow Village, Inc. will file voluntary motions to dismiss. Mrs. Van Dyke's circumstances have changed making it preferable for her to dismiss her Chapter 11 proceeding. Conversion to Chapter 7 would not result in a distribution to unsecured creditors. Conversion to Chapter 7 would only allow partial payment on priority tax claims and would generate administrative expenses needlessly.

Likewise, dismissal of the Blue Willow Village, Inc. case will have no effect on the Amended Plan. Mrs. Van Dyke will convey title to all business related real estate (Attachment 2) and leases to the Restructured Debtors for disposition pursuant to the terms of the Amended Plan in full satisfaction of her debt obligations secured by these properties and Magnolia Hall. The dismissal of Mrs. Van Dyke's case will not prejudice creditors or the viability of the Plan.

## IV. SUMMARY OF THE PLAN

Debtors' Plan provides for the satisfaction of all allowed administrative claims on the Effective Date or as soon as practicable thereafter. As to each administrative claim allowed thereafter, payment will be made as soon as practicable.

Debtors' Plan also provides for the satisfaction of all priority tax indebtedness either in cash or over a five year period in installments with interest as provided in 11 U.S.C. § 1129.

### A. Claim(s) of Wells Fargo Bank

Wells Fargo holds a first priority security interest on the 7.112 Acres and the Magnolia Hall Property. The Wells Fargo claim of $2,893,124.09 is to be treated as follows. Reorganized Debtors will retain the 2.408 acres, Tract 2 of Attachment 2, secured to Wells Fargo which contain the Restaurant and Gift Shop. The secured claim for the retained property, including all real estate, personal property and intangibles, is valued at $825,000.00. This secured claim will be paid over ten (10) years at 8% interest in monthly payments of $10,009.53.

Tracts 1 and 3 in Attachment 2 will be surrendered to Wells Fargo for credit on the debt of $500,000.00 on the Village (Tract 3) and $165,000.00 on the Office Building (Tract 1). In addition, Magnolia Hall has been surrendered to the Bank for a value of $475,000.00.

The balance of the Wells Fargo claim, $928,124.09 is undersecured and will be treated as part of Class 2.

Wells Fargo and Mrs. Van Dyke shall execute a reciprocal easement allowing full ingress and egress to the properties to be owned by each and to the retention ponds on Tract 3.

### B. Undersecured and Unsecured Claims

The following creditors have liens subordinate to Wells Fargo on all or part of the 7.112 Acres or on Magnolia Hall: Georgia Department of Community Affairs, One Georgia Authority, Georgia Cities Foundation, Inc., EverHome Mortgage and Sunbelt Builders, Inc. Due to the superior liens held by Wells Fargo, the claims of these creditors will be treated as undersecured claims, as subsets of Class 2.

Undersecured and unsecured claimants will receive a distribution of 4.5% of their allowed claims to be paid in quarterly payments for thirty-six (36) months commencing one month from the Effective Date, without interest.

### C. New Equity Membership Interests

The Blue Willow Inn Restaurant, Inc. is privately enlisting new investors to purchase shares of preferred, voting stock for $5,000.00 per share. Attached as Attachment 5 is the Private Placement Memorandum which sets forth the terms of the offering. Debtors reserve the right to negotiate additional terms with investors if in the best interest of Restructured Debtors, including enlisting one or a few larger investors to reach the equity goal. The funds raised will be used to fund the Plan and infuse new equity into the Restaurant for improvements.

### D. Funding for the Plan

Funding of the Plan shall derive from the operations of the Restaurant and Gift Shop and infusion of new value from the offering of new stock to investors. The Reorganized Debtors will be owned by Billie R. Van Dyke. Mrs. Van Dyke will continue to earn $52,000.00 per year for her employment as manager.

Further, Mrs. Van Dyke will retain her equity interest in the reorganized Debtors. The value of this equity interest will be subject to the new equity preferred membership interests.

**E.     Other Plan Provisions**

Debtors will reject all executory contracts and unexpired leases not previously rejected. All claims arising from the rejection of any executory contracts and unexpired leases shall be treated as general unsecured claims.

# THE ABOVE SUMMARY IS A BROAD OUTLINE OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH HAS BEEN FILED CONTEMPORANEOUSLY HEREWITH.

### V.   DISCUSSION OF BEST INTEREST OF CREDITORS: TREATMENT IN A CHAPTER 11 VS. CHAPTER 7

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Then unsecured creditors are paid from any remaining sales proceeds according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

For the Court to be able to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. After considering the effect that a Chapter 7 liquidation would have on the value of the Debtor's estate, including the costs of and claims resulting from a

Chapter 7 liquidation, the adverse effect of a forced sale on the prices of Debtor's assets, and, the Debtors have determined that confirmation of the Plan will provide each holder of a claim or interest with a recovery that is no less than each such holder would receive pursuant to liquidation of Debtor's assets under Chapter 7 liquidation.

Attached as Attachment 6 is a liquidation analysis (the "Liquidation Analysis") demonstrating the basis for Debtors' belief as stated herein. Since the Liquidation Analysis has not been audited or reviewed by an independent public accountant, no opinion or any other form of assurance as to its accuracy is expressed. The Liquidation Analysis reflects the Debtors' estimate of the value that may be realized by Reorganized Debtors' estates and the potential recoveries that may be available to holders of allowed claims and allowed equity interests if the Reorganized Debtors' assets were liquidated and the proceeds distributed in accordance with Chapter 7 of the Bankruptcy Code. Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors, are subject to inherent economic and competitive uncertainties and contingencies beyond the control of the Reorganized Debtors, and are based upon assumptions with respect to liquidation decisions that are subject to change. Accordingly, there can be no assurance that the values and costs reflected in the Liquidation Analysis would be realized if the Reorganized Debtors' assets were, in fact, to undergo such a liquidation.

For purposes of the Liquidation Analysis, it is assumed hypothetically that a plan of reorganization could not ultimately be confirmed at the confirmation hearing and, on or about that date, the Chapter 11 case is converted to a Chapter 7 case. In connection with the hypothetical commencement of the Chapter 7 case, it is assumed that the roles of the Debtors terminate on or about the hypothetical conversion date and a Chapter 7 trustee is appointed to, among other things, manage the liquidation process and distribute the liquidation proceeds ultimately realized in accordance with the priorities established by the Bankruptcy Code. In such a case, the Chapter 7 trustee would have to consider, and ultimately pursue, one or more recovery strategies other than the Plan.

The classification and dollar amounts of estimated allowed claims incorporated within the Liquidation Analysis are subject to modification pending further analysis and the receipt of additional information with respect to such claims.

## VI. FINANCIAL INFORMATION

### A. Summary of Financial Reports and Projection

Despite the difficulties of the recent past, especially in 2010, the Restaurant is recovering its profitability. Year-to-date in 2011, the Restaurant's profitability is running 5.2%, almost back to the rate pre-foreclosure and pre-bankruptcy, in 2009, when it was 5.7%. The following discussion highlights the historical and *pro forma* financial reports found as exhibits to Attachment 5, the Private Placement Memorandum. These reports demonstrate that by reducing food and labor costs, trimming debt and shedding bankruptcy expenses, the Plan is feasible and in the best interest of creditors.

Mr. Holmes has prepared the exhibits appended to Attachment 5 from the business records and accountant compilations of the Debtors. Attachment 5, Exhibit A, provides income and profit/loss figures from 2008 to 2011 year-to-date. The figures for 2010 demonstrate the impact of the publicity surrounding the threatened foreclosure and bankruptcy. See also, Exhibit B. The numbers for 2011 are on track to approach the profit realized in 2009.

Most of the profits in 2011 have accrued in the last three months through a combination of increased prices and lower costs. As shown on Attachment 5, Exhibit C, food costs as compared to sales have declined from just over 42% in January 2011 to 32% in June as a result of procurement changes. Likewise, as Attachment 5, Exhibit D depicts, labor costs have also declined from just over 40% to 32% sales during the same period. Direct labor costs have declined to 20%. Exhibit D of Attachment 5.

Exhibits E1-E4 of Attachment 5 are *pro forma* financial statements for July through December 2011 demonstrating that the Restaurant can make the payments scheduled in the Plan while timely meeting all ordinary course of business expenses and ending the year with a profit of $2,738.00 (or $29,536.00 after subtracting the on paper loss from the sale of the vehicle). See Exhibit E-1, Attachment 5. It is important to note that total 2011 expenses will include approximately $97,800.00 in bankruptcy-related costs, plus $2,200 for Magnolia Hall.

This projection is based on the Restaurant's actual revenues for the first half of 2011. Plan proponents believe this is a conservative projection. The Restaurant is undertaking more marketing and advertising to increase the

number of guests.  Early efforts have focused on social media because it is virtually without cost.  The response has been far greater than expected.  It is anticipated that a broader based advertising effort will substantially increase customers and further erode the impression that the Restaurant is closed.

Exhibit F of Attachment 5 is a *pro forma* statement projecting 2012 revenues at 90% of those in 2009.  Plan proponents believe this is a conservative estimate.

## VII. ANALYSIS OF CLAIMS AND APPROXIMATE DISTRIBUTIONS TO CREDITORS UNDER THE PLAN

### A. Projected Administrative Expenses

Debtors provide the following as an estimate of administrative expenses incurred and to be incurred in connection with confirmation of the Plan and closing of the Bankruptcy Estate:

| | |
|---|---|
| Bankruptcy Counsel fees and expenses | $25,000.00 |
| Accountants' fees and expenses | $ 5,000.00 |
| U.S. Trustee fees through 3rd quarter 2011 | $ 5,200.00 |
| U.S. FoodService Administrative Claim under 11 U.S.C. § 503(b)9) allowed by the Court by Order entered 3/4/11 | $ 11,504.30 |
| Sysco Administrative Claim under 11 U.S.C. § 503(b)(9) allowed by the Court by Order entered 3/4/11 | $ 11,155.59 |
| Other miscellaneous administrative expenses | $    250.00 |

      **Total administrative expenses incurred in
connection with confirmation and closing**    $58,109.89


B. **Projected Priority Claims**

As of the date of this Disclosure Statement, the priority claims of the Restaurant and Gift Shop totaling $248,806.88 are as follows:

| <u>Name Of Claimant</u> | <u>Amount Of Claim</u> |
|---|---|
| Internal Revenue Service | |
|     Restaurant | $105,035.51 |
|     Gift Shop | $ 15,644.15 |
| Georgia Department of Revenue | |
|     Restaurant | $109,672.99 |
| Future Management Corporation d/b/a Phoenix Wholesale Food Service (PACA) | $ 18,454.23 |

The above taxes will be paid on the Effective Date, or as soon thereafter as practical, but in no event later than the end of five (5) years from the Petition Date. If Debtor pays over time, interest will be paid on the tax claim, not to exceed 7.5% per annum. All sums paid to the taxing authorities through the Plan for post-petition priority taxes are to be designated to priority tax liabilities only. The PACA claim will be paid over six (6) months from the Effective Date.

## C. Projected Plan Pay-outs

Projected approximate initial pay-outs under Debtors' Plan are as follows:

| Category or Class of Claim | Initial Payment |
|---|---|
| Administrative Expenses - one time payment | $ 58,105.89 |
| Priority Claims - initial payment | $125,000.00 |
| General Unsecured - initial payment | $ 2,671.00 |
| Wells Fargo first monthly payment | $ 10,009.53 |
| Future Management Corporation d/b/a Phoenix Wholesale Foodservice | $ 3,075.71 |
| **Total Initial Pay-out** | **$198,862.13** |

## IX. INFORMATION RELEVANT TO THE RISKS POSED TO CREDITORS UNDER THE PLAN

Based on future projections of profitability and the infusion of new capital, Debtors Restaurant and Gift Shop should be able to fund the initial pay-out, as well, the subsequent payments, assuming no catastrophic event occurs to either business.

## X. FEDERAL AND STATE TAX IMPLICATIONS TO CREDITORS

Debtors do not believe that there are any adverse federal and state tax implications to creditors by virtue of the treatment of their claims under the Plan, except to the extent that any creditor has written off all or a portion of its claim against Debtors as a bad debt.

In any event creditors are well advised to consult their tax advisors as to whether the Plan provides any individual adverse tax implications.

## XI. CONCLUSION

Debtors submit that their Plan provides for an orderly and expeditious payment of its indebtedness to its creditors while maintaining a unique and valuable asset to the community. Debtors further submit that the alternative of a Chapter 7 liquidation does not appear to Debtors as a viable method of maximizing recovery to creditors in this case. A pad-locked restaurant is worth far less than an important ongoing concern.

By: _/s/ Billie R. Van Dyke_
    Billie R. Van Dyke